IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **BESSIE JONES**, | : | Case No. 1:04-CV-616 |
| *Administratrix of the Estate on behalf of* | : | |
| Nathaniel Jeffrey Jones, *et al.*, | : | District Judge Susan J. Dlott |
| | : | |
| Plaintiffs, | : | ORDER GRANTING IN PART AND |
| | : | DENYING IN PART |
| v. | : | MOTION TO DISMISS |
| | : | |
| **CITY OF CINCINNATI**, *et al.,* | : | |
| | : | |
| Defendants. | : | |

This matter comes before the Court on the Defendants' Motion to Dismiss the Second

Amended Complaint. (Doc. 28).  For the reasons that follow, the Court **GRANTS** in part and

**DENIES** in part Defendants' Motion.

## I.    BACKGROUND

Nathaniel Jones died in the early morning of November 30, 2003 in the parking lot of a

White Castle restaurant in Cincinnati, Ohio.  Jones stopped breathing after six Cincinnati Police

Officers struggled with him, handcuffed him, and left him face down on the ground.  Firefighters

who arrived later were unable to revive Jones.  Plaintiffs, Jones' grandmother and administratrix

of his estate and Jones' two minor sons, claim that Jones had not been committing any unlawful

act.  They allege that the officers approached Jones, beat him with their PR-24s,[1] used the

combined weight of their bodies to press Jones to the ground and handcuff him, left him face

down on the ground when they should have rolled him over, and did not give Jones necessary

emergency medical care.  Plaintiffs also claim that the firefighters, who were on the scene but

---

[1]     A PR-24 is a side-handle police baton.

left after the police arrived, contributed to Jones' death by not being present and available to provide immediate emergency medical care to Jones.

From this fatal event comes Plaintiffs' Second Amended Complaint (hereafter the "Complaint") (Doc. 25), which alleges that the six officers who struggled with Jones, the three responding firefighters, three supervisory police officers, the City of Cincinnati, the Chief of Police, the Fire Chief, and the City Manager (hereafter "the Defendants")[2] violated Jones' civil rights under the Fourth and Fourteenth Amendments of the United States Constitution.[3] Plaintiffs also allege that the arresting officers, responding firefighters, and city officials wrongfully caused Jones' death in violation of Ohio Rev. Code § 2125.01 and that defendant firefighters are liable for gross negligence.  Plaintiffs claim loss of consortium and seek compensatory damages, punitive damages, and injunctive relief.  Plaintiffs seek redress against all Defendants in their individual and official capacities.

_____

[2]  The sixteen defendants in this action are the City of Cincinnati, Cincinnati Chief of Police Thomas Streicher, Jr., Cincinnati Fire Chief Robert Wright, now former City Manager Valerie Lemmie, the six police officers present during the struggle with Jones (Guy Abrams, James Pike, Joehonny Reese, Jay Johnstone, Baron Osterman, and Thomas Slade), three police sergeants who arrived at the scene after the struggle (Leroy Brazile, James Waites, and Jeffrey Battison), and three Cincinnati firefighters (Gregory Adams, Tyrone Harrison, and Brian Otten).

[3]  The first claim of relief, brought against all Defendants, is expressly pursuant to 42 U.S.C. § 1983 for alleged violations of the Fourth and Fourteenth Amendments.  The third claim of relief, brought against the City, Lemmie, and Streicher, asserts that these defendants have supervisory liability for the officers' wrongful conduct; that they implemented municipal policy and custom allowing officers to use excessive force against citizens; that they failed to train and/or supervise officers on the appropriate use of force; that they failed to discipline officers who use excessive force and do not provide emergency medical care to persons in the course of being apprehended; that they failed to provide necessary equipment or training to officers to allow them to provide emergency aid; and that they failed to train, supervise, and enforce policies for the fire department in responding when police use excessive force.  The third claim of relief, therefore, also is a claim for violation of Jones' Fourth and Fourteenth Amendment rights.

2

The Defendants move to dismiss Plaintiffs' Complaint in its entirety.  Defendants assert that the Complaint fails to state a claim against any of them, that the individual Defendants are entitled to qualified immunity from suit on the federal claims, and that all Defendants are entitled to statutory immunity under Ohio law on the tort and statutory claims.  (Doc. 28 at 1.)

While the crux of the occurrence is outlined above, the following allegations from Plaintiffs' Complaint add clarity to their claims.[4]  Sometime between 3:00 and 5:30 a.m. on November 30, 2003, a White Castle employee called 911 seeking emergency medical care for Jones, who had lost consciousness in the restaurant's parking lot.  City of Cincinnati firefighters arrived but "refused to evaluate treat and/or care" for Jones, who had regained consciousness and reentered the White Castle.  (Doc. 25 at ¶ 30-31.)  Jones then exited the White Castle "walking and dancing" and "continued in a like manner in the parking lot."  (*Id.* at ¶ 33.)  The firefighters contacted the Cincinnati police radio by way of dispatcher and described Jones as being a nuisance.

Officers Pike and Osterman arrived first on the scene.  Pike contacted dispatch and requested a Medical Help Response Team and a supervisor with a tazer.  Pike and Osterman then approached Jones and "tried to subdue him."  (*Id.* at ¶ 37.)  According to Officers Pike and Osterman, the interaction between Jones and the officers began as conversation, and then Jones

_____

[4]  These facts are drawn from the Second Amended Complaint (Doc. 25) and its exhibits, which were attached to the First Amended Complaint (Doc. 20) and incorporated into the Second Amended Complaint by reference.  Exhibits to the Complaint include excerpts of police officer interviews conducted by the Citizen's Complaint Authority regarding the November 30, 2003 incident involving Jones.  The Federal Rules of Civil Procedure provide that "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."  Fed. R. Civ. P. 10(c).  Accordingly, the Court will give due consideration to the officers' interview statements in summarizing the alleged facts of this case.

became aggressive. (Doc. 20 Ex. 1 at 2-3.) At some point, Jones hit Officer Pike and then both officers physically engaged Jones. (*Id.*; Doc. 20 Ex. 2 at 2.) Officer Pike told Jones to put his hands behind his back, but Jones did not comply. (Doc. 20 Ex. 1 at 3.) Officers Pike and Osterman began to strike Jones with their PR-24s, and the three men engaged in a "ground fight." (Doc. 20 Ex. 1 at 3.) The firefighters who had initially arrived at the White Castle in response to the 911 call left the scene after Officers Pike and Osterman began to struggle with Jones.

