Case: 1:04-cv-00616-SJD Doc #: 119 Filed: 06/04/10 Page: 1 of 20 PAGEID #: 2098

**1 (Pages 1 to 4)**

| Jones, B. vs. City of Cinti. | JOHNSTONE, J. | 9/9/2009 |
|---|---|---|

## Page 1

```
 1      UNITED STATED DISTRICT COURT
 2       SOUTHERN DISTRICT OF OHIO
 3          WESTERN DIVISION
 4
        ---------------------------------
 5                              :
    BESSIE JONES, ADMINISTRATRIX :
 6  of the ESTATE of NATHANIEL   :
    JONES, DECEASED, et al       :
 7                               : CASE NO.
        Plaintiffs,   : 1:04CV616
 8                    :
        vs.           :
 9                    :
    CITY OF CINCINNATI, et al.,  :
10                               :
        Defendants.   :
11                    :
    ---------------------------------
12
13
14   DEPOSITION OF:    JAY JOHNSTONE
15   TAKEN:       By the Plaintiffs
16   DATE:        September 9, 2009
17   TIME:        Commencing at 9:26 a.m.
18   PLACE:       Offices of:
                  Freking & Betz LLC
19                525 Vine Street
                  Sixth Floor
20                Cincinnati, Ohio  45202
21   BEFORE:      Barbara A. Thacker, RPR
                  Notary Public-State of Ohio
22
23
24
```

## Page 2

```
 1  APPEARANCES:
 2    On behalf of the Plaintiffs:
 3       TOD J. THOMPSON, ESQ.
            of
 4       Freking & Betz LLC
         525 Vine Street
 5       Sixth Floor
         Cincinnati, Ohio  45202
 6
      On behalf of the Defendants:
 7
         PETER J. STACKPOLE, ESQ.
 8          of
         City of Cincinnati
 9       Solicitor's Office
         801 Plum Street
10       Room 214
         Cincinnati, Ohio  45202
11
      On behalf of the Defendant
12    Police Officers in their Individual Capacity:
13       DONALD E. HARDIN, ESQ.
            of
14       Hardin, Lefton, Lazarus & Marks LLC
         Cincinnati Club Building
15       30 Garfield Place
         Suite 915
16       Cincinnati, Ohio  45202
17            - - -
18      S T I P U L A T I O N S
19      It is stipulated by and among counsel
20  for the respective parties that the deposition of JAY
21  JOHNSTONE, a witness herein, may be taken at this time
22  by Counsel for the Plaintiffs as upon Cross-Examination
23  pursuant to the Federal Rules of Civil Procedure; that
24  the deposition may be taken in stenotypy by the notary
```

## Page 3

```
 1  public-court reporter and transcribed by her out of the
 2  presence of the witness; that the transcribed
 3  deposition is to be submitted to the witness for
 4  examination and signature; and that signature may be
 5  affixed out of the presence of the notary public-court
 6  reporter.
 7              I N D E X
 8  JAY JOHNSTONE                          PAGE
 9  CROSS-EXAMINATION BY MR. THOMPSON       4
10  EXAMINATION BY STACKPOLE                -
11  EXAMINATION BY MR. HARDIN               -
12
13
14           E X H I B I T S
15  JOHNSTONE EXHIBITS      MARKED    REFERENCED
16     1                      13
17     2                      53
18  PREVIOUSLY-MARKED          REFERENCED
19    Slade 2              10, 39
20    Slade 3              36
21    Slade 4              44
22
23
24
```

## Page 4

```
 1           JAY JOHNSTONE
 2  of lawful age, a witness herein, being first duly sworn
 3  as hereinafter certified, was examined and deposed as
 4  follows:
 5           CROSS-EXAMINATION
 6  BY MR. THOMPSON:
 7       Q.   Good morning.  We met briefly.  My name is
 8  Tod Thompson, and I, along with others of this firm,
 9  represent the estate of Nathaniel Jones and other
10  Plaintiffs against the City of Cincinnati and other
11  Defendants in this lawsuit.
12            You're familiar with this action, right?
13       A.   Yes.
14       Q.   For the record, could you state and spell
15  your name, please?  Full name.
16       A.   My name is Jay Johnstone.  J-A-Y,
17  J-O-H-N-S-T-O-N-E.
18       Q.   Do you go by Jay?
19       A.   I go by Jay.
20       Q.   You can call me Tod.
21            Do you have a middle name, Jay?
22       A.   Burtram, B-U-R-T-R-A-M.
23       Q.   And Jay, have you ever had your deposition
24  taken before?  Have you ever provided deposition
```

Case: 1:04-cv-00616-SJD Doc #: 119 Filed: 06/04/10 Page: 2 of 20 PAGEID #: 2099

**2 (Pages 5 to 8)**

| Jones, B. vs. City of Cinti. | JOHNSTONE, J. | 9/9/2009 |

**5**

1 testimony?
2  A. Not on this case, no.
3  Q. But you have in other cases?
4  A. Yes.
5  Q. Approximately how many, do you know?
6  A. One.
7  Q. Just one? What did that case involve?
8  A. That case involved myself in uniform
9 patrol and stopping a vehicle for, I believe, a Street
10 Corner or Vice Unit, and it was a case of, I believe,
11 Fourth Amendment illegal search.
12     MR. STACKPOLE: Alleged illegal search.
13     THE WITNESS: Alleged illegal search.
14  Q. When was that case?
15  A. I believe the deposition I gave was 2001.
16 I believe the incident occurred in 1999.
17  Q. And what was the result of that case?
18  A. I do not know.
19  Q. Do you remember who the plaintiff was in
20 that action?
21  A. I do not know.
22  Q. You were a named defendant?
23  A. Yes.
24  Q. Was that arising out of your duties as a

**6**

1 Cincinnati Officer?
2  A. Yes.
3  Q. Was it in Federal Court?
4  A. I don't recall.
5  Q. Were you the only named defendant?
6  A. No.
7  Q. Who else was named?
8  A. Police Officer Tammy Hussels, Police
9 Officer Mike Hudepohl, and a Police Officer Mark Kelly.
10  Q. Mark Kelly?
11  A. Yes.
12  Q. Was there an internal investigation
13 relating to the events that underlined the case?
14  A. Yes.
15  Q. Was that internal investigation in 1999?
16  A. I don't recall.
17  Q. What was the result of that internal
18 investigation?
19  A. I don't recall.
20  Q. You don't? Any other times where you
21 provided deposition testimony?
22  A. Not that I remember, no.
23  Q. I understand that prior to November 30,
24 2003 -- prior to July 19, 2004, rather, you were

**7**

1 involved -- you were the subject of a racial profiling
2 investigation; is that right?
3  A. Yes.
4  Q. Could you tell me a little bit about that?
5  A. I believe I was working third shift on
6 bike patrol and myself and my partner, and I believe
7 another unit, stopped a subject.
8  Q. Who was your partner?
9  A. Police Officer Jason Lamb.
10  Q. Subject was African-American?
11  A. Correct.
12  Q. Why did you stop him?
13  A. I don't recall what the incident was
14 about.
15  Q. During the course of that investigation,
16 did you provide a statement, or were you interviewed?
17  A. I believe I was interviewed.
18  Q. Do you remember who the complainant was?
19  A. I do not.
20  Q. Do you recall what the result of that was,
21 of the investigation?
22  A. I believe it was unfounded.
23  Q. I understand you were also subject of an
24 investigation for poor demeanor, I guess. Do you

**8**

1 recall that?
2  A. No, I do not.
3  Q. But you recall being the subject of more
4 investigations than the racial profiling, right?
5  A. Yes.
6  Q. And the search?
7  A. Yes.
8  Q. And you were subject of an investigation
9 regarding excessive force?
10  A. I don't recall.
11  Q. You don't recall that? Do you know how
12 many times you've been investigated, pursuant to some
13 citizen complaint of some sort?
14  A. No.
15  Q. More than what we've discussed so far?
16  A. I don't remember.
17     MR. THOMPSON: Pete, we don't have any of
18     the files on Jay.
19     MR. STACKPOLE: Okay. You don't have his
20     personnel file?
21     MR. THOMPSON: No. And I don't have
22     anything but the -- I don't have any of the
23     complaint investigations.
24  Q. And you were subject of an investigation