Officers Abrams, Slade, Reese, and Johnstone arrived at the White Castle parking lot to assist Officers Pike and Osterman. Plaintiffs allege that Abrams, Slade, and Reese began striking Jones with their PR-24s and never allowed Jones to comply with verbal commands to put his hands behind his back or to be placed in a sitting position that would allow air to enter his lungs. Officers Pike and Slade also sprayed chemical irritant in Jones' face. According to the Complaint, "the chemical irritant was sprayed in [Jones'] face while Defendant officers used the combined force of their bodies to press undue weight on [Jones'] back restricting movement of [Jones'] diaphragm resulting in lack of air exchange in his lungs." (Doc. 25 ¶ 43.) Eventually, the officers succeeded in handcuffing Jones. Plaintiffs allege that at no time did the officers disengage or de-escalate as recommended by Cincinnati Police Department Policy 12.545.[5]

---

[5] Plaintiffs claim that CPD Policy 12.545 recommends that police officers disengage or de-escalate and cite as support Exhibit 6. (Doc. 25 ¶ 39.) The exhibit does not support this statement. (Doc. 20 Ex. 6.) Exhibit 6 refers to CPD policy concerning the use of chemical irritant and does not address disengagement or de-escalation. Further, City Manager Lemmie's letter, referred to in paragraph 40 of the Complaint and attached as Exhibit 7, quotes CPD's use of force policy as follows: "Disengagement is a reasonable *option* in consideration of officer safety and the necessity to apprehend immediately. Disengagement ... *may* be an appropriate response to a situation and *should* be considered." (Doc. 20 Ex. 7 (emphasis added).)

Plaintiffs further allege that "Defendant Officers' savage beating and failure to allow [Jones] to submit was done with malice, ill will and intent to harm."  (Doc. 25 ¶ 39.)

Plaintiffs allege that after placing Jones in handcuffs, the officers stood up and walked around to catch their breath from the prolonged struggle.  Jones remained face down on the ground, lying on his stomach with his hands cuffed behind his back.  The officers then rolled Jones onto his back and saw that he was not breathing.  After realizing that the firefighters had left the scene, an officer recalled them to provide medical care to Jones.  (Doc. 20 Ex. 1 at 5.) None of the officers gave Jones respiratory support, mouth-to-mouth, or CPR.  None of the officers had with them a mouth barrier for use in mouth-to-mouth resuscitation.  At some point after the struggle, Police Supervisors Battison, Waite, and Brazile arrived at the scene.  None of the supervisors gave Jones CPR or removed Jones' handcuffs.

The firefighters returned to the White Castle parking lot.  Plaintiffs allege that the officers initially refused the firefighters' request to remove Jones' handcuffs so they could administer emergency aid.  Plaintiffs further allege that the officers' refusal to remove the handcuffs with knowledge of the risk that Jones was suffering from positional asphyxia and potential death as a result showed "callous and deliberate disregard for [Jones'] medical needs." (Doc. 25 ¶ 69.)   According to the Complaint, "Defendant Police Officers willfully, wantonly, and callously failed to provide [Jones] with appropriate emergency medical care after inflicting injury on him and interfered with the administering of emergency care by others," showing a "deliberate indifference" to Jones' medical needs.  (Doc. 25 ¶ 70.)

In support of their claim that the Defendants were aware that Jones was at high risk of death due to positional asphyxia, Plaintiffs point to two sources.  First, Cincinnati Police

Department ("CPD") policy 12.545 Section E states that "[o]fficers may not keep a sprayed individual in a face-down position any longer than necessary to handcuff or end the threat of harm or escape." (Doc. 25 ¶ 55.) Second, in February 2003, the CPD instructed its officers on how to avoid death in custody from positional asphyxiation and provided them with a copy of a Cincinnati Police Academy Training Bulletin titled "Sudden Custody Deaths and Positional Asphyxia." (Doc. 25 ¶ 59; Doc. 20 Ex. 10.) The Bulletin describes a number of factors that increase the risk of positional asphyxia, including cocaine induced delirium, other drug/alcohol use, and obesity. It explains that death from positional asphyxia is precipitated by "a violent struggle" and that there is an increased risk if a struggle lasts longer than three minutes, if the suspect is on his stomach, and where officers use body weight for control directly on the suspect's back. (*Id*.) The Bulletin advises that after a struggle, an officer should "move [the individual] to a seated position. Do not leave the person prone on the ground" and "[l]ook for signs of troubled breathing." (*Id*.) The Complaint alleges that the officers were on notice that Jones was at high risk for positional asphyxia because Jones was obese and had exhibited signs of possible drug or alcohol use.

Plaintiffs allege that although the City was aware of the risks of positional asphyxia, it failed to provide adequate training to officers or to promulgate clear polices addressed at avoiding deaths due to positional asphyxia. Plaintiffs also claim the City failed to discipline officers whose conduct put individuals at risk of death or caused death due to positional asphyxia. Further, they allege that the City failed to provide officers with equipment, such as mouth barriers for use in giving mouth-to-mouth resuscitation, necessary to render basic emergency aid to individuals who suffered from positional asphyxia.

## II.      LEGAL STANDARD ON A RULE 12(B)(6) MOTION TO DISMISS

Rule 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In assessing the sufficiency of a complaint, the Court must follow "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  This accords with the purpose of Rule 12(b)(6), which the Sixth Circuit Court of Appeals has explained "is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993).  In addition to the allegations in the complaint, the court may consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice. *Wyser-Pratte Management Co., Inc. v. Telxon Corp.*, 413 F.3d 553, 560 (6th Cir. 2005) (*citing Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360-61 (6th Cir.2001)).