Case: 1:04-cv-00616-SJD Doc #: 119 Filed: 06/04/10 Page: 3 of 20 PAGEID #: 2100

**3 (Pages 9 to 12)**

Jones, B. vs. City of Cinti.    JOHNSTONE, J.    9/9/2009

**9**

1  in the death of Nathaniel Jones as well?
2       A.   Yes.
3       Q.   And you understand that that is the matter
4  that this current case is concerned with, right?
5       A.   Yes.
6       Q.   Well, today's deposition shouldn't be too
7  different from the one that you were involved with
8  before. There are a few rules that we want to adhere
9  to, because the result of today's deposition is going
10 to be a written transcript. That's what Barb is taking
11 down into that machine right there. Everything we say,
12 she's typing into the machine, and in the end, it will
13 look like a script for a play.
14           Because that's going to be the result of
15 the deposition, there are a few things you and I want
16 to do to make sure we get a clear record. First,
17 verbalize everything we communicate. Barb can't get
18 down non-verbal communications: Nods of the head;
19 shakes of the head; any kind of gesture. They just
20 don't get into the record. Okay?
21      A.   Yes.
22      Q.   Second, we want to try to avoid speaking
23 over one another, as people do in regular conversation,
24 because it's hard for Barb to get what two people are

**10**

1  saying at the same time into the record. Okay?
2       A.   Yes.
3       Q.   And third, this is your sworn testimony
4  that we're taking today. And to that end, you want to
5  make sure that you understand my questions. And if
6  there's something that I can do to rephrase or
7  reiterate a question so that you understand it, if you
8  misunderstand a question, just let me know, and we'll
9  attempt, as best as we can, to get you a question that
10 you can answer.
11          If you do answer a question, we have to
12 assume that you understood it. Okay?
13      A.   Yes.
14      Q.   Other than that, if you need a break for
15 any reason whatsoever, just let Pete or Don here know,
16 or me, and we'll accommodate your request. The only
17 rule there is, if there's a question pending, we'll get
18 your response to that question before we take a break.
19 Okay?
20      A.   Yes.
21          (Reference to previously-marked Slade
22          Deposition Exhibit No. 2.)
23      Q.   All right. We've marked some exhibits --
24 previously marked some exhibits. I'd like to show you

**11**

1  what was marked as Slade Exhibit 2. And you can go
2  ahead and look at that portion under where it says,
3  "Policy."
4           Do you recognize Slade Exhibit 2?
5       A.   Yes.
6       Q.   What is your current position?
7       A.   I am a Sergeant in District 4.
8       Q.   District 4?
9       A.   Yes.
10      Q.   Where is that located?
11      A.   It's located in the neighborhoods of Bond
12 Hill, Hartwell, Avondale, Walnut Hills. And it's at
13 4150 Reading Road.
14      Q.   How long have you held that position?
15      A.   It's going to be 13 months.
16      Q.   13 months?
17      A.   No, I'm sorry. 25 months.
18      Q.   25 months. That's when you were promoted
19 to Sergeant?
20      A.   Yes.
21      Q.   When did you start with the Cincinnati
22 Police Department?
23      A.   January, 1998.
24      Q.   And your first position was?

**12**

1       A.   Police officer.
2       Q.   And is that the title you held until you
3  were promoted to Sergeant?
4       A.   I was promoted to Police Specialist in
5  between.
6       Q.   And when were you a Specialist?
7       A.   I believe I was in July of 2006 --
8  promoted in July of 2006.
9       Q.   November 30, 2003, then, you were a police
10 officer?
11      A.   Yes.
12      Q.   What district were you assigned?
13      A.   District 5.
14      Q.   When did you move -- well, was that the
15 first district you were assigned to?
16      A.   Yes.
17      Q.   And other than District 4 and District 5,
18 any other districts you were assigned to?
19      A.   I was assigned to Recruiting.
20      Q.   And when were you assigned to Recruiting?
21      A.   I believe it was January, 2006.
22      Q.   And how long were you assigned to
23 Recruiting?
24      A.   Until July, 2007.

Case: 1:04-cv-00616-SJD Doc #: 119 Filed: 06/04/10 Page: 4 of 20  PAGEID #: 2101

**4 (Pages 13 to 16)**

| Jones, B. vs. City of Cinti. | JOHNSTONE, J. | 9/9/2009 |
|---|---|---|

**13**

1  Q. Did you request that assignment?
2  A. Yes.
3  Q. Why did you request it?
4  A. I was interested in working in that unit.
5  Q. And why did you leave that unit?
6  A. Because of the promotion to Sergeant.
7      (Johnstone Deposition Exhibit No. 1 was
8      marked for identification.)
9  Q. You have been handed what's been marked
10 Johnstone Exhibit 1. And with reference to Slade
11 Exhibit 2 the Mental Health Policy there, you are not
12 an MHRT certified officer; is that true?
13 A. No, that's incorrect.
14 Q. You are MHRT certified?
15 A. Yes.
16 Q. When did you achieve certification?
17 A. I'm not sure. I believe it might have
18 been 2004.
19 Q. Was it after the death of Nathaniel Jones?
20 A. Yes.
21 Q. Okay. And Johnstone Exhibit 1 purports to
22 be a record of the training that you've completed
23 through the police department. Is that consistent with
24 your read?

**14**

1  A. Yes.
2  Q. And looking at Page 3, does it comport
3  with your recollection that you received Mental Health
4  Response Team certification training September 12,
5  2005?
6  A. Yes.
7  Q. At least the 12th through the 16th, right?
8  A. Yes.
9  Q. 40 hours of training?
10 A. Yes.
11 Q. Have you received any other training in
12 mental health response?
13 A. Not that I recall.
14 Q. I presume that a component of that
15 training was some training in the MHRT policy?
16 A. The training from the mental health, is
17 that what you're saying?
18 Q. Yes.
19 A. Yes.
20 Q. What other training did you receive to
21 obtain certification in MHRT?
22 A. The 40 hours that you previously stated.
23 Q. What does that include?
24 A. It includes several speakers who represent

**15**

1  mental health departments and mental health agencies.
2  Q. And what do they speak about?
3  A. Mental health response, mental health
4  consumers.
5  Q. What is the purpose of the training that
6  you received, the MHRT certification training?
7  A. What is the purpose?
8  Q. Yes.
9  A. The purpose would be to give the officers
10 a better understanding on how to deal with mental
11 health consumers.
12 Q. And the better understanding with regard
13 to what? I mean, what kind of qualifications did you
14 obtain through the course of that certification, let's
15 say, that a regular beat officer wouldn't have? What
16 kind of knowledge did they give you?
17 A. They just gave us a better understanding
18 of what -- to understand why and how mental health
19 consumers behave the way they do, and how they may tend
20 to react to police officers and first responders.
21 Q. Folks who are suspected mentally ill --
22 strike that.
23     First of all, certification doesn't
24 qualify you to diagnose mental illness, right?

**16**

1  A. Correct.
2  Q. Okay. The certification qualifies you to
3  respond to individuals with suspected mental health
4  issues, right?
5  A. Yes.
6  Q. Okay. And that certification provided you
7  with tools for response to folks who may have mental
8  health issues, right?
9  A. It provided us with knowledge.
10 Q. Knowledge. Okay. Knowledge about ways to
11 communicate with folks who might be mentally ill?
12 A. Yes.
13 Q. I think you said knowledge about how
14 mentally ill individuals may tend to react to first
15 responders, right?
16 A. Yes.
17 Q. How to manage those reactions?
18 A. Yes.
19 Q. You received some training on how to
20 handle folks who are suspected mentally ill in a manner
21 that hopefully will or would minimize the possibility
22 of escalation?
23 A. Yes.
24 Q. And specific training in ways to

Case: 1:04-cv-00616-SJD Doc #: 119 Filed: 06/04/10 Page: 5 of 20 PAGEID #: 2102

5 (Pages 17 to 20)

| Jones, B. vs. City of Cinti. | JOHNSTONE, J. | 9/9/2009 |

**17**

1 de-escalate folks who maybe suffer mental illness?
2     A.    I don't recall any specific training, no.
3     Q.    And prior to receiving that certification,
4 you'd received no training in the handling or response
5 to folks who are suspected mentally ill?
6     A.    That's incorrect.
7     Q.    That is?
8     A.    Yes.
9     Q.    What training have you received?
10     A.    In the Police Academy, there had been some
11 training.
12     Q.    And your certification indicates, though,
13 that you've had much more extensive training. You
14 passed a course in MHRT, right?
15     A.    From the 2005 training, yes.
16     Q.    And your certification means that you are
17 more qualified to respond to folks who are suspected
18 mentally ill than someone who's not had the
19 certification training or who has not been certified,
20 right?
21     A.    I would not agree with that.
22     Q.    Why not?
23     A.    I have had possibly more training than
24 those who have not received the training. But I would

**18**

1 not state that I am more qualified.
2     Q.    Well, Slade Exhibit 2 is an older version
3 of the policy on handling suspected mentally ill
4 individuals and potential suicides. There have been
5 subsequent revisions, I'm sure, and you're familiar
6 with those, right?
7     A.    Yes.
8     Q.    Nonetheless, the idea is that the police
9 department certifies -- trains and certifies officers
10 in MHRT, precisely so that those officers can take on
11 the role of primary responding officer, in cases where
12 there is suspected mentally ill individuals, right?
13     A.    Yes.
14     Q.    Okay. And is it your understanding that
15 the purpose of that, the purpose of that policy where
16 folks who are MHRT certified are going to be the first
17 responders in such cases is to have the most qualified
18 officers responding to people who are suspected
19 mentally ill?
20     A.    Yes.
21     Q.    You're certified, right?
22     A.    Yes.
23     Q.    That would make you more qualified, right?
24     MR. HARDIN: Objection. You can answer.