The defendant, as the movant, bears the burden of demonstrating that the plaintiff has failed to state a claim. *See Bangura v. Hansen*, 434 F.3d 487, 498 (6th Cir. 2006).  Therefore, "[o]n a Fed.R.Civ.P. 12(b)(6) motion, all of the allegations contained in the plaintiff's complaint are accepted as true, and the complaint is construed liberally in favor of the party opposing the motion." *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995).  At the same time, however, the Court "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).  Nor is the Court required to accept as true complaint allegations that are contradicted by public records and other evidentiary materials

of which the Court may take judicial notice. *See Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988, *amended upon denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255, 263 (S.D.N.Y. 2004). Finally, the Court must scrutinize with "special care" a motion to dismiss a complaint filed under a civil rights statute. *See Perry v. McGinnis*, 209 F.3d 597, 603 (6th Cir. 2000).

Defendants filed certain public record documents and a public record videotape of the incident, recorded by an officer's motor vehicle recorder, as exhibits in support of their Motion to Dismiss. (*See* Doc. 13 (Motion to Dismiss Original Complaint) Ex. A-B; Doc. 14; Doc. 28 Ex. A.) As a general rule, the Court may not consider matters outside the pleading when deciding a Rule 12(b) motion. *See* Fed. R. Civ. P. 12(b). The Court's decision whether to consider public records in ruling on a Rule 12(b)(6) motion is discretionary. While Defendants are correct that the Court may take judicial notice of public records without converting the motion to dismiss into a motion for summary judgment, the Court declines to exercise its discretion to consider these matters outside the pleading in ruling on this motion. *Accord Marx v. Janke,* No. 1:02cv050, Order on Motion to Dismiss (S.D. Ohio Sept. 2, 2004) (declining to consider videotapes containing an incomplete recording of protest events in deciding a motion to dismiss). A court may take judicial notice of adjudicative facts that are "not subject to reasonable dispute in that [they are] ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. With respect to the videotape in particular, Plaintiffs argue that it captures only part of the incident and would provide a distorted view of events at issue. (Doc. 30 at 4-5.) Thus, while the video may

accurately reflect a portion of the incident, a reasonable dispute may still exist as to the entirety of the events alleged in the Complaint.  Furthermore, the Court has culled an understanding of that morning's events from the police interview transcripts that were attached as exhibits to the Complaint.  Accordingly, the Court concludes that it is able to properly review the motion to dismiss, and honor the principles underlying the qualified immunity defense, by taking into consideration only the allegations of the Complaint and the exhibits attached thereto.

III.    ANALYSIS

   A.    Plaintiffs' Claims Under 42 U.S.C. § 1983 and Qualified Immunity

Section 1983 is not itself a source of substantive rights but provides "a method for vindicating federal rights elsewhere conferred."  *Graham v. Connor*, 490 U.S. 386, 393-94. Thus, to establish a claim under § 1983, a plaintiff must "identify a right secured by the United States Constitution and deprivation of that right by a person acting under color of state law." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992).  Plaintiffs have done so here, claiming that all Defendants, under color of state law, deprived Jones of rights, privileges, and amenities secured by the United States Constitution, including, inter alia, the Fourth Amendment right to be free from excessive force and the Fourteenth Amendment right of a pretrial detainee to adequate medical care.  While § 1983 permits recovery against public officials who violate an individual's civil rights, these officials are often entitled to qualified immunity from individual liability for damages.  Defendants argue that such is the case here and that all individual Defendants are immune from suit.

Whether a government official exercising a discretionary function is entitled to qualified immunity depends on the objective reasonableness of the official's action.  An official will be

9

entitled to immunity unless his or her action violated a "clearly established" federal right which would have been known to a reasonable person. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). If a plaintiff's allegations fail to state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery. *Mitchell v. Forsyth*, 472 U.S. 511 (1985).

Courts apply a two-step analysis in determining whether a public official facing liability for civil damages is immune from suit. *Dickerson v. McClellan*, 101 F.3d 1151, 1157-58 (6th Cir. 1996). First, the court must determine whether the defendant violated a clearly established constitutional right. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Russo*, 953 F.2d at 1042. Second, the court must determine whether the plaintiff has alleged sufficient facts supported by sufficient evidence to indicate what the officer allegedly did was objectively unreasonable in light of the clearly established constitutional rights. *Dickerson*, 101 F.3d at 1158.

### 1.    Fourth Amendment Right to be Free From Excessive Force

The Supreme Court has interpreted the Fourth Amendment, which guarantees citizens the right "to be secure in their persons ... against unreasonable seizures," as providing the right to be free from excessive force. *Graham v. Connor*, 490 U.S. 386 (1989). Courts must therefore analyze claims that law enforcement officers have used excessive force in the course of an arrest using the Fourth Amendment's "reasonableness" standard. *Id.* at 395. The reasonableness test is not capable of mechanical application but requires careful application of the facts of the case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to

evade arrest by flight." *Id.* at 396. In other words, a court must "ask whether the officer's actions, in light of the totality of the circumstances, were objectively reasonable." *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001) (reversing the district court's ruling that granted defendants' motion to dismiss, finding that the complaint stated a legally sufficient claim of excessive force and that the officers were not entitled to qualified immunity).

Because the amount of force that is reasonable in a seizure depends on a variety of circumstances, and because those circumstances may change throughout the course of a seizure, the Sixth Circuit analyzes excessive force claims in segments. *See*, *e.g.*, *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996). The analysis involves consideration of the reasonableness of "seizure" alone, not whether it was reasonable for the police to create the circumstances that lead up to the seizure. *Id.*; *see also Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993) (scrutinizing only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment because the "Fourth Amendment prohibits unreasonable seizures, not unreasonable conduct in general.")