**19**

1     Q.    Maybe it's just a matter of deductive
2 necessity, but it seems to me --
3     A.    The concept, yes, is that I should be more
4 qualified.
5     Q.    But you are not in reality?
6     A.    I have received the training and
7 therefore, I should be more qualified, yes.
8     Q.    Okay. Looking at Slade Exhibit 2 -- now,
9 again, this is the policy that was in place in -- well,
10 revised, you'll see down there, "Revised July 1, 2002."
11 You would have been, to some extent, trained on this
12 policy, 12.11, right?
13     A.    Yes.
14     Q.    And you would have read it?
15     A.    Yes.
16     Q.    Would you have been, like, quizzed or
17 tested on it, let's say, as of November 30, 2003?
18     A.    No.
19     Q.    You would have received some training with
20 regard to the existence and import of the policy,
21 right?
22     A.    I'm not quite sure I understand what
23 you're asking.
24     Q.    Okay. You received training, at least to

**20**

1 the extent that you learned that the policy exists?
2     MR. HARDIN: There's going to be an
3     objection to questions regarding the policy.
4     He's identified this as the mental health
5     procedure. But go ahead.
6     Q.    And did you receive any training with
7 regard to the import or purpose of the policy?
8     MR. HARDIN: Objection.
9     A.    Not that I recall.
10     Q.    Okay. Just to be clear, I'm talking about
11 the words there under "Policy."
12     A.    Yes.
13     Q.    Okay. What does "policy" mean to you?
14     A.    "Policy" is what the department has set in
15 place and how they want specific situations handled.
16     Q.    And this is somehow different than
17 procedures?
18     A.    Procedures are a guideline set aside to
19 maintain policy.
20     Q.    Police officers are expected to know
21 policy?
22     A.    Yes.
23     Q.    They are expected to follow policy?
24     A.    Yes.

| Jones, B. vs. City of Cinti. | JOHNSTONE, J. | 9/9/2009 |
|---|---|---|

### 21

1  Q.  Policies are in place to ensure the safety
2  of the public and police officers, right?
3  A.  Yes.
4  Q.  Police officers are required to follow
5  procedure?
6  A.  Yes.
7  Q.  And to know it? To know procedures?
8  A.  They should be very familiar with them,
9  yes.
10  Q.  And as you read Slade Exhibit 2, under
11  there, where you -- the five paragraphs under that
12  heading, "Policy."
13  A.  Yes.
14  Q.  Does that, in your mind, express a policy
15  or procedure?
16  A.  That is a policy statement.
17  Q.  Okay. And then if you go to Page 2.
18  There's a heading that says "Procedure."
19  A.  Yes.
20  Q.  And there's language under that. And in
21  your mind, does that language express procedure?
22  A.  Yes.
23  Q.  Have you had an opportunity to look at the
24  language under the heading "Policy" on Page 1 of Slade

### 22

1  Exhibit 2?
2  A.  Yes.
3  Q.  Would you agree that this policy
4  establishes protocol for MHRT -- well, for response to
5  folks who are deemed MHRT -- I understand the language
6  is, "you are suspected mentally ill."
7      Let me ask that more simply. Is it your
8  understanding that this policy sets out the protocol
9  for -- general protocol for response to folks who are
10  suspected mentally ill?
11  A.  Yes.
12  Q.  And that this policy expresses different
13  responses, provided different circumstances, right?
14  A.  I'm not sure what you're asking.
15  Q.  Well, for example, there are circumstances
16  where an MHRT officer is available -- is not available,
17  where there's an emergency, where there's not an
18  emergency, and so on, right?
19  A.  Yes.
20  Q.  And pursuant to this policy, what is your
21  understanding with regard to MHRT response requirements
22  in a non-emergency situation with a suspected mentally
23  ill individual?
24  A.  I'm not sure what you're asking.

### 23

1  Q.  Well, let's say that a beat officer is
2  called out to a non-emergency situation, and identifies
3  the subject of the call as potentially mentally ill.
4  Calls that into dispatch. In that non-emergency
5  situation, what does the policy require?
6      MR. STACKPOLE: Objection. You can
7  answer.
8  A.  I need for you to explain to me the
9  emergency versus non-emergency. I don't understand.
10  Q.  Well, I guess I'm going to have to ask you
11  to educate me on that, because that's the language in
12  the policy. It says, "If the run is an emergency,"
13  you'll see, and then there's another situation where it
14  says, "If the run is not an emergency." So you're
15  probably much more qualified to tell me what that means
16  than I am.
17  A.  Okay. And what was your question?
18  Q.  Non-emergency situation, what does that
19  mean to you, first of all? Let's start there.
20  A.  Non-emergency?
21  Q.  Yeah.
22  A.  That would be a non life-threatening
23  situation.
24  Q.  Non life-threatening. Would you add

### 24

1  property to that? Non property threatening?
2  A.  No, I would not.
3  Q.  You would not?
4  A.  No.
5  Q.  Okay. And threatening to the life of self
6  or others would be an emergency?
7  A.  Yes.
8  Q.  But an individual who's a threat to
9  property is not an emergency?
10  A.  That would depend on the situation.
11  Q.  Depend on the situation. And what
12  situation would that -- what kind of situation would be
13  an emergency?
14  A.  I can't say specifically which situations.
15  It would all depend on variables in a specific
16  situation.
17  Q.  Okay. Other than possibly a threat to
18  property, depending on the situation, and threat to
19  self, life -- threat to self or others, right? Any
20  other situations that you can think of that would
21  constitute "emergency?"
22  A.  No.
23  Q.  Okay. So with that understanding of the
24  term emergency and non-emergency. In a non-emergency

Case: 1:04-cv-00616-SJD Doc #: 119 Filed: 06/04/10 Page: 7 of 20 PAGEID #: 2104

**7 (Pages 25 to 28)**

Jones, B. vs. City of Cinti.      JOHNSTONE, J.      9/9/2009

## 25

1 situation, where you have an officer's been called out,
2 and the subject of the call is deemed by that officer
3 to be suspected mentally ill. Non-emergency. The
4 individual is not a threat to self, others, or
5 property. What does the policy require?
6      MR. STACKPOLE: Objection. You can
7      answer.
8      A. The policy states if an MHRT officer is
9 available, they will be dispatched.
10      Q. And for what purpose?
11      A. The purpose is for them to become the
12 first responder.
13      Q. And "first responder" means the first
14 intervention with the subject, right?
15      A. Yes.
16      Q. Right. And the purpose of having the MHRT
17 certified officer be the person who intervenes first
18 with the suspected mentally ill subject is for all
19 those reasons that we've already discussed. You've
20 received training on how to communicate with these
21 people. Avoid escalation of circumstances -- or avoid
22 escalation of the situation, and so on. All this stuff
23 that we have already discussed, right?
24      A. I'm not sure what you just asked there.

## 26

1      Q. The purpose -- the whole idea behind
2 having an MHRT certified officer being that first
3 responder is all of the training that we discussed that
4 you've had, right? Because MHRT certified officers are
5 trained to avoid escalation where there's a suspected
6 mentally ill individual. They are trained to have an
7 awareness of the ways MHRT folk might react to them.
8 They are trained to communicate. And so on, right?
9      MR. STACKPOLE: Objection. You may
10      answer.
11      Q. Is that right?
12      A. Yes.
13      Q. And because the policy, as we discussed in
14 this situation, would require that the MHRT officer
15 take the role as the first responder, the beat officer,
16 who's not MHRT certified, in a non-emergency situation,
17 should allow the MHRT certified officer to take the
18 role as primary responder, right?
19      MR. HARDIN: Objection.
20      A. It depends on the situation. If they --
21      Q. Non-emergency.
22      A. Non-emergency?
23      Q. Yeah.
24      A. It would depend on the situation.