### a. *The Police Officers*

Looking to the factors mentioned by the Supreme Court in favor of a greater use of force, and considering the allegations of the Complaint and the exhibits attached thereto, the Court concludes that Plaintiffs have sufficiently stated a claim that the six officers who apprehended Jones used excessive force against him. The firefighters called police to the scene because they perceived Jones was creating a nuisance. A nuisance is not the type of crime that permits officers to use a greater use of force. However, that Jones apparently then hit one of the officers reflects the commission of a more serious crime and likewise indicates that Jones posed an

11

immediate threat to the officer's safety.  This factor weighs in favor of a greater use of force. Defendants characterize Jones' actions as resisting arrest.  Plaintiffs, on the other hand, allege that Jones was never given an opportunity to submit to arrest and that he was trying to ward off the officers' blows and to maneuver his body from underneath the officers so he could breathe. If, in fact, Jones was not resisting arrest but was trying to position himself so that he could breathe, the third factor of the analysis does not weigh in favor of a greater use of force.

In determining the reasonableness of an officer's use of force, the Court must view the circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996). However, a Rule 12 dismissal is proper only when it appears beyond doubt that a plaintiff can prove no set of facts in support of his claims, and a court must accept a plaintiff's allegations as true unless plainly contradicted by public records and other evidentiary materials of which the court may take judicial notice.  While the Defendants have cast doubt on Plaintiffs' excessive force claim, the Court cannot say they have met their burden of demonstrating that Plaintiffs can prove no set of facts in support of their claim that the officers violated Jones' Fourth Amendment right.  The Court concludes that the Complaint properly states a § 1983 claim against the six officers who struggled with Jones the morning of his death.

Neither are these officers entitled to qualified immunity on the claim.  The right to be free from excessive force is a clearly established right for purposes of the qualified immunity analysis.  *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004).  This circuit has specifically held that various types of force applied after a suspect has been subdued are unreasonable and a violation of a clearly established right.  *Id.* (citing *Phelps v. Coy*, 286 F.3d

12

295 (6th Cir. 2002), *McDowell v. Rogers*, 863 F.2d 1302 (6th Cir. 1988), *Lewis v. Downs*, 774 F.2d 711 (6th Cir. 1985)).  Specifically, an officer's use of pepper spray against an individual after he was secured and no longer posing a threat is an excessive use of force.  *Id*. at 902-903 (*citing Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994)).  Plaintiffs in this case specifically allege that Officer Slade "sprayed [Jones] after confirming that Officer Pike had already deployed chemical irritant and after [Jones] was prone and multiple sets of handcuffs were being placed on his wrists."  (Doc. 25 ¶ 43.)  The Sixth Circuit also has recognized that putting significant pressure on a suspect's back while that suspect is in a face-down position after being subdued or incapacitated constitutes excessive force.  *Id*. at 903.  Plaintiffs specifically allege that after Jones was face down and was being handcuffed, "[t]he chemical irritant was sprayed in [Jones'] face while Defendant officers used the combined force of their bodies to press undue weight on [Jones'] back."  (Doc. 25 ¶ 43.)  The Complaint additionally alleges that the officers were instructed on the risk factors linked to death in custody by positional asphyxia and knew they were supposed to immediately roll Jones over after handcuffing him.

Given Sixth Circuit precedent, Plaintiffs have alleged facts sufficient to indicate that the officers may have acted unreasonably in their use of force against Jones.  The officers are not entitled to qualified immunity because a reasonable officer in the situation might have known that engaging in the alleged acts violated Jones' right to be free from excessive force.  Defendant's Motion to Dismiss Plaintiffs' first claim against the officers is DENIED.

**b.** **The Firefighters**

Plaintiffs bring their § 1983 claim against the Defendant firefighters as well.  Plaintiffs' Complaint fails to state a claim against the responding firefighters under the Fourth Amendment.

13

The protection of the Fourth Amendment is to be secure against unreasonable seizures. The Complaint directly refutes any notion that the firefighters took part in any seizure of Jones' person. It specifically alleges that the firefighters left the scene after the police officers arrived. Accordingly, the firefighters did not take part in Jones' seizure. The Court therefore GRANTS Defendants' motion as to the first cause of action stating a Fourth Amendment claim against the firefighters and Fire Chief Wright.[6]

### c.    The Police Supervisors

Plaintiffs' Complaint likewise fails to state a claim against the three supervisory police officers under the Fourth Amendment. A supervisory official's failure to supervise, control, or train an offending individual is not actionable unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982). Thus, a supervisory officer who is merely present at the scene of a search or arrest is not subject to liability, but an officer who participates at the scene may be liable for a constitutional violation that occurred during the search or arrest. *See Hall v. Shipley*, 932 F.2d 1147, 1154 (6th Cir. 1991) (*quoting Ghandi v. Police Dept. of the City of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984)); *see also Otero v. Wood*, 316 F.Supp.2d 612, 623-24 (S.D. Ohio 2004) (holding that supervisory officers directly participated in the alleged constitutional violation that occurred when another officer fired a "knee knocker" round at

---

[6]  A municipality cannot be held liable under § 1983 absent an underlying constitutional violation by its officers. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

plaintiff because the officers were present in the immediate vicinity and were arguably deliberately indifferent to plaintiff's need).

The Complaint and its attachments illustrate that the three Defendant Police Sergeants did not arrive at the scene until after the struggle took place between the six police officers and Jones. Like the firefighters, because the police supervisors were not even present at the time of the allegedly unlawful seizure of Jones, the Complaint fails to state a Fourth Amendment claim against them. Thus, the Defendants' motion to dismiss is GRANTED as to the first cause of action stating a Fourth Amendment claim against the three supervisory police officers.