## 27

1      Q. Does the policy -- Slade Exhibit 2, I
2 mean, does it lay out any other situations? Any other
3 conditions, that you can see, with regard to that?
4      A. I'm not sure what you're asking me.
5      Q. You have emergency situations and
6 non-emergency situations, right?
7      A. Yes.
8      Q. What other situations are there?
9      A. There could be a situation where the beat
10 officer, as you described, a non-MHRT officer responds
11 to a non-emergency situation and then it escalates
12 rather quickly.
13      Q. Right. So that's where it turns into an
14 emergency?
15      A. Yes.
16      Q. Ignoring that. All right? So take that
17 out of this example. There's neither an emergency nor
18 a situation that has turned into an emergency.
19 Officers recognize MHRT. Called in MHRT. That officer
20 should wait for the MHRT officer to respond, right?
21      MR. STACKPOLE: Objection.
22      MR. HARDIN: Objection.
23      Q. Right?
24      A. No.

## 28

1      Q. That officer should take on the role of
2 primary responder?
3      A. If that officer has first contact.
4      Q. Officer hasn't had any contact whatsoever.
5      MR. HARDIN: Objection to the form of the
6      question. Go ahead.
7      A. I'm not sure what you asked.
8      Q. All right. Beat officer is called out and
9 the subject of the call, the beat officer recognizes or
10 identifies as MHRT. Before he interacts with that
11 person at all, identifies this is an MHRT. It's a
12 non-emergency situation. No threat to property. No
13 threat to the life of self or others. Beat officer
14 calls in an MHRT. Shouldn't the beat officer wait for
15 an MHRT certified officer to arrive on the scene?
16      A. No.
17      MR. HARDIN: Objection.
18      MR. STACKPOLE: Objection.
19      Q. No? So the beat officer should take the
20 role as first responder?
21      A. They can.
22      Q. But the policy says that the MHRT
23 certified officer is to be the primary responder,
24 right?

Case: 1:04-cv-00616-SJD Doc #: 119 Filed: 06/04/10 Page: 8 of 20 PAGEID #: 2105

8 (Pages 29 to 32)

| Jones, B. vs. City of Cinti. | JOHNSTONE, J. | 9/9/2009 |

### 29

1  A. The policy states that will be the first
2  responder when available.
3  Q. When available. So, I mean, what do I
4  have wrong?
5      MR. HARDIN: Objection to the form of the
6      question.
7  A. I'm not sure what you're asking me.
8  Q. You said, no, the beat officer -- you said
9  the beat officer should take the role as the primary
10 responder --
11     MR. STACKPOLE: Objection.
12 Q. -- I think, right?
13 A. All right.
14 Q. Very simple. Where you have a
15 non-emergency situation with a subject who's been
16 identified as MHRT -- called an MHRT. Who should be
17 the first responder?
18     MR. HARDIN: Objection to the form of the
19     question. You may answer.
20     MR. STACKPOLE: Objection.
21 A. An MHRT officer, if they are available.
22 Q. Okay. All right. And in order for that
23 to occur, the beat officer should wait to allow that
24 MHRT certified officer to be the first responder,

### 30

1  right?
2      MR. HARDIN: Objection.
3  A. No.
4  Q. No. Why not?
5  A. Because this officer has received some
6  training in the Academy and with their experience, they
7  can speak with the MHRT person.
8  Q. Is that what the policy says?
9  A. The policy doesn't stop that from
10 happening.
11 Q. So where it says "MHRT officer on the
12 scene will be the primary officer handling the
13 situation," that also allows, say, a non-certified
14 police officer to be the primary officer handling the
15 situation?
16     MR. STACKPOLE: Objection.
17 A. If the non-MHRT officer responds first on
18 the scene, they can provide first contact with an
19 individual.
20 Q. Where it says, "If the run is not an
21 emergency and no MHRT officer is available, the nearest
22 available MHRT officer from an adjoining district will
23 be dispatched as the primary car." That would also
24 allow a non-MHRT officer to be dispatched as the

### 31

1  primary car?
2      MR. HARDIN: Objection
3      MR. STACKPOLE: Objection.
4  A. I'm not sure what you just asked.
5  Q. I'm trying to understand where the policy
6  allows the beat officer, a non-MHRT beat officer in a
7  non-emergency situation, that has been deemed MHRT, to
8  take on the role as the primary officer?
9      MR. HARDIN: Objection to the form of the
10     question. You may answer.
11     MR. STACKPOLE: Objection.
12 A. The policy does not disallow it if that
13 officer arrives there first.
14 Q. So where it says, "Mental Health Response
15 Team officers will be the first responders, when
16 available, on all runs involving suspected mentally ill
17 individuals." If that doesn't preclude non-MHRT
18 officers from being first responders, what does that
19 language do?
20     MR. STACKPOLE: Objection.
21 A. That language describes when the MHRT
22 officer arrives, they then become the primary officer.
23 Q. But the beat officer has no obligation to
24 wait for the MHRT officer to arrive in a non-emergency

### 32

1  situation?
2  A. Yes.
3  Q. He does or does not?
4  A. He does not.
5  Q. And are you referring to a subsequent
6  revision of this policy, or the very policy that's in
7  Slade Exhibit 2?
8  A. The policy that's in front of me.
9  Q. And is that consistent with the training
10 that you've received as well, as an MHRT certified
11 officer?
12 A. I don't recall.
13 Q. You don't recall?
14 A. No.
15     MR. HARDIN: There's going to be an
16     objection, only because he said he was trained in
17     2005, I believe, and this incident occurred in
18     2003.
19 Q. Are you familiar with the term "positional
20 asphyxia?"
21 A. Yes.
22 Q. Were you familiar with it in November,
23 2003?
24 A. Yes.

Case: 1:04-cv-00616-SJD Doc #: 119 Filed: 06/04/10 Page: 9 of 20 PAGEID #: 2106

9 (Pages 33 to 36)

Jones, B. vs. City of Cinti.        JOHNSTONE, J.                          9/9/2009

**33**

1  Q. You were familiar with it when Mr. Jones
2  died?
3  A. Yes.
4  Q. What did you know about positional
5  asphyxia back then?
6  A. I don't recall specifically.
7  Q. When did you receive training in
8  positional asphyxia?
9  A. If I recall correctly, we received formal
10 training after the incident.
11 Q. Not before?
12 A. Not that I recall.
13 Q. Can you tell me -- have you received -- I
14 mean, what kind of training did you receive after?
15     MR. HARDIN: Objection. You may answer.
16 A. I believe it was in-service training.
17 Q. In-service?
18 A. Yes.
19 Q. Is that your yearly?
20 A. Yes.
21 Q. And do you recall if that training was in
22 2003 -- like, if you were to look at Johnstone Exhibit
23 1, can you identify which training would have included
24 the positional asphyxia training?

**34**

1  A. No, it does not state it, so I don't
2  recall.
3  Q. Do you recall receiving a Training
4  Bulletin on positional asphyxia?
5  A. No.
6  Q. Do you think that you were trained more
7  than once with regard to positional asphyxia?
8  A. I don't remember how many times we were
9  trained.
10 Q. Might have been once? Might have been
11 more?
12 A. I don't remember.
13 Q. Are you familiar with factors -- warning
14 signs for positional asphyxia? Risk signs of factors?
15 A. Not specifically, no.
16 Q. Generally?
17 A. Not that I recall.
18 Q. So as you sit here today, you do not know
19 what the risk factors are for positional asphyxia?
20 A. I do know some risk factors, yes.
21 Q. What do you know?
22 A. That it can cause someone to stop
23 breathing.
24 Q. Anything else?

**35**

1  A. It can cause them to pass out.
2  Q. Anything else?
3  A. It can cause death.
4  Q. Did you know that back in 2003?
5  A. Not that I recall.
6  Q. What about steps to take to avoid
7  positional asphyxia? Are you familiar with those?
8      MR. HARDIN: There will be an objection,
9  if it has anything to do with training after the
10 2003 incident. Go ahead.
11 A. In general, yes.
12 Q. What are those steps?
13 A. If somebody is on their stomach, to get
14 them off of their stomach.
15 Q. Anything else?
16 A. No.
17 Q. If you don't recall what training, how
18 often you received training in positional asphyxia, are
19 you really able to testify that you received that
20 training after November 30 of 2003?
21 A. I do recall receiving some training
22 afterwards, yes.
23 Q. You do not recall receiving training
24 before?