### d.      *Municipality/City Officials*

Plaintiffs allege that Jones' death was the direct result of the City's unwritten custom and/or policy of allowing their officers to abandon the written City policies at the unilateral discretion of the officers and firefighters. As a result, Plaintiffs allege, the City is the "moving force" behind the officers' beating and killing of Jones. A municipality cannot be held liable under § 1983 absent an underlying constitutional violation by its officers. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Because Plaintiffs have sufficiently stated a § 1983 claim against the Defendant police officers, and because they allege that the City has a policy that was the moving force behind the allegedly unconstitutional conduct, the Court finds that Plaintiffs have sufficiently stated a § 1983 claim against the City and the police department policymakers Streicher and Lemmie.

The doctrine of respondeat superior is inapplicable to §1983 actions. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691-94 (1978). A municipality can be held liable for a constitutional violation only when execution of the municipality's policy or custom inflicts the alleged injury.

*Id.* at 694.  The official policy or custom "must be the moving force of the constitutional violation in order to establish the liability of a government body under § 1983."  *Polk County v. Dodson*, 454 U.S. 312, 326 (1981).  Additionally, a municipality may ratify the acts of its employees–and thus subject itself to § 1983 liability–if it fails to meaningfully investigate alleged constitutional violations.  *See Otero*, 316 F.Supp.2d at 627-28 (holding that "evidence that a municipality inadequately investigated an alleged constitutional violation can be seen as evidence of a policy that would condone the conduct at issue").

Plaintiffs allege, inter alia:

- "[A] continuing and pervasive pattern of civil rights abuses by the City of Cincinnati police officers against persons who live within the City."  (Doc. 25 ¶ at 5.)

- "[T]he deliberate indifference of the City in failing to adequately train, supervise and discipline police officers."  (*Id.*)

- "[A] continuing pattern of civil rights abuses ... that results from the Defendant City's deliberate conduct in establishing policy and custom that encourages and acquiesces in Fourth and Fourteenth Amendment rights violations."  (*Id.* at ¶ 18.)

- "Defendants' ... failure to stand ready to provide emergency medical care when faced with substantial likelihood of injuries, were the direct result of the City's unwritten custom and/or policy of allowing their officers to abandon the written City policies at [their] unilateral discretion ....  As a result of Defendant City's 'unwritten' policies and customs, deliberate indifference, and deliberate conduct as described above, the City is the 'moving force' behind [Defendant Officers'] act of beating and killing Mr. Jones."  (*Id.* at ¶ 22.)

- "[P]olicies, practices and customs of these Defendants, that allowed Officers to use excessive force against citizens, and to subject persons to outrageous, unreasonable and inhuman treatment that leads to serious injury and death."  (*Id.* at ¶ 78.)

- "Defendants Streicher, Lemmie and the City of Cincinnati failed to discipline any of the Officers who aggressively approached [Jones] instead of awaiting [Mental Health Response Team] or a supervisor....  Their refusal to discipline the Officers effectively acted to ratify the conduct, and further evidences the existence of pre-

existing policy and custom of allowing Officers to engage in such conduct." (*Id.* at ¶ 82.)

This Court has previously held that similar allegations are specific enough to satisfy the notice pleading requirement. *See Marx v. Janke,* No. 1:02cv050, Order on Motion to Dismiss (S.D. Ohio Sept. 2, 2004). Accordingly, Plaintiffs' allegations that the City had an official policy or custom that was the moving force behind the alleged violation of Jones' constitutional rights are sufficient to survive Defendants' motion. The Court DENIES Defendants' Motion to Dismiss as to Plaintiffs' Fourth Amendment Claim against the City, Lemmie, and Streicher.

### 2. Fourteenth Amendment Right to Adequate Medical Treatment

The Fourteenth Amendment guarantees protection to individuals against arbitrary action of the government. "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (*citing Collins v. Harker Heights*, 503 U.S. at 129). The cognizable level of executive abuse of power is that which "shocks the conscious." *Id.* The United States Supreme Court has held that "deliberate indifference" to the serious medical needs of pretrial detainees is sufficiently shocking to constitute a substantive due process violation. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983); *see also Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The deliberate indifference standard requires that the defendants knew of and disregarded a substantial risk of serious harm to a detainee's health and safety. *Farmer v. Brennan*, 511 U.S. 825, 835-37 (1994).

The parties disagree as to whether "deliberate indifference" is the appropriate standard in this case. Jones argues that it is, citing, for example, *Massachusetts General* and *Lewis*. Defendants, on the other hand, argue that the "deliberate indifference" standard is not applicable in this case because it applies only in situations where the defendant has adequate time to

17

deliberate over whether the detainee required medical care.  Rather, Defendants contend that Plaintiffs must plead that the officers acted maliciously and with the intent to cause harm, a heightened standard applicable to noncustodial situations.  The Supreme Court's discussion in *Lewis* is illustrative.

In *Lewis*, the parents of a motorcycle passenger killed in a high-speed police chase of the motorcyclist brought a § 1983 claim against the county, the sheriff's department, and the deputy alleging deprivation of the passenger's substantive due process right to life.  The Court described that a government official's allegedly unconstitutional action will fall somewhere along a spectrum of culpability:

> [L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process....  It is, on the contrary, behavior and the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level....  "Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property."... Whether the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but "less than intentional conduct..." is a matter for closer calls.

*Lewis*, 523 U.S. at 849 (internal citations omitted).  Thus, whether conduct falling between negligence and intent to injure meets the "shocks the conscious" standard depends on the circumstances in each case.  The Court confirmed that "deliberate indifference," which falls somewhere in the middle of the culpability spectrum, satisfies the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial (*citing Mass. Gen. Hosp*, 463 U.S. 239).  The Court also emphasized that the rules of due process are not

subject to mechanical application and that "deliberate indifference that shocks in one environment may not be so patently egregious in another."  *Id*. at 850.  However, the Court noted that the deliberate indifference standard "is sensibly employed only when actual deliberation is practical" (*id.* at 851), and that "liability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations" (*id.* at 853).  Ultimately, the Court held that "a purpose to cause harm" is the requisite level of culpability to give rise to due process liability in a high-speed chase, the same level of culpability required for Eight Amendment liability in prison riot case.  *Id*. at 854.