**36**

1  A. I do not.
2  Q. In any form?
3  A. I don't recall receiving any training.
4  Q. You've received training -- you've
5  received training on the department's Use of Force
6  Policy; is that right?
7  A. Yes.
8      MR. HARDIN: Objection to the word
9  "policy." Go ahead.
10 Q. Is that a word -- I think you just told me
11 the difference between policy and procedure. Do you
12 remember that?
13 A. Yes.
14 Q. Is policy a word that you have trouble
15 with?
16 A. No.
17     (Reference to previously-marked Slade
18     Deposition Exhibit No. 3.)
19 Q. Okay. Neither do I.
20     You've been handed Slade Exhibit 3?
21 A. Yes.
22 Q. And do you recognize this as the Use of
23 Force policy that was in place, revised July 29, '03?
24     MR. HARDIN: Objection to the use of the

Case: 1:04-cv-00616-SJD Doc #: 119 Filed: 06/04/10 Page: 10 of 20 PAGEID #: 2107

10 (Pages 37 to 40)

Jones, B. vs. City of Cinti.  JOHNSTONE, J.  9/9/2009

37

1 word "policy."
2   MR. THOMPSON: Do you just want to make a
3 standing objection to every time I say "policy?"
4   MR. HARDIN: No.
5   MR. THOMPSON: You don't?
6   MR. HARDIN: No.
7   MR. THOMPSON: It would be easier.
8   MR. HARDIN: Probably.
9   MR. THOMPSON: Don doesn't like the word
10 "policy."
11   MR. HARDIN: Well, it's not a policy.
12   MR. THOMPSON: Well, we'll put you up on
13 the stand and you can testify to that, when the
14 time comes.
15   MR. HARDIN: I don't think so.
16   I represent the client and if you continue
17 to use the word "policy," I'll object to it.
18   MR. THOMPSON: Could you enlighten me,
19 like, with regard to what grounds? I mean, I
20 know you're objecting, but I'm trying to
21 understand -- under the Rules of Evidence, I'm
22 trying to figure out what could possibly be the
23 grounds for objecting to my use of the term
24 "policy?"

38

1   MR. HARDIN: Because it's Procedure 12.455
2 or Procedure, so on. It has a policy statement
3 in it.
4   MR. THOMPSON: Don, clearly, you know --
5   MR. HARDIN: It's not a policy
6   MR. THOMPSON: -- you're establishing
7 this, or you're attempting to establish this like
8 a factual dispute. I don't think that factual
9 disputes -- because there is a dispute of fact, I
10 don't think that thereby renders a question, you
11 know, objectionable. I'm not familiar with any
12 rule that says that a dispute of fact is
13 objectionable. But I could be wrong. Maybe I'll
14 have to go through them again.
15   Q.  If you turn to Slade Exhibit 3, Page 6,
16 please.
17   A.  Okay.
18   Q.  And do you see that first word at the top
19 of the page?
20   A.  Yes.
21   Q.  What is that word?
22   A.  "Policy."
23   Q.  And do you see the language under that
24 word, continuing to Page 7?

39

1   A.  Yes.
2   Q.  Is it consistent with your read, that that
3 language expresses the department's Use of Force
4 policy?
5   A.  Yes.
6   Q.  Okay.
7   MR. HARDIN: There was no objection to
8 that.
9   (Reference to previously-marked Slade
10   Deposition Exhibit No. 2.)
11   Q.  And I'd like to ask you, with your
12 understanding of the -- if I call Slade Exhibit 2 the
13 MHRT policy, that language that we looked at on Exhibit
14 2. With your understanding of Slade Exhibit 2, I'd
15 like to ask you some questions about the Use of Force
16 policy, okay?
17   The third paragraph on Page 6 -- are you
18 there?
19   A.  Yes.
20   Q.  Starts with "courtesy." If you could just
21 go ahead and read that -- not out loud, just read that
22 paragraph to yourself.
23   A.  (Witness reviewing document).
24   Q.  And this generally talks about courtesy,

40

1 and then it talks about the best result, the most
2 desirable result in effectuating an arrest, right?
3   A.  Yes.
4   Q.  And that most desirable result is
5 compliance with simple directions, right?
6   A.  Yes.
7   Q.  Okay. And isn't the MHRT certified
8 officer's role important because one of the issues with
9 folks who suffer mental illness is that they may be
10 impaired with regard to complying with simple
11 directions?
12   A.  What is your question?
13   Q.  My question is, the MHRT certified officer
14 sometimes plays an important role. The knowledge and
15 training that you received is significant with regard
16 to assisting mentally ill individuals to comply with
17 simple directions; is that right?
18   A.  They can be an asset, yes.
19   Q.  Right. That's because the mentally ill
20 population, sometimes because of their illness or
21 suspected illness, will demonstrate an inability to
22 comply with simple directions?
23   A.  Yes.
24   Q.  They are sometimes impaired in that

| Jones, B. vs. City of Cinti. | JOHNSTONE, J. | 9/9/2009 |

41

1  regard, right?
2     A.   I do not know.
3     Q.   Impaired. Sometimes -- it's tough for
4  them sometimes to follow simple directions, right?
5     A.   Yes.
6     Q.   Okay. And the MHRT certified officer has
7  received training in how to help them, or how to
8  communicate with suspected mentally ill individuals, in
9  order to effectuate compliance with simple directions,
10 right?
11    A.   Yes.
12    Q.   Okay. That's kind of why you don't want,
13 you know -- if possible, you don't want a non-MHRT
14 certified officer taking on the role of first responder
15 with a suspected mentally ill individual, right?
16    A.   That's incorrect.
17    Q.   That's incorrect?
18    A.   Yes.
19    Q.   If you look at the next paragraph -- and
20 take whatever time you need to read that.
21    A.   (Witness reviewing document).
22    Q.   And this paragraph has to do with when
23 control is necessary to effectuate an arrest -- or to
24 effect an arrest, right?

42

1     A.   Yes.
2     Q.   And kind of the first step for taking
3  control, or steps to take control, says, "advice,
4  warnings and persuasion," right?
5     A.   Yes.
6     Q.   Now, just kind of along the same lines,
7  mentally ill individuals are sometimes -- it's
8  sometimes difficult for them to take advice, heed
9  warnings, or be persuaded, right?
10    A.   Yes.
11    Q.   And MHRT certified officers are trained
12 with regard to advising, warning, and attempting to
13 persuade mentally ill individuals, right?
14    A.   Yes.
15    Q.   And because mentally ill individuals
16 sometimes have difficulty following simple directions,
17 heeding advice, warnings, or being persuaded, it can be
18 more difficult to get that individual to submit
19 without, say, the use of force, right?
20    A.   I'm not sure what you're asking.
21    Q.   Because of the difficulty -- because of
22 the mentally ill individual's impaired understanding,
23 impaired cognition, their inability to follow simple
24 directions in some instances. Their inability to take

43

1  advice, to heed warnings, to be persuaded, that renders
2  effecting an arrest without force sometimes more
3  difficult, right?
4     A.   Yes.
5     Q.   Okay. And sometimes, it takes more skill
6  in those cases with a mentally ill individual to avoid
7  force in effecting an arrest, right?
8     A.   I wouldn't agree with that.
9     Q.   You would not?
10    A.   No.
11    Q.   Well, when I use the term -- is it the
12 term "skill?"
13    A.   Yes.
14    Q.   I'm using that term to refer to the
15 special training that you received as an MHRT certified
16 officer. And I guess my question is, would you agree
17 that those skills, or that training, that knowledge
18 that you've received during the course of training, is
19 useful in dealing with MHRT folk, mentally ill folk,
20 and avoiding the use of force in such dealings?
21    A.   Useful, yes.
22    Q.   Okay. And sometimes necessary to avoid
23 force, right?
24    A.   I wouldn't agree with that, no.

44

1     Q.   Really? And if you look at -- and the
2  next paragraph is about de-escalation and escalation,
3  with regard to the amount of force being used. I think
4  you have already testified to this, to some extent, but
5  MHRT certified officers are trained to -- you get
6  knowledge and training that allows you to -- or
7  hopefully allows you to avoid escalation caused by an
8  individual's mental illness, right?
9     A.   Yes.
10            (Reference to previously-marked Slade
11            Deposition Exhibit No. 4.)
12    Q.   Okay. I would like to hand you Slade
13 Exhibit 4. Do you recognize this document?
14    A.   I recognize that it's Staff Notes, yes.
15    Q.   And if you turn, then, to February 25 of
16 2003. Do you see that on the first page?
17    A.   Yes.
18    Q.   If you turn -- and I'll represent to you
19 that these are excerpts from Staff Notes, okay? If you
20 turn to the last two pages of that exhibit. Have you
21 ever received or seen that Training Bulletin?
22    A.   I have seen it.
23    Q.   You have? Have you ever read it?
24    A.   Yes.