Case law leads the Court to conclude that the Sixth Circuit Court of Appeals would likely apply the "deliberate indifference" standard in this case.  *See Owensby v. City of Cincinnati*, 414 F.3d 596 (6th Cir. 2005); *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001) (applying the "deliberate indifference" standard to arresting officers in a § 1983 action brought by the estate of a man who died approximately three hours after his arrest as a result of eating drugs); *Sowards v. City of Trenton*, No. 03-2036, 125 Fed. Appx. 31, *39 (6th Cir. Feb. 24, 2005) (applying the deliberate indifference standard to the conduct of police officers who decided to delay medical treatment to an injured suspect after the apartment building had been evacuated).  In *Owensby*, the court held that "deliberate indifference" was the proper level of culpability required to establish a violation of an apprehended suspect's constitutional right to medical care.  The police had beaten Owensby with their batons, placed him in handcuffs, and maced him.  They then placed him in a police cruiser, where he stopped breathing.  The court concluded that deliberate indifference was the appropriate level of culpability because the

officers were capable of actual deliberation in the six minutes between the time Owensby was taken into custody and the time medical care was provided.  *Id.* at 603.

The "key variable" in determining the appropriate level of culpability is "whether actual deliberation is practical, not whether the claimant is in state custody....  Custodial settings ... are not the only situations in which officials may have a reasonable opportunity to deliberate." *Ewolski v. City of Brunswick*, 287 F.3d 492, 511 at n. 5 (6th Cir. 2002).  Plaintiffs have alleged that the Defendant Officers had time to deliberate whether to turn Jones over after the struggle and then whether to give him emergency medical care.  Accordingly, Plaintiffs have alleged acts on the part of the Defendants that fall within the requisite culpability standard to state a claim for a violation of Jones' Fourteenth Amendment rights.

> ### a.    *The Police Officers*

Plaintiffs allege that after struggling with Jones and leaving him face down in handcuffs, the Defendant Police Officers did not check to see if Jones was breathing.  They allege that when the officers rolled Jones over and discovered he was not breathing, they did not provide him with any respiratory support, mouth-to-mouth, or CPR.  They further allege that the officers did not immediately remove Jones' handcuffs so that the firefighters could quickly give Jones emergency medical care.  Neither did the three police supervisors to arrive on the scene attempt to provide medical aid to Jones, nor did they order any officer to do so.  Plaintiffs claim that these actions and inactions violated Jones' right under the Fourteenth Amendment Due Process Clause to obtain medical care for serious medical needs.  These facts, together with Plaintiffs' allegations that the officers "willfully, wantonly, and callously failed to provide [Jones] with appropriate emergency medical care" and "showed deliberate indifference to [Jones'] medical

20

needs" (Doc 25 ¶ 70), state a claim against the police officers for violation of Jones' Fourteenth Amendment rights.

The Court likewise concludes that the Defendant officers are not entitled to qualified immunity. Defendants argue that the officers should be immune from the Fourteenth Amendment claim against them because "[i]n November 2003, the contours of a fleeing and resisting suspect's right to immediate medical care was not clearly established in a particularized sense." (Doc. 28 at 11). The Court disagrees. First, Jones was not fleeing, and there is a reasonable dispute as to whether and at what point he was resisting arrest. Thus, whether precedent established the right of a fleeing and resisting suspect's right to immediate medical care is irrelevant. Second, the determination of whether Jones, as a pretrial detainee, had a right to immediate medical care was "clearly established" by virtue of *Revere v. Massachusetts General Hospital*, 463 U.S. 239 (1983). Jones was in the custody of the police at the time he required immediate medical attention. That he was not a prison inmate does not nullify his right to care, as "it need not be the case that the very action in question has previously been held unlawful." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992). Rather, "in the light of preexisting law the unlawfulness must be apparent." *Id.* The Court DENIES the motion to dismiss Plaintiffs' § 1983 claim alleging that the six officers violated Jones' Fourteenth Amendment rights.

### b. The Firefighters

Plaintiffs allege that the Defendant firefighters refused to evaluate and treat Jones when they first arrived at the White Castle restaurant in response to the 911 call. Jones was conscious at that time and was in the parking lot "walking and dancing." Plaintiffs further allege that the

Defendant firefighters "began to watch [the police] beating [Jones] and, with knowledge of risk and foreseeable injury to [Jones] caused by the severe beating with a PR-24, left the scene of the incident."  (Doc. 25 ¶ 57.)

The Sixth Circuit Court of Appeals has held that an official can be found liable under § 1983 for denying a prisoner humane conditions if that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Taylor v. Franklin County*, No. 02-6470, 2004 WL 1595203 at **5 (6th Cir. July 14, 2004) (*citing Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  The Complaint thus states components of a § 1983 violation claim against the firefighters.

However, referring again to the qualified immunity analysis employed by the Sixth Circuit, the Court finds that the Defendant firefighters are entitled to qualified immunity on the § 1983 claim against them.  *See Dickerson v. McClellan*, 101 F.3d 1151, 1157-58 (6th Cir. 1996). Plaintiffs have failed to demonstrate that the Defendant firefighters violated a clearly established constitutional right.  While Jones' right to medical care after being injured by the police officers was clearly established, Plaintiffs have failed to guide this Court to precedent that clearly establishes an individual's constitutional right to have firefighters remain on the scene during the course of an arrest.  At the time Jones' medical need arose, the firefighters simply were not present.  Neither did Jones have a constitutional right to medical care before he was detained by the police.  Thus, that the firefighters did not initially treat Jones when they arrived at the White Castle restaurant does not state a claim under § 1983.  Accordingly, Defendant's Motion to

Dismiss is GRANTED as to Plaintiffs' § 1983 claim against the firefighters for violation of Jones' Fourteenth Amendment rights in grounds of qualified immunity.