Jones, B. vs. City of Cinti.        JOHNSTONE, J.        9/9/2009

### 45

1  Q.  Would that have been February 25, 2003?
2  A.  I don't recall reading it then, no.
3  Q.  You recall signing that you read it?
4  A.  No, I do not.
5  Q.  Is this exhibit consistent with, like,
6  bulletins that you might receive -- a Training Bulletin
7  you might have received during roll call?
8  A.  No.
9  Q.  So you do not recall receiving this
10 Training Bulletin during roll call?
11 A.  No.
12 Q.  Could you tell me -- some training occurs,
13 though, in roll call, right?
14 A.  Yes.
15 Q.  Can you tell me how that occurs?
16 A.  There are six-minute training scenarios
17 that are provided by the Police Academy and the
18 Sergeant reads the training.
19 Q.  And then -- I mean, are you quizzed on it?
20 A.  No.
21 Q.  And then you sign something?
22 A.  No.
23 Q.  Are you familiar with -- are you familiar,
24 generally, with Training Bulletins? Like, the concept

### 46

1  of Training Bulletins?
2  A.  Yes.
3  Q.  And if you receive a Training Bulletin,
4  are you expected to sign for them?
5  A.  You do not receive them.
6  Q.  By "receive" -- I understand they might
7  just pass in front of you during roll call. But you're
8  expected to sign that you've seen a Training Bulletin,
9  at least?
10 A.  You're expected to sign that you've seen
11 the Staff Notes.
12 Q.  Staff Notes that may include a Training
13 Bulletin?
14 A.  May include, yes.
15 Q.  And when you sign saying that you've seen
16 the Staff Notes, are you signing saying that you've
17 read through the Staff Notes, or just that you've been
18 given the opportunity to?
19 A.  That you've been given the opportunity to.
20 Q.  Were these Staff Notes from February 25,
21 2003 -- you would have received them, right?
22    MR. HARDIN: Objection.
23 A.  I wouldn't have received them.
24 Q.  Well, you would have seen them, right?

### 47

1  A.  Yes.
2  Q.  You would have been given the opportunity
3  to see them?
4  A.  Yes.
5  Q.  You would not be expected to read them,
6  though?
7     MR. HARDIN: Objection. Asked and
8  answered.
9  Q.  Is that right?
10 A.  I'm not sure what the expectation is.
11 Q.  Okay. So you would have been given the
12 opportunity to see these before November of 2003?
13 A.  No.
14 Q.  You would not have?
15 A.  These specific Staff Notes?
16 Q.  Yeah.
17 A.  No.
18 Q.  Why not?
19 A.  Because they are printed on -- they would
20 have been printed on February 25, 2003.
21 Q.  Help me out with that.
22    MR. HARDIN: Can we go off the record a
23 minute?
24    (Off the record discussion.)

### 48

1  Q.  Is it consistent with your read of Exhibit
2  4, that -- I mean, these Staff Notes would have been
3  disseminated or read from, like, around February 25,
4  2003?
5  A.  Yes.
6  Q.  And you would have been given the
7  opportunity to read these?
8  A.  Yes.
9  Q.  And that would have been before November
10 of 2003?
11 A.  Yes.
12 Q.  Okay. Does Slade Exhibit 4 refresh your
13 recollection as to whether you received any training in
14 positional asphyxia, prior to the death of Nate Jones?
15 A.  No.
16 Q.  It does not?
17 A.  No.
18 Q.  You were there -- I mean, you were there
19 that early morning, right, at the White Castle?
20 A.  Yes.
21 Q.  And you were subject of an investigation
22 into the death of Nate Jones, right?
23 A.  Yes.
24 Q.  I guess at least two investigations,

Case: 1:04-cv-00616-SJD Doc #: 119 Filed: 06/04/10 Page: 13 of 20 PAGEID #: 2110

13 (Pages 49 to 52)

Jones, B. vs. City of Cinti.          JOHNSTONE, J.          9/9/2009

**49**

1 right? The police internal investigation and the
2 Citizens Complaint Authority investigation, right?
3    A.   Yes.
4    Q.   And with regard to the police internal
5 investigation, you did not provide a statement, right?
6    A.   No, that's incorrect.
7    Q.   That is incorrect?
8    A.   Yes.
9    Q.   You did provide a statement?
10   A.   To internal, yes.
11   Q.   And when did you provide that statement?
12   A.   I don't recall.
13   Q.   Do you recall to whom?
14   A.   No.
15   Q.   Were you interviewed?
16   A.   Yes.
17   Q.   And there was a transcript of that
18 interview?
19   A.   That's my understanding, yes.
20   Q.   Do you recall asserting your right not to
21 incriminate yourself in response to a request for an
22 interview during the course of the --
23        MR. HARDIN: Objection to the question.
24        You may answer.

**50**

1    Q.   -- investigation?
2        Do you recall an interview where you said,
3 you know, on the advice of my counsel I'm not going to
4 answer questions?
5    A.   Yes.
6    Q.   Okay. And then there was some subsequent
7 interview, or some interview after that?
8    A.   Yes.
9    Q.   With police internal?
10   A.   Yes.
11   Q.   And that interview -- do you know if it
12 was taped?
13   A.   That's my understanding, yes.
14   Q.   And, I'm sorry, have you seen a written
15 transcript of that interview?
16   A.   From?
17   Q.   The one where you answered questions. You
18 responded to questions.
19   A.   From internal?
20   Q.   Yeah.
21   A.   Yes.
22   Q.   When is the last time you've seen that?
23   A.   I've seen it this week.
24   Q.   This week?

**51**

1    A.   Yes.
2        MR. THOMPSON: I'm going to have to go
3 back and check, but I don't have any transcript
4 of any testimony from any internal investigation
5 on him, either.
6        MR. STACKPOLE: Okay.
7        MR. THOMPSON: In fact, for all of the
8 named defendants with regard to internal
9 investigations. The only transcripts that I have
10 are those where they pled the Fifth.
11        MR. STACKPOLE: Those are the Homicide
12 investigation's, where they pled the fifth.
13        MR. HARDIN: It's CIS.
14        MR. STACKPOLE: I'll double check.
15   Q.   In preparation for your deposition today,
16 did you review two transcripts of interviews, or one?
17   A.   Three.
18   Q.   Three? All where you answered questions,
19 or was one where you pled the fifth? When I say that,
20 you generally know what I mean? "On advice of counsel,
21 I refuse to answer."
22   A.   Yes.
23   Q.   One of them, you pled the Fifth?
24   A.   Yes.

**52**

1        MR. HARDIN: Objection to the questions
2 relating to pleading the Fifth. But go ahead.
3    Q.   Okay. But two others where you answered
4 questions?
5    A.   Yes.
6    Q.   One before the CCA, the Citizen Complaint
7 Authority?
8    A.   Yes.
9        MR. THOMPSON: Yeah, I don't have any
10 transcripts with any of these guys where they
11 actually answered questions, other than CCA.
12        MR. STACKPOLE: I know you've been given
13 the tapes. I don't know. The transcripts may be
14 things that -- well, off the record for a second.
15        MR. HARDIN: Can we take a break for a
16 minute?
17        MR. THOMPSON: Sure.
18        (At which time, a recess was taken from
19        10:45 a.m. until 10:54 a.m.)
20        MR. THOMPSON: All right. We'll go back
21 on the record.
22   Q.   Jay, the CCA complaint, the interview you
23 participated in and provided a statement to those
24 interviewers, you've reviewed that in preparation -- or

Case: 1:04-cv-00616-SJD Doc #: 119 Filed: 06/04/10 Page: 14 of 20 PAGEID #: 2111

14 (Pages 53 to 56)

| Jones, B. vs. City of Cinti. | JOHNSTONE, J. | 9/9/2009 |

### 53

1  a transcript of that?
2  A.  Yes.
3  Q.  And I understand that you -- well, let's
4  go back to November 30, 2003. And you were Unit No.
5  5315?
6  A.  Yes.
7  Q.  Out of District 5?
8  A.  Yes.
9  Q.  And you stated that you were originally
10 dispatched -- let me mark this.
11      (Johnstone Deposition Exhibit No. 2 was
12      marked for identification.)
13 Q.  Okay. Jay, you've been provided a
14 transcript of that interview. I'm looking at Page 1.
15 You indicate that you were originally dispatched with
16 Officer Pike. But then you were disregarded by Officer
17 Osterman. Can you tell me what that means?
18 A.  They, being Communication, dispatched two
19 officers to White Castle's. Officer Pike and myself.
20 It was in Beat 2, to the best of my recollection. I
21 was not a Beat 2 officer; however, Officer Pike was.
22 At some point, Officer Osterman became available, and
23 he disregarded me, stating, you know, "Do not send
24 Officer Johnstone, I will respond instead."