### c.    The Police Supervisors

The Complaint alleges that Defendants Battison, Waite, and Brazile, police sergeants with supervisory responsibility for the officers on the scene, violated Jones' Fourteenth Amendment right to care for a serious medical condition.  It alleges that these officers arrived at the scene and were aware that Jones was not breathing and that his handcuffs should be removed, but none of them rendered aid or removed the handcuffs, nor did they order any officer to do so. Supervisory liability would attach for the acts of the officers if the sergeants "did more than play a passive role in the alleged violation or showed mere tacit approval of the goings on."  *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999) (*citing Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (1989)).  Supervisory liability requires more than a showing of negligence. *Id*. Because the Complaint alleges that these officers were present and participated in the deprivation of medical to Jones, and for the same reasons that the officers are not immune from suit, the Court DENIES Defendants' motion to dismiss the § 1983 claim against the supervisory officers.

### d.    Municipality/City Officials

Plaintiffs allege that the City's inadequate training and policies and practices directly caused Jones' death.  Specifically, Plaintiffs claim that the City was aware of the risks of positional asphyxia but failed to provide adequate training to officers, train them in CPR, provide them with standard emergency medical equipment such as mouth barriers, or promulgate clear policies addressed at avoiding such deaths.  Plaintiffs additionally claim that the City, Lemmie,

and Streicher failed to discipline officers who did not provide medical care to persons injured in the course of being apprehended and failed to properly train, supervise, and enforce policies for the fire department in responding when police officers use excessive force.

The Supreme Court has acknowledged that an allegation of "failure to train" can be the basis for municipal liability under § 1983. *City of Canton v. Harris* 489 U.S. 378, 387 (1989). However, "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact." *Id.* at 388 (emphasis added). A policymaker's deliberate indifference can be inferred when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights." *Id.* at 390. Thus, "[i]n resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform," and "the identified deficiency in a city's training program must be closely related to the ultimate injury." *Id.* at 390-91.

The Court incorporates its discussion of municipal liability set forth in Section III.A.1. herein. Furthermore, the Complaint specifically alleges that the City's failure to train the officers in emergency medical care–particularly in light of its awareness of the possibility of death due to positional asphyxia following a violent struggle–constituted a custom and/or policy that was the "moving force" behind the alleged constitutional violation. The Complaint also alleges that this policy resulted in Jones' death. Accordingly, the Court DENIES Defendants' Motion to Dismiss as to Plaintiffs' Fourteenth Amendment Claim against the City, Lemmie, and Streicher.

24

To summarize, Plaintiffs' § 1983 claim remains as to the Police Officers (for the alleged Fourth and Fourteenth Amendment violations), the Police Supervisors (for the alleged Fourteenth Amendment violation), the City, Chief of Police Streicher, and City Manager Lemmie (for the alleged Fourth and Fourteenth Amendment violations).  The Defendants' Motion to Dismiss is GRANTED as to the § 1983 claim against the Firefighters and Fire Chief Wright.

### B. Plaintiff's Claims Under Ohio Law

Plaintiffs bring five claims under Ohio law: wrongful death pursuant to Ohio Rev. Code § 2125.01, assault, battery, gross negligence, and loss of consortium.[7]  Defendants argue that all defendants are entitled to statutory immunity against these claims pursuant to § 2744.03 of the Ohio Revised Code, which provides limited immunity to political subdivisions and their employees so long as the employees did not act "with malicious purpose, in bad faith, or in a wanton or reckless manner."[8]  Ohio Rev. Code § 2744.03.  Plaintiffs argue that the claims should stand as the Complaint makes allegations that support a finding of wanton and malicious conduct on the part of the Defendants.

---

[7]  In the Preliminary Statement of their Complaint, Plaintiffs state that this is an action seeking damages for "assault, battery, wrongful death, and gross negligence."  (Doc. 25 at 5.) However, Plaintiffs do not designate assault or battery as claims of relief and do not discuss these claim in the body of the pleading.  However, because assault and battery are specified in the preliminary statement, the Court will treat these as additional claims for the purposes of Defendants' Motion.

[8]  As a preliminary matter, the Court addresses Plaintiffs' contention that the Political Subdivision Tort Liability Act, as codified in Revised Code Chapter 2744, is unconstitutional and thus provides Defendants no basis for a dismissal.  Plaintiffs' argument is incorrect.  The Sixth Circuit Court of Appeals recently confirmed that the Act is constitutional, noting that no majority decision of the Supreme Court of Ohio has held otherwise.  *Ellis v. Cleveland Municipal School Dist.*, 455 F.3d 690, 697 (6th Cir. 2006).

### 1.     Wrongful Death

Plaintiffs bring their wrongful death claim against all Defendants except the City.  The Complaint alleges that "Defendant Officers' savage beating and failure to allow [Jones] to submit was done with malice, ill will and intent to harm."  It further alleges that "Defendant Police Officers willfully, wantonly, and callously failed to provide [Jones] with appropriate medical care after inflicting injury on him."  (Doc. 25 ¶ 70.)  Plaintiffs support their assertion that the officers' behavior toward Jones was malicious with the following alleged facts: the officers were aware of the risk of death due to positional asphyxiation and that Jones was at high risk for such a death given his physical build, obvious use of intoxicants, and the prolonged struggle; that despite this knowledge the officers left Jones lying on his stomach while they caught their breath after the struggle; and that after seeing he was not breathing, none of the officers, including the later-arriving supervisors, rendered medical aid to Jones.  Furthermore, at least some of the defendants were aware that Jones' handcuffs needed to be removed before firefighters could provide medical care, but none of the officers removed the cuffs after Jones stopped breathing and before the firefighters arrived.  Because Plaintiffs have pleaded facts that, if true, could indicate that the officers acted maliciously or in bad faith, neither the officers nor the police supervisors who were also present at the scene are entitled to immunity under Ohio Rev. Code § 2744.03.