### 54

1      MR. HARDIN: For the record, I'm going to
2      object to the transcript, only because I can't
3      tell you that it's authentic. Go ahead.
4  Q.  So Osterman instructed you not to respond?
5  A.  I would not take it as an instruction. He
6  responds to the dispatcher that you can go ahead and
7  disregard Officer Johnstone.
8  Q.  Okay. All right. And you were then
9  dispatched to the burglary with Shulte?
10 A.  A burglar alarm.
11 Q.  And then, through dispatch, you came to
12 understand that Officer Pike had called in an MHRT,
13 right?
14 A.  I believe he came over and stated that it
15 was possibly an MHRT.
16 Q.  Looking at this transcript, your
17 recollection of the events was, I suppose, better on
18 June 25, 2004, than it is today; is that a fair
19 assumption?
20 A.  That would probably be accurate.
21 Q.  And this transcript does not indicate that
22 it was your recollection then, that Officer Pike said,
23 "It's possibly an MHRT," right?
24 A.  Yes.

### 55

1  Q.  It says, "Officer Pike, who came over and
2  said it was going to be an MHRT run," right?
3  A.  Yes.
4  Q.  Has your recollection changed?
5  A.  No.
6  Q.  Have you talked with anyone? In addition
7  to reviewing the two transcripts, what else have you
8  done to prepare for your deposition?
9  A.  I spoke with my attorney, Don Hardin.
10 Q.  Okay. And did you speak with any of the
11 officers?
12 A.  No.
13 Q.  None?
14 A.  No.
15 Q.  Did you speak with anyone else?
16 A.  No.
17 Q.  And Officer Shulte was MHRT, right?
18 A.  Yes.
19 Q.  Certified MHRT. And so he called in that
20 he would respond to Officer Pike's MHRT call?
21 A.  Yes.
22 Q.  Then there's, "Officer needs assistance"
23 call on that MHRT run, right?
24 A.  Yes.

### 56

1  Q.  And you respond?
2  A.  Yes.
3  Q.  And when you get to the White Castle, you
4  see officers struggling on the ground with Mr. Jones?
5  A.  Yes.
6  Q.  And specifically, you saw Officer Abrams
7  attempting to cuff Mr. Jones' right arm; is that right?
8  A.  His left arm.
9  Q.  His left arm? Okay. And we'll talk about
10 that struggle in a little bit. But after the struggle,
11 do you recall anyone placing Nate Jones in a seated
12 position?
13 A.  No.
14 Q.  Do you recall anyone trying to place him
15 in a seated position?
16 A.  No.
17 Q.  Do you recall anyone suggesting that he
18 ought to be placed in a seated position?
19 A.  No.
20 Q.  And that's at any point after the struggle
21 from, you know, after the EMT arrives and they take him
22 off to the hospital, right?
23 A.  Yes.
24 Q.  When you participated in the CCA

Case: 1:04-cv-00616-SJD Doc #: 119 Filed: 06/04/10 Page: 15 of 20  PAGEID #: 2112

15 (Pages 57 to 60)

Jones, B. vs. City of Cinti.    JOHNSTONE, J.    9/9/2009

**57**

1 investigation and the police intervention
2 investigation, when you actually provided responses to
3 the interview, were you truthful and honest?
4    A.   Yes.
5    Q.   If you turn to 07082. And for context, if
6 you want to read -- this is about that Training
7 Bulletin, 2003, the one on positional asphyxia. They
8 asked you if you received a copy. You indicated that
9 you do not remember if you did. They talked about the
10 Training Bulletin and the Staff Notes and so on.
11       And the interviewer asks, "Are those" --
12 this is toward the middle of the page, Jay. "Are those
13 Training Bulletins normally something that is part of
14 roll call training, that's discussed by a supervisor at
15 roll call?" You indicate you're not sure if it's done
16 consistently or not. Do you see that?
17    A.   Yes.
18    Q.   And by your response, is it fair for me to
19 understand that -- that it may well be that a Training
20 Bulletin on positional asphyxia became a part of the --
21 was incorporated in the Staff Notes, and that you could
22 have signed off on that Staff Notes, but that that
23 Training Bulletin may or may not have been discussed
24 during roll call, and you may or may not have read the

**58**

1 Training Bulletin; is that fair to say?
2    A.   Yes.
3    Q.   If you turn to 07083. You indicate -- and
4 you're talking about the trouble that Officer Abrams is
5 having getting the left arm behind Mr. Jones' back
6 cuffed, right?
7    A.   Yes.
8    Q.   And at that time, Mr. Jones is prone on
9 the ground, right?
10    A.   Yes.
11    Q.   And you were asked whether Mr. Jones was
12 resisting, right --
13    A.   Yes.
14    Q.   -- the handcuffing process. And you
15 indicated that he was, right?
16    A.   Yes.
17    Q.   And you recall being asked why you thought
18 he was resisting?
19    A.   No, I don't recall that.
20    Q.   Well, do you recall being asked what you
21 meant when you indicated he was resisting?
22    A.   I don't recall being asked that, no.
23    Q.   It's on 07083, when they asked, "What do
24 you mean by resisting?"

**59**

1    A.   Okay.
2    Q.   Your response was, "There was just tension
3 in his arm. They were telling him to put his arm
4 behind his back; he was tensed up. He wasn't moving
5 his arm," right?
6    A.   Yes.
7    Q.   And that is what indicated to you that
8 Mr. Jones was resisting?
9    A.   Yes.
10    Q.   Now, you had no idea why Mr. Jones' arm
11 was tense, right?
12    A.   No.
13    Q.   And by "no," you mean you don't know,
14 right?
15    A.   I don't know why it was tense.
16    Q.   Why it was tense. Okay. And Mr. Jones
17 was a big guy, right?
18    A.   Yes.
19    Q.   Obese. And, in fact, I think you had to
20 use three pairs of handcuffs, or you were trying to use
21 three pairs of handcuffs just to get enough length to
22 get from one wrist to the other, behind his back,
23 right?
24    A.   Yes.

**60**

1    Q.   Okay. And the tension that you perceived
2 in his arm, that didn't really indicate to you whether
3 that tension was a result of his size, perhaps the
4 position that he was in, versus a symptom of active
5 resisting, right?
6       MR. HARDIN: Objection. You may answer.
7    A.   I'm not sure what you're asking.
8    Q.   All right. Jones is prone on the ground.
9 The officers are having a hard time getting his left
10 arm behind his back, right, to get it cuffed?
11    A.   Yes.
12    Q.   And I think you said that that was
13 indicated to you by the tension in his arm, right?
14    A.   Yes.
15    Q.   Okay. You don't know whether that tension
16 was caused by his size, right?
17    A.   Yes.
18    Q.   You believe it was?
19       MR. HARDIN: Objection.
20    A.   I'm not sure what you're asking.
21    Q.   The tension that was in his arm -- the
22 difficulty in getting his arm behind his back, that
23 was, in part, due to Mr. Jones' size?
24    A.   That's not what I believe.

Case: 1:04-cv-00616-SJD Doc #: 119 Filed: 06/04/10 Page: 16 of 20 PAGEID #: 2113

**16 (Pages 61 to 64)**

Jones, B. vs. City of Cinti.　　　　　JOHNSTONE, J.　　　　　9/9/2009

**61**

1　Q.　That is not what you believe?
2　A.　No.
3　Q.　Why not?
4　A.　I believe he was resisting by keeping his
5　arm tensed.
6　Q.　Okay. It was that tension that indicated
7　to you that he was resisting?
8　A.　Yes.
9　Q.　Was anyone holding Mr. Jones down at the
10　time?
11　A.　I believe Officer Joehonny was holding his
12　legs, and Officer Slade was holding his right arm
13　behind his back.
14　Q.　And presumably, placing pressure on his
15　right arm behind his back, right?
16　　　MR. HARDIN: Objection. You may answer.
17　A.　I'm not sure what kind of pressure was
18　being applied.
19　Q.　Okay. And were the officers on his legs,
20　on his lower legs or upper legs?
21　A.　I don't recall.
22　Q.　When the officers realized -- after the
23　struggle and the officers stood up, checked on each
24　other, at some point, someone realized that there was

**62**

1　something wrong with Mr. Jones, right?
2　A.　Yes.
3　Q.　And in particular, it didn't appear like
4　he was breathing, right?
5　A.　I don't recall what they saw.
6　Q.　You don't recall? What did you see?
7　A.　I didn't see anything pertaining to
8　Mr. Jones directly after the struggle.
9　Q.　Okay. After you stood up, what did you
10　do?
11　A.　Caught my breath.
12　Q.　Okay.
13　A.　Checked on the other officers that were
14　there.
15　Q.　Okay. Anything else?
16　A.　I spoke with the other officers.
17　Q.　But did you see Mr. Jones laying on the
18　ground?
19　A.　Not immediately, no.
20　Q.　At any point, after you stood up?
21　A.　Yes.
22　Q.　Okay. And he was in the prone position,
23　handcuffed behind -- arms handcuffed behind his back,
24　right?