With respect to the firefighters, Plaintiffs allege that they refused to evaluate and treat Jones when they first arrived at the scene, at which time Jones was walking and dancing in the parking lot, and that they left the scene of the incident "with knowledge of risk and foreseeable injury" to Jones.  As support for their allegation that the firefighters left the scene despite

26

knowing that Jones was likely to require emergency medical care, Plaintiffs cite to the investigative interview of Firefighter Harrison, in which he said, "I knew that when the police get on the scene with someone, it's how Miss Daniels and Mr. Jones acting?  If something was going to come up, I didn't want to see it.  I didn't want to be privy to it."  (Doc. 20 Ex. 16 at 2.)

According to the Ohio Supreme Court, the standard for wanton misconduct is high, defining it as the failure to exercise any care whatsoever and noting that "mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor."  *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 356, 639 N.E.2d 31 (1994).  Mindful that it may not dismiss a claim under Rule 12(b)(6) unless it appears beyond doubt that Plaintiffs can prove no set of facts in support of their claim, the Court concludes that the Defendants have failed to demonstrate that the firefighters are entitled to statutory immunity on the wrongful death claim.

Finally, Defendants argue that Streicher, Wright, and Lemmie are entitled to the same immunity granted to the City under Revised Code § 2744.02(A) because "[u]nder Ohio law, when a party sues an employee of a political subdivision in his official capacity he is protected by the immunity which protects the political subdivision itself."  *Oswald v. Lucas Cty Juvenile Detention Ctr.*, No. 99-3771, 2000 WL 1679507 (6th Cir. Oct. 30, 2000).  The Court agrees that these Defendants are immune in their official capacities.  However, the Complaint expressly pursues its wrongful death cause of action against these city officials in both their official and individual capacities.  As the Defendants have set forth no argument with respect to the propriety of the wrongful death claim against these Defendants in their individual capacities, they have not met their burden of proving that dismissal of the claim is warranted.

Therefore, the Court DENIES Defendants' Motion to Dismiss Plaintiffs' third claim of relief under Ohio Revised Code § 2125.01 for wrongful death as to all Defendants.

### 2.    Assault and Battery

To the extent Plaintiffs' Complaint asserts claims against the Defendants for assault and battery, the Court dismisses them as to Defendants firefighters, police supervisors, Police Chief Streicher, City Manager Lemmie, and Fire Chief Wright.  None of these Defendants were present at the scene when the six police officers struggled with Jones, thus Plaintiffs can prove no set of facts that would entitle them to relief on these claims.  To the extent the Complaint asserts assault and battery claims against the City, the Court finds the City is immune pursuant to Ohio Rev. Code § 2744.02(A)(1), providing that "a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."  Finally, as to the police officers, the attachments to the Complaint reveal that at some point Jones hit Officer Pike.  Accordingly, the officers were entitled to make physical contact with Jones for the purpose of effectuating his arrest.  *See Hale v. Vance*, 267 F. Supp. 2d 725, 736 (S.D. Ohio 2003).  The Court therefore GRANTS Defendants' Motion to Dismiss Plaintiffs' claims for assault and battery against the Defendants.

### 3.    Gross Negligence

Plaintiffs bring a claim against the Defendant Firefighters for gross negligence.  As discussed in the preceding section, employees of a political subdivision are immune from suit under Ohio Rev. Code § 2744.03(A)(6) unless the employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner.  The allegation of gross negligence is not sufficient to come within the exception to immunity provided by Ohio Rev. Code § 2744.03(A)(6) because gross negligence does not equal malice, bad faith or recklessness.

*Burdine v. Szilagyi,* No. 3:98CV7094, 1999 WL 1491774, *12 (N.D. Ohio 1999).  Accordingly, Defendant's Motion to Dismiss the Plaintiffs' Fourth Claim of Relief is GRANTED.

## 4.      Loss of Consortium

Plaintiffs bring a separate claim for loss of consortium against all Defendants. Defendants argue that Plaintiff Bessie Jones' loss of consortium claim must be dismissed because Ohio law does not extend the claim of consortium to grandparents.  The Court agrees. Pursuant to Ohio Rev. Code § 2125.02(3), damages available in a wrongful death action include "[l]oss of the society of the decedent, including loss of companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, *suffered by the surviving spouse, dependent children, parents, or next of kin of the decedent*."(emphasis added).  Independent of the wrongful death statute, the Ohio Supreme Court has held that a minor child has a cause of action for loss of parental consortium against a third-party tortfeasor who negligently or intentionally causes physical injury to the child's parent. *Gallimore v. Children's Hosp. Med. Ctr.*,  67 Ohio St.3d 244, 244, 617 N.E.2d 1052 (1993).  The court did not, however, extend filial consortium claims to the grandparents of emancipated grandchildren.

The case cited by Plaintiffs in support of their position, *Rolf v. Tri-State Motor Transit Co.*, 91 Ohio St.3d 380 (2001) holds that adult emancipated children may recover for loss of parental consortium.  It does not address whether a grandparent can recover for loss of a grandchild's consortium. Accordingly, Defendants' Motion to Dismiss Plaintiffs' loss of consortium claim is GRANTED as to Plaintiff Bessie Jones and DENIED as to Jones' two minor sons.

30

**IV.     CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss (Doc. 28) is **GRANTED** as to

Plaintiffs' § 1983 claim asserting Fourth Amendment violations against Defendant Firefighters,

Police Supervisors, and Fire Chief Wright; **GRANTED** as to Plaintiffs' § 1983 claim asserting

Fourteenth Amendment violations against Defendant Firefighters and Fire Chief Wright;

**GRANTED** as to Plaintiffs' assault and battery claims against all Defendants; **GRANTED** as to

Plaintiffs' gross negligence claim against the Firefighters, and **GRANTED** as to Bessie Jones'

loss of consortium claim.  Defendants' Motion as to all remaining claims is **DENIED**.

IT IS SO ORDERED.


_____s/Susan J. Dlott_____
Susan J. Dlott
United States District Judge

31