**63**

1　A.　No.
2　Q.　He was not?
3　A.　Not when I saw him.
4　Q.　What position was he in when you saw him?
5　A.　He had been rolled over onto his back.
6　Q.　So you saw him -- so, after you stood up,
7　the next view of Mr. Jones you had was of Mr. Jones
8　lying on his back?
9　A.　Yes.
10　Q.　After someone had rolled him over?
11　A.　Yes.
12　Q.　And do you recall who rolled him over?
13　A.　No.
14　Q.　Do you recall why he was rolled over? Did
15　you see him rolled over?
16　　　I mean, did you see him when he was rolled
17　over? Did you watch that?
18　A.　I don't recall.
19　Q.　Do you have an understanding as to why he
20　was rolled over?
21　A.　I have an understanding now, yes.
22　Q.　Well, what is your understanding now?
23　A.　To avoid positional asphyxiation.
24　Q.　What was your understanding then?

**64**

1　A.　My understanding then? I was vaguely
2　familiar with positional asphyxiation.
3　Q.　Do you think that -- do you think that
4　including a Training Bulletin on positional
5　asphyxiation in Staff Notes, where the information in
6　that Training Bulletin may or may not be read during
7　roll call, may or may not be read by the officers who
8　are signing off on the Staff Notes, do you think that
9　that constitutes adequate training for you as a police
10　officer on positional asphyxia?
11　　　MR. HARDIN: Objection.
12　　　MR. STACKPOLE: Objection.
13　A.　I don't think it constitutes formal
14　training, no.
15　Q.　Well, do you feel like you were adequately
16　trained?
17　　　MR. STACKPOLE: Objection.
18　Q.　I mean, when you testified -- or when you
19　responded to these questions during the course of the
20　interview, you indicated that you were only vaguely
21　familiar with the term "positional asphyxia." You
22　recall that, right?
23　A.　Yes.
24　Q.　You didn't really know any of the factors,

Case: 1:04-cv-00616-SJD Doc #: 119 Filed: 06/04/10 Page: 17 of 20 PAGEID #: 2114

17 (Pages 65 to 68)

Jones, B. vs. City of Cinti.  JOHNSTONE, J.  9/9/2009

**65**

1 right?
2    A.   Yes.
3    Q.   And you stated that at the time, that you
4 didn't know what steps should be taken to avoid
5 positional asphyxia after a struggle, right?
6    A.   Yes.
7    Q.   And I think even today, as you sit here,
8 you don't really know, right?
9         MR. STACKPOLE:  Objection.
10   A.   I know more than I knew then.
11   Q.   Right.  Okay.  Do you feel like you were
12 adequately -- do you feel like you had the training
13 required to avoid positional asphyxia?
14        MR. STACKPOLE:  Objection.
15   A.   Now?
16   Q.   Then.
17   A.   Then?
18   Q.   Yeah.
19   A.   No.
20   Q.   It doesn't seem like thorough training at
21 all, if it's training at all, to throw a Training
22 Bulletin into Staff Notes and have you sign off on it,
23 whether you've read them or not, whether they've been
24 read to you or not, right?

**66**

1         MR. STACKPOLE:  Objection.
2    Q.   You would agree with that, right?
3    A.   No.  I'm not sure what you're asking me.
4    Q.   Well, would you call that thorough
5 training that you received -- would you call putting a
6 Training Bulletin into Staff Notes --
7         MR. STACKPOLE:  Objection.
8    Q.   -- and then requiring you to sign off on
9 it, whether you've read them, whether they have been
10 read to you.  Would you consider that to constitute
11 thorough training?
12        MR. STACKPOLE:  Objection.
13   A.   I don't believe it's even considered
14 training.
15   Q.   Right.  You wouldn't even call that
16 training?
17   A.   Correct.
18   Q.   Have you ever seen a -- either at the
19 Academy or anywhere, anywhere in the physical plant,
20 Cincinnati Police Department, ever seen, like, a poster
21 about positional asphyxia?
22   A.   Not that I recall.
23   Q.   Nothing that shows the factors and steps
24 to take to avoid it and so on?

**67**

1    A.   Not that I remember.
2         MR. THOMPSON:  I don't have any further
3 questions for you today, Jay.
4         There are some documents that we requested
5 that we haven't received with regard to your
6 personnel files, disciplinary actions -- or,
7 pardon me, complaint investigations and so on.
8 And so to the extent necessary to question you on
9 those, if we have to, we're going to hold the
10 deposition open.  Okay?
11        THE WITNESS:  Okay.
12        MR. THOMPSON:  All right.  Very good.
13
14                    _____
                           JAY JOHNSTONE
15
16                         - - -
17     DEPOSITION CONCLUDED AT 11:17 A.M.
18                         - - -
19
20
21
22
23
24

**68**

1                C E R T I F I C A T E
2 STATE OF OHIO      :
                     : ss
3 COUNTY OF HAMILTON :
4        I, Barbara A. Thacker, RPR, the
5 undersigned, a duly qualified and commissioned notary
6 public within and for the State of Ohio, do hereby
7 certify that, before giving of the aforesaid
8 deposition, JAY JOHNSTONE, was by me first duly sworn
9 to depose the truth, the whole truth, and nothing but
10 the truth; that the foregoing is the deposition given
11 at said time and place by JAY JOHNSTONE; that said
12 deposition was taken in all respects pursuant to
13 stipulations of counsel hereinbefore set forth; that I
14 am neither a relative of nor employee of any of their
15 counsel, and have no interest whatever in the result of
16 the action.  I further certify that I am not, nor is
17 the court reporting firm with which I am affiliated,
18 under a contract as defined in Civil Rule 28(D).
19       IN WITNESS WHEREOF, I hereunto set my hand
20 and official seal of office at Cincinnati, Ohio, this
21 _____ day of _____, 2009.
22
                          _____
23 My Commission Expires:   BARBARA A. THACKER, RPR
   May 17, 2013       Notary Public - State of Ohio
24

## ADDENDUM

TO THE REPORTER: I have read the entire transcript of my deposition taken on the 5th day of October, 2009 or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the signature page and authorize you to attach the following changes to the original transcript:

| PAGE | LINE | CORRECTION |
|---|---|---|
| 65 | 19 | I had not recieved any formal training on positional asphyxia. I was provided the information contained in the Training Bulletin |

10-5-09
(Date)

(Signature of Deponent)

BESSIE JONES vs. CITY OF CINCINNATI        JAY JOHNSTONE    9-9-09    BT

ORIGINAL

AMS DEPO
P.O. Box 58641 · Cincinnati, Ohio 45258-8641
(513) 941-9464

| Jones, B. vs. City of Cinti. | JOHNSTONE, J. | 9/9/2009 |
|---|---|---|

Page 67

1  A.    Not that I remember.
2       MR. THOMPSON:  I don't have any further
3  questions for you today, Jay.
4       There are some documents that we requested
5  that we haven't received with regard to your
6  personnel files, disciplinary actions -- or,
7  pardon me, complaint investigations and so on.
8  And so to the extent necessary to question you on
9  those, if we have to, we're going to hold the
10 deposition open.  Okay?
11      THE WITNESS:  Okay.
12      MR. THOMPSON:  All right.  Very good.

_____
JAY JOHNSTONE

- - -

DEPOSITION CONCLUDED AT 11:17 A.M.

- - -

Case: 1:04-cv-00616-SJD Doc #: 119 Filed: 06/04/10 Page: 20 of 20 PAGEID #: 2117

Jones, B. vs. City of Cinti.   JOHNSTONE, J.                    9/9/2009

Page 68

1         C E R T I F I C A T E

2  STATE OF OHIO            :
                            : ss
3  COUNTY OF HAMILTON       :

4         I, Barbara A. Thacker, RPR, the
5  undersigned, a duly qualified and commissioned notary
6  public within and for the State of Ohio, do hereby
7  certify that, before giving of the aforesaid
8  deposition, JAY JOHNSTONE, was by me first duly sworn
9  to depose the truth, the whole truth, and nothing but
10 the truth; that the foregoing is the deposition given
11 at said time and place by JAY JOHNSTONE; that said
12 deposition was taken in all respects pursuant to
13 stipulations of counsel hereinbefore set forth; that I
14 am neither a relative of nor employee of any of their
15 counsel, and have no interest whatever in the result of
16 the action.  I further certify that I am not, nor is
17 the court reporting firm with which I am affiliated,
18 under a contract as defined in Civil Rule 28(D).
19        IN WITNESS WHEREOF, I hereunto set my hand
20 and official seal of office at Cincinnati, Ohio, this
21 _13th_ day of _October_, 2009.
22                            _Barbara A. Thacker_
23 My Commission Expires:   BARBARA A. THACKER, RPR
   May 17, 2013             Notary Public - State of Ohio
24