Johnstone

EXHIBIT NO. ____

AMS DEPO
513-941-9464

# CITY OF CINCINNATI - POLICE DIVISION
## POLICE ACADEMY
### RECORD OF TRAINING FOR:

JOHNSTONE, JAY        Assignment: District4 Sergeants        Badge: S0014        SSN

| Training# | Title | Sponsor | Location | Beginning Date | Ending Date | W/M Hours |
|---|---|---|---|---|---|---|
| S1534 | INTOXILYZER 5000 RECERTIFICATION | CPD | Academy | 06/19/09 | 06/19/09 | 8 |
| S3444 | FIREARMS FAMILIARIZATION-2009 | CPD | Range | 05/14/09 | 05/14/09 | 8 |
| S2187 | CRIME ANALYST TRAINING | CPD | Academy | 05/06/09 | 05/07/09 | 16 |
| S3474 | THE ULTIMATE SUPERVISOR | CAREER TRACK | Cincinnati, Oh | 05/04/09 | 05/04/09 | 8 |
| S3490 | PACKET WRITER | CPD | Radcliff | 12/09/08 | 12/09/08 | 3 |
| S3087 | VEHICLE PURSUIT TRAINING | CPD | Coney Is | 12/02/08 | 12/02/08 | 2 |
| S3363 | SWORN MANAGEMENT IN-SERVICE 2008 DAY 2 | CPD | Academy | 11/24/08 | 11/24/08 | 8 |
| S3310 | FIREARMS QUALIFICATIONS 2008 | CPD | Range | 11/19/08 | 11/19/08 | 8 |
| S1797 | ADMINISTRATIVE OFFICERS' COURSE | SPI | Louisville, Ky | 08/11/08 | 11/07/08 | 520 |
| S4130 | OVI RECERTIFICATION | CPD | Cincinnati, Oh | 06/25/08 | 06/25/08 | 8 |
| S4099 | SWORN MANAGEMENT IN-SERVICE 2008 DAY 1 | CPD | Academy | 06/02/08 | 06/02/08 | 8 |
| S4038 | FIREARMS FAMILIARIZATION-2008 | CPD | Range | 05/28/08 | 05/28/08 | 8 |
| S4084 | INTERNAL INVESTIGATION CERTIFICATION | IPTM | Academy | 05/12/08 | 05/16/08 | 40 |
| S3306 | TEAM BUILDING, MENTORING, | FRED PRYOR SEMINARS | Cincinnati, Oh | 03/14/08 | 03/14/08 | 7 |

| Training# | Title | Sponsor | Location | Beginning Date | Ending Date | Hours |
|---|---|---|---|---|---|---|
| S1527 | FTO CERTIFICATION | CPD | Academy | 11/26/07 | 11/26/07 | 32 |
| S3246 | IN-SERVICE SWORN MANAGEMENT 2007 | CPD | Academy | 11/14/07 | 11/15/07 | 16 |
| S3239 | VICTIM'S RIGHTS-PHASE II | CPD | Academy | 11/06/07 | 11/06/07 | 2 |
| S3238 | TASER RECERTIFICATION | CPD | Academy | 11/06/07 | 11/06/07 | 1 |
| S3174 | FIREARMS QUALIFICATION 2007 | CPD | Range | 10/24/07 | 10/24/07 | 8 |
| S3206 | MHRT REFRESHER TRAINING | CPD | Academy | 10/16/07 | 10/16/07 | 4 |
| S3194 | VICTIM'S RIGHTS -PHASE I | CPD | Academy | 10/03/07 | 10/03/07 | 3 |
| S3186 | NEW SUPERVISORS' TRAINING | CPD | Academy | 07/30/07 | 08/17/07 | 120 |
| S1534 | INTOXILYZER 5000 RECERTIFICATION | CPD | Academy | 07/16/07 | 07/16/07 | 8 |
| S3101 | FIREARMS FAMILIARIZATION IN-SERVICE 2007 | CPD | Range | 05/31/07 | 05/31/07 | 8 |
| S3084 | IN-SERVICE-SWORN 2007 DAY 2 | CPD | Academy | 03/20/07 | 03/20/07 | 8 |
| S3083 | IN-SERVICE-SWORN 2007 DAY 1 | CPD | Academy | 03/19/07 | 03/19/07 | 8 |
| S2304 | EXCEL XP LEVEL II | | Cincinnati Police Academy | 03/05/07 | 03/05/07 | 8 |
| S2297 | WORD XP LEVEL II | | Cincinnati Police Academy | 02/26/07 | 02/26/07 | 8 |
| S1980 | EXCEL XP LEVEL I | | Cincinnati Police Academy | 02/14/07 | 02/14/07 | 8 |
| S2292 | POWERPOINT XP LEVEL I | | Cincinnati Police Academy | 01/31/07 | 01/31/07 | 8 |
| S1991 | WORD XP LEVEL I | | Cincinnati Police Academy | 01/29/07 | 01/28/07 | 8 |
| S2302 | FIREARMS QUALIFICATION 2006 | CPD | Range | 11/29/06 | 11/29/06 | 8 |

| Training# | Title | Sponsor | Location | Beginning Date | Ending Date | Hours |
|---|---|---|---|---|---|---|
| S2300 | FIREARMS S&W TRANSITION-2006 | CPD | Range | 11/28/06 | 11/28/06 | 8 |
| S2296 | COPSMART 2006 | CPD | Academy | 10/11/06 | 10/12/06 | 16 |
| S1534 | INTOXILYZER 5000 RECERTIFICATION | CPD | Academy | 07/17/06 | 07/17/06 | 8 |
| S0149 | REID TECHNIQUE OF INTERVIEWING & INTERROGATION | CPD | Cincinnati, Oh | 05/22/06 | 05/25/06 | 32 |
| S2254 | IN-SERVICE- SWORN 2006 | CPD | Cincinnati, Oh | 05/01/06 | 05/01/06 | 8 |
| S1639 | FATS TRAINING | CPD | Cincinnati, Oh | 03/27/06 | 03/27/06 | 30 |
| S640 | CONDUCTING BACKGROUND INVESTIGATIONS | OPOTA | London, Oh | 02/14/06 | 02/15/06 | 16 |
| S0121 | FIREARMS QUALIFICATIONS | CPD | Cincinnati, Oh | 11/02/05 | 11/02/05 | 8 |
| S1571 | MENTAL HEALTH RESPONSE TEAM CERT | CPD | Cincinnati, Oh | 09/12/05 | 09/16/05 | 40 |
| S1534 | INTOXILYZER 5000 RECERTIFICATION | CPD | Cincinnati, Oh | 07/12/05 | 07/12/05 | 8 |
| 121 | FIREARMS ANNUAL QUAL 2004 | CPD | CINCINNATI | 09/23/04 | 09/23/04 | 8 |
| 1985 | CPR CERTIFICATION TRAINING | CPD | CINCINNATI | 07/12/04 | 07/12/04 | 8 |
| 1534 | INTOXILYZER/DUI RECERTIFICATION | CPD | CINCINNATI | 05/18/04 | 05/18/04 | 8 |
| 2004 | POLICE MOUNTAIN BIKE FIREARMS | CPD | CINCINNATI | 04/23/04 | 04/23/04 | 8 |
| 1975 | TASER (X 26) TRAINING | CPD | CINCINNATI | 03/03/04 | 03/03/04 | 8 |
| 1840 | 2004 FTO TRAINING | CPD | CINCINNATI | 02/09/04 | 02/13/04 | 40 |
| 1973 | 2004 WINTER SWORN IN SERVICE TRAINING | CPD | CINCINNATI | 01/13/04 | 01/13/04 | 4 |

| Training# | Title | Sponsor | Location | Beginning Date | Ending Date | Hours |
|---|---|---|---|---|---|---|
| 1959 | ALS/OVI 2004 ORC UPDATE | CPD | CIINCINNATI | 12/16/03 | 12/16/03 | 2 |
| 1865 | INSERVICE SWORN 2004 | CPD | CINCINNATI | 11/10/03 | 11/10/03 | 8 |
| 121 | FIREARMS ANNUAL QUAL 2004 | CPD | CINCINNATI | 10/08/03 | 10/08/03 | 8 |
| 1736 | FIREARMS TRAINING 2004 | CPD | CINCINNATI | 05/06/03 | 05/06/03 | 8 |
| 1731 | INSERVICE TRAINING FOR PO/PS 2003 | CPD | CINCINNATI | 04/03/03 | 04/04/03 | 16 |
| 1733 | 2003 CROWN VICTORIA FAMILIARIZATION TRAINING | CPD | HAMILTON CTY. SHERIFFS | 03/02/03 | 03/03/03 | 2 |
| 121 | FIREARMS ANNUAL QUAL 2004 | CPD | CINCINNATI | 12/18/02 | 12/18/02 | 8 |
| 1250 | CITIES OF CHARACTER PROGRAM | CPD | CINCINNATI | 10/25/02 | 10/25/02 | 8 |
| 862 | INTOXILYZER 5000 RECERTIFICATION | CPD | POLICE ACADEMY | 07/18/02 | 07/18/02 | 8 |
| 467 | FIREARMS TRAINING SIMULATOR (FATS) | CPD | F.A.T.S. UNIT | 06/05/02 | 06/05/02 | 1 |
| 1484 | FIREARMS/TACTICAL 2002 | CPD | CINCINNATI | 06/05/02 | 06/05/02 | 8 |
| 470 | MOUNTAIN BIKE PATROL SCHOOL | CPD | Cincinnati | 05/13/02 | 05/17/02 | 40 |
| 217 | BASIC RADAR OPERATOR | CPD | POLICE ACADEMY | 03/28/02 | 03/28/02 | 8 |
| 1449 | INSERVICE FOR SWORN 2003 | CPD | CINCINNATI | 02/19/02 | 02/20/02 | 16 |
| 121 | FIREARMS ANNUAL QUAL 2004 | CPD | CINCINNATI | 10/02/01 | 10/02/01 | 8 |
| 1231 | PRINCIPLES OF INVESTIGATION | CPD | CINCINNATI | 06/25/01 | 06/28/01 | 24 |
| 801 | GANG NET TRAINING | CPD | POLICE ACADEMY | 04/25/01 | 04/25/01 | 2 |

| Training# | Title | Sponsor | Location | Beginning Date | Ending Date | Hours |
|---|---|---|---|---|---|---|
| 1309 | CDOP 2001/ CROWD CONTROL TRAINING | CPD | TARGET RANGE - CINCINNATI | 04/06/01 | 04/06/01 | 8 |
| 1283 | INSERVICE FOR SWORN 2001 | CPD | CINCINNATI | 03/21/01 | 03/22/01 | 16 |
| 861 | INTOXILYZER 5000 PROFICIENCY TEST | CPD | POLICE ACADEMY | 02/15/01 | 02/15/01 | 1 |
| 1054 | STRESS I, D. & MANAGEMENT FOR SWORN | CPD | CINCINNATI | 11/29/00 | 11/29/00 | 8 |
| 1227 | QUICK ACTION DEPLOYMENT (QUAD) | CPT | CINCINNATI | 10/18/00 | 10/18/00 | 3 |
| 861 | INTOXILYZER 5000 PROFICIENCY TEST | CPD | POLICE ACADEMY | 08/17/00 | 08/17/00 | 3 |
| 467 | FIREARMS TRAINING SIMULATOR (FATS) | CPD | F.A.T.S. UNIT | 07/30/00 | 07/30/00 | 1 |
| 918 | LASER SPEED DETECTION | CPD | TRAFFIC SECTION | 07/20/00 | 07/21/00 | 8 |
| 1188 | CLANDESTINE DRUG LAB TRAINING | CPD | CINCINNATI | 07/13/00 | 07/14/00 | 8 |
| 121 | FIREARMS ANNUAL QUAL 2004 | CPD | CINCINNATI | 07/12/00 | 07/12/00 | 8 |
| 1026 | CDOP/RIOT/CROWD CONTROL TRAINING | CPD | Target Range | 04/20/00 | 04/20/00 | 8 |
| 1057 | FIELD SOBRIETY TESTING | NATL HIWY SAFETY ADMIN | UNION TOWNSHIP | 03/28/00 | 03/31/00 | 32 |
| 1013 | INSERVICE 2000 | CPD | POLICE ACADEMY | 03/14/00 | 03/14/00 | 8 |
| 1028 | SEARCH&SEIZURE CELL/PAGER | HAM CO SHERIFF | HAM CO | 02/09/00 | 02/09/00 | 3 |
| 151 | INTOXILYZER 5000 SR. OP. | CPD | OPOTA | 10/19/99 | 10/21/99 | 24 |
| 945 | DOMESTIC PREPAREDNESS/ RESPONSE TRNG | CPD | POLICE ACADEMY | 09/27/99 | 09/27/99 | 8 |

| Training# | Title | Sponsor | Location | Beginning Date | Ending Date | Hours |
|---|---|---|---|---|---|---|
| 467 | FIREARMS TRAINING SIMULATOR (FATS) | CPD | F.A.T.S. UNIT | 09/22/99 | 09/22/99 | 1 |
| 914 | VAWA GRANT LAPTOP COMPUTER TRNG | COMPUSA | POLICE ACADEMY | 09/16/99 | 09/16/99 | 8 |
| 21 | DOMESTIC VIO. "IT TAKES A VILLAGE" | RCPI | COLUMBUS | 09/01/99 | 09/03/99 | 24 |
| 892 | MENTAL HEALTH LAW ENFORCEMENT TRNG | MENTAL HEALTH ASSOC. | SCARLET OAKS | 04/19/99 | 04/19/99 | 8 |
| 864 | CDOP TRAINING 1999 | CPD | TARGET RANGE | 04/02/99 | 04/02/99 | 8 |

## C C A COMPLAINT - #03513

Q = Ken Glenn
QQ = Dave Moonitz
A = Jay Johnstone
AA = Ed Schindler

This is June 25, 2004, approximately 8:30 a.m. I'm CCA investigator Ken Glenn here with CCA investigator Dave Moonitz. And, we're here with Police Officer Jay Johnstone and his FOP rep Mr. Ed Schindler. And, we're going to discuss CCA Case #03513. And that's a death in custody of Mr. Nathaniel Jones that occurred on November 30, 2003, approximately 6:00 a.m. at the White Castle parking lot located at 64 W. Mitchell Ave.

Q:     Officer Johnstone, you read your rights and you signed your Advice of Rights.

        Is that correct?

A:     That's correct.

Q:     I'd like to go back to the date of November 30, 2003, and can you tell me your

        assignment on that particular date, please?

A:     I was Unit #5315, that's third shift, District 5.

Q:     And, were you in uniform?

A:     Yes.

Q:     Okay. And, can you tell me on that particular evening at approximately

        6:00 a.m., uhm, how you happened to arrive at the location of 64 W. Mitchell

        and what happened when you got there and what you observed?

A:     Okay. I was originally dispatched to the radio run along with Officer Pike.

        Shortly after being dispatched, I was disregarded by Officer Osterman. So, I

        acknowledged my disregard over the air. Uhm, I'm not sure what the time

        frame is, but I eventually was dispatched to another radio run up on Beat 1 for a

        residential burglar alarm along with Officer Schulte. Uhm, at some point, I

1



Johnstone
EXHIBIT NO. 2
AMS DEPO
513-941-9464

07077

believe it was Officer Pike, who came over and said it was going to be an MHRT run, and the dispatcher then conferred with a supervisor stating the nature of the run, and she advised that she didn't have a MHRT officer available.

At that time, Officer Schulte pre-empted himself since he was MHRT trained to respond down to Mitchell. So, at that point, they disregarded myself on the alarm runs because I needed a cover car, and there wasn't a unit available to cover me on the alarm. At that time, I decided to, uh, head down to, uh, towards Mitchell anyway. Within moments of me starting to head down towards Mitchell, "Officer Needs Assistance" came out to reference that run. At that time, I used my lights and sirens and expedited to the scene.

When I arrived, I parked my car at the corner of Mitchell and Kessler, just outside of the uh, White Castle, lot and I observed officers struggling on the ground with Nathaniel Jones. Exited my vehicle, walked over to the area where the officers and Mr. Jones was to see if there was any way I could assist, and I noticed, uh, that they had the right hand behind his back in handcuffs, but Officer Abrams was still struggling to get Mr. Jones's left hand behind him because Mr. Jones was still yelling and resisting.

So, I walked over and assisted Officer Abrams with getting his left arm behind his back. Someone, I'm not sure who it was behind me, I believe, an officer handed me a set of handcuffs which were placed on his left hand, and someone then also handed me or one of us a third set of handcuffs that we used to attach the other two sets, which was necessary because of Mr. Jones' size.

2

Q:     Once the – once you completed the handcuffing process, you said you assisted with the left arm, correct?

A:     Yes.

Q:     And, once that handcuffing process was completed, what was your next step? What did you do?

A:     At that point, I just stood up. We, uh, all checked on each other to make sure everybody was okay.

Q:     What position was Mr. Jones in once you stood up?

A:     On his stomach.

Q:     Did you ever hear him gasping for air or was there any signs of trouble breathing coming from him?

A:     No, not that I noticed.

Q:     Did you – were you able to see his face once you stood up?

A:     I don't recall looking at his face.

Q:     Dave?

QQ:    Upon your arrival, did you observe anybody striking Mr. Jones at that time?

A:     No.

QQ:    After cuffing that – you guys rose to your feet, at what point was Mr. Jones rolled on to his side or back, do you recall?

A:     I don't recall the exact timeframe. It wasn't long after we placed him in custody.

QQ:    Do you remember who did that?

A:     No, I do not.

07079

QQ:   Were you there when the Fire Department arrived back on the scene?

A:    Yes.

QQ:   Did you – were you close proximity still when the Fire Department approached
      Mr. Jones?

A:    No.

QQ:   What did you do – what were you doing at that time, if you recall, when the Fire
      Department arrived back?

A:    Uhm, I know I was behind Officer Pike's car talking with at least one or two of
      the other officers involved.

QQ:   So, you didn't hear any conversation with any of the officers or firefighters as
      they went to tend Mr. Jones?

A:    No.

QQ:   Are you familiar with positional asphyxia?

A:    Yes.

QQ:   Basically, what is the main cause of positional asphyxia, if you recall then?

A:    What is the main cause?

QQ:   Yes.

A:    Body weight pressing lung capacity.

QQ:   Are you aware of any symptoms of the person experiencing that?

A:    No, I'm not.

QQ:   At any time, did you hear any mention – anyone mention anything about Mr.
      Jones having difficulty breathing or not being able to breathe?

4

07080

A:    I heard one of the officers state, "Check his pulse." An officer then checked his pulse.

QQ:   Do you remember which officer?

A:    No, I don't.

QQ:   Do you recall what the response was from the officer when he checked the pulse?

A:    That he, uhm, felt a weak pulse, but he wasn't sure he was breathing.

QQ:   Was that, if you recall again, before or after Mr. Jones was rolled over?

A:    I don't recall.

QQ:   Ken.

Q:    I'd like to go back to the handcuffing process as he was being handcuffed. What was your position during that handcuffing process?

A:    I was kneeling to his left side.

Q:    When you say kneeling, were you down on the ground? Was your knees on the ground?

A:    I don't remember specifically.

Q:    Did you ever observe any officers with their body weight on Mr. Jones' back?

A:    No.

Q:    Regarding positional asphyxia, are you – do you recall ever being trained on Training Bulletin 2003/1?

A:    No, I do not.

Q:    Did you ever receive a copy of that Training Bulletin?

A:    I don't remember if I did or did not.

5

Q:     What is the Police Department's process in terms of when a Training Bulletin has been issued by the Academy? What's the normal process that occurs with those Training Bulletins?

A:     I knew they're included in the staff notes, which are then handed out at roll call. And, you have to sign a sheet stating that you read the staff notes.

Q:     So, the actual Training Bulletin becomes part of the staff notes?

A:     Correct.

Q:     Do you recall ever signing that you received a copy of the Training Bulletin?

A:     I know that it's required that I sign each week. And, they don't turn in the sheet until they're signed off by the officers.

Q:     Are those Training Bulletins normally something that's part of roll call training, that's discussed by a supervisor at roll call?

A:     I'm not really sure if it's done consistently or not.

Q:     Okay, so as you receive those Training Bulletins, you don't recall what your supervisors discuss each time you receive a particular – not this particular Training Bulletin, but any Training Bulletin. You don't recall whether they actually discuss; I mean, you've signed for it, that you've received it, and you don't recall whether a supervisor always discuss those Training Bulletins?

A:     Well, I don't sign that I receive it, I sign that – there's one copy that goes around with a sign-on sheet on the front of it. And, you're handed it at roll call to look over it. And, then you sign it.

Q:     Okay. So, you don't receive your own individual copy of the Training Bulletin?

A:     Correct.

6

07082

Q:     That's what I was getting at.

A:     Okay.

Q:     You said, at the time, uhm, you arrived on the scene, as you were attempting to assist Officer Pike in handcuffing his left arm that he was still - Mr. Jones was still resisting.  Can you go more into detail about – was he – when you say resisting, what do you mean by resisting?

A:     It was Officer Abrams, not Officer Pike.

Q:     I'm sorry.

A:     That I was assisting.

Q:     Okay.  I'm sorry.

A:     There was just tension in his arm.  They were telling him to put him arm behind his back; he was tensed up.  He wasn't moving his arm.

Q:     Was there – was he saying anything at that particular time?

A:     He was just yelling.

Q:     Dave?

QQ:    Uhm, it took two of you to get his left arm down into position and cuff him?

A:     Yes.

QQ:    Uhm, and do you recall what he was yelling – Mr. Jones?

A:     No.

QQ:    Were any of the officers giving Mr. Jones verbal commands at that time?

A:     Telling him to put his hands behind his back.

QQ:    Were you one of those telling him that?

A:     No.  Not that I recall, no.

QQ: Do you recall who was?

A: No.

QQ: When you arrived, you had Officer Pike, Officer Osterman and Officer Abrams were present, and uhm, was Officer Reese there at time? Joehonny Reese.

A: I didn't know until afterwards. But, yes, he was.

QQ: Okay, and so you would have been maybe the fifth Cincinnati officer to arrive?

A: I believe I was the sixth.

QQ: And, uhm, if you observed, there was St. Bernard and a University of Cincinnati officer, a St. Bernard - present at the time you arrived.

A: I didn't realize they were there until afterwards.

Q: Are you familiar with the steps that are to be taken after a struggle, that type of a struggle, as it relates to the particular Training Bulletin? What should occur after a struggle like that?

A: As it related to the bulletin, the Training Bulletin?

Q: Correct.

A: No.

Q: Did you ever hear any signs of gasping, I know I probably asked this before, or any type of shallow breathing as you were attempting to handcuff?

A: No.

Q: Dave.

QQ: Uhm, excuse me, just one other thing. After he was successfully handcuffed, did he quiet down or calm down at that time as you guys got back on your feet?

A: I don't know when he got quiet, but at some point he did.

8

07084

Q:     Are you – were you watching him you as you stood up? Were you observing

       him?

A:     No.

Q:     Got anything you would like to add?

A:     No.

Q:     We'll end this interview at approximately 8:45 a.m.


                              Transcribed by:        Laura A. Hobson
                                                     Citizen Complaint Authority
                                                     City of Cincinnati
                                                     June 29, 2004


03513 Johnstone

07085

12.110

## 12.110 HANDLING SUSPECTED MENTALLY ILL INDIVIDUALS AND POTENTIAL SUICIDES

**Reference:**

Ohio Revised Code 5122.10 - Emergency
                                Hospitalization;
                                Examination; Disposition
Procedure 12.175 - Use of Special Weapons and
                   Tactics Unit
Procedure 12.180 - Use of Crisis Negotiations Team
Procedure 12.400 - Offense Reporting, Miscellaneous
                   Reporting
Procedure 12.555 - Arrest/Citation: Processing of
                   Adult Misdemeanor and Felony
                   Offenders
Procedure 12.600 - Prisoners: Securing, Handling,
                   and Transporting
Procedure 12.910 - Missing Persons
Standards Manual - 1.1.3, 1.2.6, 41.2.6, 71.1.8,
                   81.2.5

**Policy:**

Mental Health Response Team (MHRT) officers will be
the first responders, when available, on all runs
involving suspected mentally ill individuals. If two
MHRT officers are available, they will be dispatched
as a team. When necessary a cover car will be
dispatched. If the run is an emergency and no MHRT
officer is available, beat cars will be dispatched
immediately and an MHRT officer from another
district will be notified to respond. If the run is
**not** an emergency and no MHRT officer is available,
the nearest available MHRT officer from an adjoining
district will be dispatched as the primary car.

An MHRT officer on the scene of a suspected mentally
ill individual will be the primary officer handling
the situation. They will also be responsible for
transporting the individual, if necessary, to the
hospital.

A supervisor will respond on all radio runs
involving violent or potentially violent mentally
ill individuals and when possible, will consult the
MHRT officer on scene to decide on a course of
action.



Slade

EXHIBIT NO. 2

AMS DEPO

Rev. 7/01/02, Replaces 5/23/00

12.110

Document all encounters with suspected mentally ill individuals on a Minor Accident/Aided Case/Mental Health Response Report (Form 316). This will be in addition to any other reports made.

Any suspected mentally ill person with a mental hold or who voluntarily agrees, when found, will be returned to the facility that reported them missing. If the facility is unknown, the subject is violent, or from outside the Hamilton County boundaries, the suspected mentally ill person will be taken to University Hospital Psychiatric Emergency Services (PES).

*Information:*

When officers arrive on the scene of a suspected mentally ill individual and the situation meets the criteria for activating the Crisis Negotiations Team or the Special Weapons and Tactics Unit, follow the steps as outlined in Procedures 12.175 and 12.180.

Mobile Crisis Team (MCT) members are employees of the Psychiatric Emergency Services Unit at University Hospital. The Mobile Crisis Team is an aid to Department personnel, providing around-the-clock, on-site psychiatric crisis intervention. Their aim is to help prevent harm to a suspected mentally ill person, or others, during psychiatric emergency situations requiring police response.

*Procedure:*

A.   Emergency Hospitalization without Medical Certificate Issued by a Qualified Physician, Ohio Revised Code (ORC) Section 5122.10:

   1.   A police officer may take an individual into custody and transport him to a hospital if:

      a.   The individual is suspected to be mentally ill and likely to injure himself or others if allowed to remain at liberty.

Rev. 7/01/02, Replaces 5/23/00                                    2

12.110

2. ORC Section 5122.10 reads, "A person taking the respondent into custody pursuant to this section, shall explain to the respondent the name, professional designation, and agency affiliation of the person taking the respondent into custody; that the custody taking is not a criminal arrest; and that the person is being taken for examination by mental health professionals at a specified mental health facility identified by name."

3. Whenever there is any use of force or other significant police action with a state mental hold, sign appropriate criminal charges against the individual. This includes any use of force, use of chemical irritant, canine apprehension, or use of the taser, beanbag shotgun, 40mm foam round, or pepperball launcher.

   a. When placing criminal charges, place a prisoner hold at the hospital (see Procedure 12.600). Have Police Communications Section (PCS) notify the hospital if the person is an unusual security risk.

   b. Telephone the Hamilton County Justice Center Intake Office with the necessary information about the individual hospitalized only when placing criminal charges. Call before leaving the hospital.

   c. Complete an Arrest and Investigation Report (Form 527) and process according to Procedures 12.555 and 12.600.

4. Handcuff suspected mentally ill individuals during the transporting and processing phases when the individual's behavior is unpredictable or past contact indicates there is a potential for violence.

5. Explain the use of handcuffs to the person and the family in a tactful manner.

6. Two officers will transport the suspected mentally ill individual.

12.110

    a. The officer with personal knowledge of the individual's behavior or an MHRT officer will accompany the transporting officer to the hospital and complete the proper forms.

7. Only two hospitals in this area will admit individuals under these circumstances. Service is available 24 hours a day, 7 days a week.

    a. Transport adults age 18 and over to University Hospital Psychiatric Emergency Services (PES).

    b. Transport children, under 18 years of age, to Children's Hospital Medical Center.

        1) Handcuffed juveniles are to be brought in through the squad entrance for admission.

8. Upon arrival at the hospital:

    a. Complete the Ohio Department of Mental Health Form for emergency admission. In the "Statement of Belief" section, briefly note:

        1) The circumstances under which the individual came into custody.

        2) The reasons for your belief that hospitalization is necessary.

        3) Any other pertinent information known about the individual.

9. Complete a Form 316.

B. CARE (a Talbert House crisis hotline) Action in Potential Suicides:

1. When CARE/Talbert House personnel receive a telephone call dealing with a potential suicide, they will assess the situation.

    a. If they believe the caller is a threat to himself, they will call Emergency Number 911.

12.110

2. Police Communications Section will:

    a. Relay information to the Cincinnati Bell Telephone Company requesting call tracing.

    b. Relay the address received to the officer in charge (OIC) of the affected district and dispatch two officers to the scene.

    c. Dispatch an MHRT officer to the scene when they are available.

    d. Advise CARE/Talbert House of the address.

3. A shift supervisor will respond to the scene.

4. Applicable law will guide Department personnel in the investigation of these cases. Compassion is a necessary approach to the successful handling of these crisis situations.

C. Mobile Crisis Team (MCT)

1. Mobile Crisis Team members are permanently assigned to Districts One and Five and will primarily work during the day Monday through Friday. Supervisors and MHRT officers can activate the MCT through PES 24 hours a day at 513-584-8577.

2. MCT members will give priority response to the Police Department within the constraints of available staff. This priority response includes:

    a. Responding with MHRT officers in Districts One and Five.

    b. Assessing the nature of a crisis.

    c. Helping to control a situation, if possible.

    d. Providing assistance in determining methods to use in response to the emergency.

12.110

e.  Supplying available psychiatric information about a person in imminent risk of danger to himself or others. The release of this information is in the interest of safety to the person, police, and public in emergency situations.

   1)  Where permitted by law, do not release information given to Department personnel by sources outside the Department without written permission. Do not use this information beyond the current emergency.

      a)  Immediately advise the appropriate outside source of any requests from the public for documents containing information provided by them.

3.  The Mobile Crisis Hotline (513-584-8200) for police provides:

a.  Around the clock contact for any police officer facing a situation involving a suspected mentally ill individual.

b.  Known premise history about a person with a mental illness who is in a dangerous situation.

c.  Immediate suggestions about dealing with a person showing signs of mental illness.

d.  Immediate information about services available to help someone in a psychiatric crisis.

e.  Other necessary information.

4.  The Police Department retains primary authority over any crisis situation covered by these guidelines. In an emergency, the Department will, when appropriate, use the advice and information the Mobile Crisis Team provides.

## 12.545  USE OF FORCE

***Reference:***

Graham vs. Conner, 490 US 386, 396 (1989)
Tennessee vs. Garner, 471 US 1 (1985)
Manual of Rules and Regulations - 1.22, 1.23, 1.24,
                                    1.25, 2.12,
                                    2.26A&B, 4.05
Ohio Revised Code - 2901.01(A)(5) Definitions
                    (Serious physical harm to
                    persons)
Procedure 12.140 - Canine Operations
Procedure 12.170 - Civil Disturbance Operation
                   Procedure
Procedure 12.550 - Discharging of Firearms by
                   Police Personnel
Procedure 12.554 - Investigatory Stops and Field
                   Interview Report (FIR)
Procedure 12.600 - Prisoners: Securing, Handling,
                   and Transporting
Procedure 12.905 - Fingerprinting and Photographing
                   of Juveniles
Procedure 15.100 - Citizen Complaints
Standards Manual - 1.3.1, 1.3.2, 1.3.4, 1.3.5,
                   1.3.6, 1.3.7, 1.3.9, 1.3.10,
                   46.1.4

***Definitions:***

Actively Resisting: the subject is making
physically evasive movements to defeat the
officer's attempt at control, including bracing,
tensing, or pushing, or verbally signaling an
intention to avoid or prevent being taken into or
retained in custody.

Force: any physical strike or instrumental contact
with a person, or any significant physical contact
that restricts movement of a person.  The term
includes, but is not limited to, the use of
firearms, chemical spray, choke holds or hard
hands; the taking of a subject to the ground; or
the deployment of a canine.  The term does not
include escorting or handcuffing a person, with no
or minimal resistance.

Hard Hands: using physical pressure to force a
person against an object or the ground, or use of
physical strength or skill that causes pain or
leaves a mark; leverage displacement, joint
manipulation, pain compliance, and pressure point
control tactics.

Rev. 7/29/03, Replaces 6/1/03                          1

Slade
EXHIBIT NO. 3
AMS DEPO

12.545

Serious use of force: any action by a CPD officer that involves: a critical firearm discharge; the use of deadly force; a baton strike to the head; or a use of force in which the person is seriously injured (as defined in ORC 2901.01(A)(5) or requires hospital admission.

Escorting: the use of light pressure to guide a person, or keep a person in place.

Choke Holds: The courts could consider a chokehold or other similar type holds as deadly force. Chokeholds are prohibited unless a situation arises where the use of deadly force is permissible under existing law and Department policy. The use of any type chokehold to prevent the swallowing of evidence is prohibited.

Deadly Force: force likely to cause or capable of producing death.

Self-Defense: protecting oneself or another from physical harm or serious physical harm.

Crowd Management: observing, monitoring, and facilitating the activities of persons assembled.

Crowd Control: The use of police action to stop the activities of persons assembled.

Use of force in crowd management and/or control: Officers will not initiate the use of force or chemical irritant against crowds or a group of individuals except when reasonable and necessary to protect the officer, the subject, or another party from an risk of death or physical harm or is necessary to effect the arrest of an actively resisting subject, or to prevent the escape of that subject.

Officers encountering crowds will address the situation and determine if a need exists or may exist requiring crowd control or crowd management. Prior to police action, the officers will immediately summon a supervisor to the scene. If crowd control is required or will be required, the supervisor will summon a command officer to the scene. Once on the scene, the command officer will direct all police action and authorize the use of weapons, tools or tactics used to resolve the situation. The approval of a supervisor is required any time chemical irritant is used against a crowd, absent exigent circumstances.

Rev. 7/29/03, Replaces 6/1/03                    2

12.545

The use of force (including the beanbag shotgun, the 40 MM foam round and the pepperball launcher) as well as the use of chemical irritant during periods of civil unrest or for crowd management is restricted. A command officer must be present and must authorize the deployment of these devices, absent exigent circumstances.

Command officers must give verbal notice prior to deploying these devices into a crowd, unless it would present a danger to the officer or others to give such a warning.

Any deployment of the beanbag shotgun, the 40 MM foam round, or the pepperball launcher during crowd management/control requires:

- Specific targeting of a subject by the officer.

- Under no circumstances should any of these devices be deployed into a crowd without first identifying a specific target that represents an imminent risk of death or physical injury to the officer or others.

- The officer must be reasonably sure that the weapons will not strike other individuals in the crowd who pose no threat of violence.

If demonstrators or protesters are in a place they have a legal right to be and are conducting themselves in a non-violent and lawful manner, an officer cannot make their conduct criminal by ordering them to disperse and arresting them if they refuse

**Information:**

Beanbag shotgun and 40mm foam rounds: The beanbag shotgun and 40mm foam rounds are impact projectile devices that offer a less lethal alternative that may be used to subdue or incapacitate a subject to prevent imminent physical harm, while maintaining officer safety.

These types of police tactical tools have been designed for law enforcement to assist in resolving situations, which could otherwise result in the use of deadly force.

**Deleted:** ¶
Resistive Tension: Subject fails to comply with verbal commands from an officer to submit to arrest and makes body rigid by tensing the muscles. Can be full body resistance or a particular body part. Goal of the action is to prevent control by means of superior strength. Conspicuously Ignoring: Subject fails to comply with verbal commands from an officer to submit to arrest and fails to respond to questions or orders, refuses to acknowledge the officer's presence, engages in other activities, or attempts to leave the area.¶
Exaggerated Movement: Subject fails to comply with verbal commands from an officer to submit to arrest and exhibits rapid body movements, such as flailing of the arms, excited pacing, bouncing or similar actions. Actions are often behavioral cues indicating preparation for physical exertion to avoid having the officer take control.Combative/Assaultive: Subject fails to comply with verbal commands from an officer to submit to arrest and attempts, threatens or succeeds in physically assaulting an officer or another person by means of body weapons (hands, feet kicks, punches, elbow strikes spitting, biting etc.)Armed: Subject fails to comply with verbal commands from an officer to submit to arrest and displays or claims to possess a weapon, threatens to obtain or use a weapon, makes overt actions consistent with being armed, or is reported to be armed.¶
Excessive Emotional Tension: Subject fails to comply with verbal commands from an officer to submit to arrest and is belligerent, yelling or argumentative towards the officer or another person. Actions are often behavioral cues indicating preparation for physical exertion to avoid having the officer take control.Ceased All Movement: Subject fails to comply with verbal comm ... [1]
¶
**Deleted:** Information:¶

Rev. 7/29/03, Replaces 6/1/03                                3

12.545

They are designed to enable officers to subdue or incapacitate a subject, in order to prevent imminent physical harm to the officer or another person, by allowing the officers to maintain greater distance between themselves and the subject. Most of the time these tactical tools are used when a subject is armed with or simulating the possession of a potentially deadly instrument and often is someone who is emotionally disturbed, intoxicated, or suicidal. These tools are designed to de-escalate the deadly force potential and allow the subject to be controlled by a lower level of force.

Use of these types of tactical tools is reasonable in situations when allowing the subject to leave would pose an imminent continuing threat to others, including the subject.

These types of impact projectiles may not be used to prevent theft or minor vandalism.

Beanbag shotgun and 40mm foam rounds may only be used to subdue or incapacitate a subject to prevent imminent physical harm. In certain circumstances, it may be inappropriate to use these impact projectile tools, even if the only alternative is to allow the subject to escape. Officers must consider the severity of the crime at issue, whether the subject poses an immediate threat of imminent physical harm to officers or other persons, and whether the subject is actively resisting arrest.

PR-24: The PR-24 is an impact tool that offers a less lethal method for subduing and apprehending violent and/or actively resisting subjects. Compared to empty hand counter strikes, the PR-24 is less likely to cause injury to the officer and provides added distance from the subject. Officers should target a subject's torso, arms, and legs, and avoid, unless threatened with serious physical harm, the subject's head, throat, neck, heart, and groin.

Pepperball: The Pepperball launcher is a non-lethal tool, according to the manufacturer, and provides another alternative to assist in apprehending violent and/or actively resisting individuals while maintaining officer safety. This impact and chemical irritant device is capable of incapacitating subjects, thereby reducing their ability to continue aggressive action.

12.545

Taser: The taser is an electronic control device that is a less lethal force alternative used to assist officers in the performance of their duties. The taser is designed to temporarily immobilize a violent or potentially violent suspect. It generates electricity in a small, hand held battery operated unit about the size of a flashlight. When properly used, the taser generates an electrical current that dominates the existing neuromuscular system. Suspects become disoriented and unable to control muscular movement, allowing officers to subdue them.

The taser electronic control device may be used in situations where time and conditions permit the consideration of an alternate force. The taser can be an extremely effective control device for close range immobilization. Only officers successfully completing the Department taser training program will use the taser. The taser should never be aimed at the subject's head, neck, eyes, or groin.

Chemical irritant: Chemical irritant offers a non-lethal alternative for controlling, subduing, or apprehending a suspect(s). Chemical irritant will leave an invisible ultraviolet, light-sensitive dye on an individual, which can aid in identification.

The use of chemical irritant, including the use of chemical irritant against a crowd or a group of individuals is only permitted in those cases in which such force is necessary to protect the officer, the subject, or another party from physical harm, or is necessary to effect the arrest of an actively resisting subject, or prevent the escape of that subject.

Personnel may only use chemical irritant to control a resisting subject when verbal commands and other techniques that do not require the use of force would be ineffective, or where issuing verbal commands would present a danger to the officer or others. A verbal warning must be issued to the subject that chemical spray will be used prior to the use of chemical spray, unless it would present a danger to the officers or others to issue such a warning and, when feasible, the officer will defer using chemical spray for a reasonable time to allow the subject to comply with the warning. Chemical irritant should only be aimed at the subject's face and upper torso.

12.545

*Policy:*

Cincinnati Police Officers must recognize and respect the value and dignity of every person.

In vesting officers with the lawful authority to use force to protect the public's welfare, a careful balancing of all human interests is required.

Courtesy in all public contacts encourages understanding and cooperation. The most desirable method for effectuating an arrest is where a suspect complies with simple directions given by an officer.

When officers are confronted with a situation where control is required to effect arrest or protect the public's safety, officers should attempt to achieve control through advice, warnings, and persuasion.

The suspect should be allowed to submit to arrest before force is used, unless this causes unnecessary danger to the officer or others.

When officers have a right to make an arrest, they may use whatever force is reasonably necessary to apprehend the offender or effect the arrest, and no more. Just as officers must be prepared to respond appropriately to rising levels of resistance, they must likewise be prepared to immediately de-escalate the use of force as the subject de-escalates or comes under police control. They must avoid using unnecessary violence. Their privilege to use force is not limited to that amount of force necessary to protect themselves or others, but extends to that amount reasonably necessary to enable them to effect the arrest of a resistant subject.

Force situations often do not allow for ordinal progression up a continuum of force and officers must be ready to escalate or de-escalate as the situation evolves.

Disengagement is a reasonable option in consideration of officer safety and the necessity to apprehend immediately. Disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements or calling in specialized units may be an appropriate response to a situation and should be considered.

Rev. 7/29/03, Replaces 6/1/03                                    6

12.545

Force options may be used simultaneously, for instance, combining verbal commands with use of chemical irritant. The officer must choose the necessary response based on law, department policy, training, and experience.
The officer must exercise proper use of force decision making, which means the use of reasonable force, including proper tactics, and de-escalation techniques.

All members of the CPD have a duty to ensure that use of force and any citizen allegation of excessive force are reported to the Police Department. Whenever employees use deadly force, force, hard hand tactics, chemical irritant, or confronts resistance that results in an injury or complained of injury to a citizen, or have knowledge of any of the above, or are aware of a citizen complaint of excessive force they will immediately notify a supervisor.

Officers who use excessive force will be subject to discipline, possible criminal prosecution, and/or civil liability.

Following any use of force resulting in a citizen's injury, officers will ensure appropriate first aid is rendered immediately once the incident scene is stabilized.

# Use of Force Continuum

12.545

| SUBJECT RESISTANCE | FORCE OPTIONS | OFFICER / SUBJECT FACTORS |
|---|---|---|
| **Compliant / Cooperative**<br>Complies with verbal commands and other directions | Officer Presence | Physical Size |
| | Verbal Skills | Influence of alcohol or drugs on subject |
| **Uncooperative**<br>Fails to respond to verbal commands or other directions. | Chemical Irritant | Subject's mental capacity or impairment |
| | Escort Techniques | Multiple suspects |
| **Active Resistance**<br>Subject is making physically evasive movements to defeat the officer's attempt at control, including bracing, tensing, or pushing, or verbally signaling an intention to avoid or prevent being taken into or retained in custody. | Restraining Techniques<br><br>Balance Displacement<br><br>Hard Hands (Pressure Points/Strikes)<br><br>PR-24 (Baton) | **SPECIAL CIRCUMSTANCES**<br><br><br>Environmental Factors |
| **Assault or Threat of Assault**<br>Subject assumes fighting stance, charges, strikes, or kicks an officer or verbally or physically indicates intent to commit an assault combined with the subject capability to assault | Less Than Lethal<br>  Beanbag Shotgun<br>  40 mm Foam Round<br>  Pepperball Launcher<br>  Taser | Distance from subject<br><br>Officer injury / exhaustion<br><br>Proximity of weapon<br><br>Officer on ground |
| **Life Threatening Assault or Assault Likely to Cause Serious Physical Harm**<br>Subject commits an attack using an object, a weapon, or an empty hand assault, wherein the officer reasonably believes the assault will result in serious physical harm and/or death | Deadly Force | Special knowledge<br><br>Crime involved<br><br>History / knowledge of subject |

Each force situation is unique and this continuum is intended only as an illustration of the various force options that are available to an officer facing a given level of subject resistance. This continuum is not intended to preclude a force option when that option would not exceed the amount of force reasonably necessary to effect a lawful arrest (Graham v. Connor, 490 U.S. 386 (1989)). Good judgement and the circumstance of each situation will dictate the level on the continuum of force at which an officer will start. Depending on the circumstances, officers may find it necessary to escalate and de-escalate the use of force by progressing up and down the force continuum. It is not the intent of this continuum to require officers to try each of the options before moving to the next, as long as the level of force used is reasonable under the circumstances. Disengagement, area containment, surveillance, waiting out a suspect, summoning reinforcements or calling in specialized units may be an appropriate response to a situation.

Rev. 7/29/03, Replaces 6/1/03

8

12.545

*Procedure:*

A.   Use of Beanbag Shotgun

    1.   Two supervisors' cars and ten beat cars in each district are equipped with beanbag shotguns.

        a.   Supervisors are responsible for loading beanbag shotguns.

        b.   Never load regular shotgun ammunition into beanbag shotguns or vice versa.

    2.   A beanbag shotgun shell is a standard 2 3/4 inch, 12 gauge shotgun shell with a transparent hull for easy identification.

        a.   Stocks on beanbag shotguns are orange and clearly labeled as "less letnal."

    3.   Beanbag shotguns will be carried with four rounds loaded in the magazine tube and no round in the chamber.  They will be de-cocked with safety on, in secured boxes, in the trunks of vehicles.

        a.   A breakaway seal will be on each box.

        b.   Do not remove and inspect the beanbag shotgun at the beginning of each shift.

            1)   Open the trunk and check the seal. If the seal is intact, the weapon is ready to be used.

            2)   If the seal is broken, call for a supervisor to inspect the weapon and reseal the box.

    4.   If the shotgun is removed during the shift, a supervisor must inspect the shotgun and reseal it in the box.

    5.   Supervisors will ensure beanbag shotguns are evenly disbursed geographically throughout each district.

    6.   Neither permission from nor the presence of a supervisor is required for officers to use beanbag shotguns, except in crowd control situations.

12.545

a. The presence of a second officer is highly recommended in the event the officer using the beanbag shotgun encounters lethal resistance.

7. Where the distance between the officer and the target makes it practical, verbal warnings will be given prior to use, absent exigent circumstances. Where feasible, officers will allow a reasonable time between the warning and use of the beanbag shotgun.

8. When using a beanbag shotgun, the manufacturer's recommended distance is no less than 20 feet and no more than 75 feet from a suspect. Beanbag rounds have an optimal effective range of 20 to 50 feet with a maximum effective range of 75 feet.

   a. Using a beanbag shotgun within 20 feet of an individual increases the chance of serious injury. In cases involving self defense, defense of another, or a situation where the round is used as an alternative to deadly force, when deadly force would be appropriate, the use of the beanbag round at a distance less than 20 feet is acceptable.

   b. If serious injury requiring hospitalization occurs from using a beanbag shotgun, follow the notification process for shots fired as outlined in Procedure 12.550.

9. When using a beanbag shotgun, target a specific part of the body. Avoid the head, neck, heart, and groin areas, if possible.

   a. Take any individual struck with a beanbag round to University Hospital for medical evaluation.

10. While multiple beanbag rounds may be expended as necessary, no more than two beanbag shotguns should be simultaneously deployed on an individual.

11. If four rounds prove to be ineffective, officers need to consider another option.

Rev. 7/29/03, Replaces 6/1/03                    10

pleasant

hol

okay

12.545

12. After using a beanbag shotgun, and after an individual is under control, immediately notify onlookers that a beanbag shotgun, not a regular shotgun, was used. Inform the onlookers that the beanbag shotgun is a less lethal alternative designed to apprehend individuals without causing serious injury.

    a. Officers are exempt from the notification requirements during incidents involving civil unrest.

B. Use of 40mm Foam Round

1. A 40mm foam round launcher will be assigned to each district.

2. The 40mm foam round consists of a soft rubber sponged nose attached to a hard plastic carrier.

3. The 40mm foam round launcher is a single shot shoulder mounted weapon.

    a. A holographic sight is attached to the launcher to assist with aiming and shot placement.

4. Only supervisors and officers trained in the use of the 40mm foam round launcher are permitted to use the weapon.

    a. The presence of a second officer is highly recommended in the event the officer using the 40mm foam round launcher encounters lethal resistance.

    b. Where the distance between the officer and the target makes it practical, verbal warnings will be given prior to use, absent exigent circumstances. Where feasible, officers will allow a reasonable time between the warning and use of the foam round.

    c. If serious injury requiring hospitalization occurs from using a 40mm foam round, follow the notification process for shots fired as outlined in Procedure 12.550.

Rev. 7/29/03, Replaces 6/1/03

11

12.545

5. When using the 40mm foam round, target a specific part of the body. Avoid the head, neck, heart, and groin areas, if possible. The 40mm exact impact sponge round will prove most successful for incapacitation when used within its optimal energy range of approximately 10 to 75 feet, although it may be used in situations from 5 to 120 feet.

   a. Take an individual struck with a 40mm foam round to University Hospital for medical evaluation.

6. If four rounds prove to be ineffective, officers need to consider another option.

7. After using the 40mm foam round launcher, and after an individual in under control, inform onlookers that the 40mm foam round is a less lethal alternative designed to apprehend individuals without causing serious injury.

   a. Officers are exempt from the notification requirements during incidents involving civil unrest.

C. Use of Pepperball

1. Pepperball launchers will be assigned to the districts at the discretion of the Police Chief.

2. The Pepperball round consists of a small hard plastic sphere containing OC pepper powder.

3. The Pepperball launcher is a semi-automatic shoulder mounted, high capacity weapon powered by compressed air.

   a. Each district will be assigned one SCUBA compressed air tank and a Pepperball fill adapter.

   b. Any member of Cincinnati Fire Squad 52 can refill SCUBA tanks at the firehouse at 5th and Central Avenues.

4. Only supervisors and officers trained in the use of Pepperball launchers are permitted to use the weapons.

12.545

    a.  The presence of a second officer is highly recommended in the event the officer using Pepperball encounters lethal resistance.

    b.  If serious injury requiring hospitalization occurs from the use of Pepperball, follow the notification process for shots fired as outlined in Procedure 12.550.

5.  When using Pepperball, aim at center mass. Avoid the head, neck and groin areas if possible. The effective range of the Pepperball is 0 to 30 feet for targeting individuals and up to 100 feet for area saturation according to manufacturer's specifications.

    a.  Generally, four to ten rounds should be deployed at a subject. More rounds may be utilized, if in the opinion of the officer, the additional rounds will assist in gaining compliance of the individual.

    b.  Heavy clothing can hinder the effectiveness of the Pepperball rounds. If a subject is wearing heavy clothing, consider targeting the legs.

    c.  Subjects struck with Pepperball rounds often lower their head and turn away from the source of impact. It is important to anticipate this reaction when employing Pepperball rounds.

    d.  Decontamination for individuals exposed to Pepperball OC powder is fresh air and clear cool water.

6.  Pepperball rounds can be used to saturate an area with OC powder by aiming the rounds at solid objects such as buildings, walls or the ground.

7.  After using Pepperball, and after the individual is under control, inform onlookers that Pepperball is a non-lethal alternative designed to apprehend individuals without causing serious injury.

12.545

a. Officers are exempt from the notification requirements during incidents involving civil unrest.

D. Use of the Taser:

1. Use the taser to control violent or potentially violent suspects under the following conditions:

   a. Attempts to subdue the subject by conventional tactics are inappropriate or ineffective.

   b. There is reasonable expectation it will be unsafe for officers to approach within contact range of the suspect.

2. Officers should, if possible, obtain sufficient backup before using the taser to control the suspect.

   a. Deploy personnel in such a manner that will enable them to use other appropriate means to subdue the subject if the taser is ineffective.

   b. Officers will use extreme caution and avoid standing near the subject.

3. Depressing the taser release bar will propel two darts. The darts pull two fine conducting wires from a cassette. The target bar must be held down for at least 5 seconds to be effective, and must not be held down for longer than 20 seconds.

   a. It is necessary for both darts in a cassette to hit some part of the suspect's clothing or body for the taser to be effective.

      1) If the suspect is wearing heavy clothing, the taser may not be effective.

      2) If a first shot does not make contact or is ineffective, attempt a second shot.

      3) If a second shot does not make contact or is ineffective, end taser deployment.

Rev. 7/29/03, Replaces 6/1/03                              14

12.545

      b.  Due to the high voltage electronic spark of the taser, never test or fire it near flammable materials.

          1)  Do not use the department issued chemical irritant and the taser simultaneously.

4.  Medical Treatment Guidelines:

      a.  Officers will obtain appropriate medical treatment for suspects when necessary.

      b.  Only medical personnel may remove darts embedded in a subject's skin.

          1)  Transport the individual to University Hospital for removal.

5.  Charging and Care of the Taser:

      a.  Designated vehicles in Park Unit, Traffic Unit, and the districts are equipped with unloaded tasers.

          1)  Do not store taser cartridges at temperatures above 150 degrees Fahrenheit. Extreme temperatures can cause defects in the cartridges. Supervisors will remove the taser and cartridges from police vehicles not in use when temperatures could exceed the recommended storing temperatures.

      b.  All districts, the Park Unit, and Traffic Unit have taser battery chargers.

      c.  When the taser is used, replace with a fully charged battery. When used for a brief test activation, replace the battery with a fully charged battery at shift completion.

      d.  Do not leave the same battery in a taser for more than two weeks without recharging, even if the taser was not used.

      e.  Nickel cadium batteries are spent after 500 to 1000 charges. This equates to approximately six months field use.

12.545

E.  Use of Chemical Irritant:

1.  Unless it would present a danger to the officer or another, a verbal warning to the individual that chemical irritant will be used must be issued prior to use.

2.  Where feasible, officers will defer using the chemical irritant a reasonable time to allow the individual to comply with the verbal warning.

3.  Officers may only use chemical irritant on a restrained individual when the restrained individual or another person is likely to suffer injury or to escape, absent the use of the chemical irritant.

4.  If it is necessary to use chemical irritant on a violent prisoner after handcuffing and placing him in the rear seat of the police vehicle, officers will not open the rear doors of the police vehicle to spray the prisoner. Instead officers will spray the prisoner through the protective screen.

    a.  If the vehicle is equipped with a plexiglass partition, officers can either slide the partition to an open position and spray the prisoner through the opening, or through the rear door window nearest the prisoner's face.

    b.  This should be rare and used only after officers issue a verbal warning and when other uses of force would be ineffective.

5.  When spraying chemical irritant, if possible spray five to ten feet from an individual using a 3 second burst(s). The target should be an individual's face and upper torso.

6.  Officers may not keep a sprayed individual in a face-down position any longer than necessary to handcuff or end the threat of harm or escape.

7.  Absent exigent circumstances, officers will offer to decontaminate every sprayed individual within 20 minutes of the use of chemical irritant.

Rev. 7/29/03, Replaces 6/1/03                    16

12.545

a. Expose individuals sprayed with chemical irritant to fresh air. Give them an opportunity to rinse their face with plenty of clear, cool water.

b. Individuals should not rub or hold their faces, or use any oils, creams, or ointments.

8. Officers are required to request medical assistance for sprayed individuals in the following circumstances:

a. When the individual complains of continued effects after having been decontaminated.

b. The individual indicates that they have a pre-existing medical condition (e.g. asthma, emphysema, bronchitis, heart ailment, etc.) that may be aggravated by the chemical irritant.

**Deleted:** Police officers have a number of options available when confronted with a situation that requires use of force. Force decision making will reflect not only the amount of resistance encountered but also factors related to the officer and subject involved as well as circumstances in the particular environment where the incident occurs. There may be circumstances where the best option is to disengage and wait for other officers, contain the individual without engaging him, or simply wait him out. ¶
Force situations often do not allow for a neat progression up a continuum of force and officers must be ready to escalate or de-escalate as the situation evolves. Force options may be used simultaneously, for instance, combining verbal skills with use of chemical irritant. The officer must choose the necessary response based on law, department policy, training, and experience.¶
¶
Force Options ... [2]

12.545

*Reporting Use of Force*

| Force used | Reporting requirement |
|---|---|
| Deployment of police canine (no bite) | Form 18C, explaining circumstances that led to the deployment. |
| Escorting or handcuffing a person, with no or minimal resistance | No special reporting required other than the narrative of the arrest report |
| "Hard hands" use of force by means of leverage displacement, joint manipulation, pain compliance, and pressure point control tactics; without injury or complained of injury | The arresting officer(s) will be required to notify a supervisor and document a narrative account of the subject's form(s) of resistance and the officer's specific defensive tactic used to overcome that resistance in the narrative of the arrest report and complete an officer's report of non-compliant suspect/arrestee form report to be reviewed and approved by a supervisor. The use of force report will require the officer to identify the events leading up to the use of force and the supervisor will be required to evaluate the tactics used by the officer. |
| Force using any physical strike or instrumental contact with a person; chemical irritant; choke holds; deployment of a canine resulting in a bite; beanbag shotgun and forty millimeter foam rounds; taser; pepperball; and any use of force resulting in injury or complained of injury or allegation of excessive force | Supervisors will be called to the scene and conduct a supervisory investigation including the supervisor's narrative description of the events preceding the use of force, the officer(s)' description of events, and audio taped statements of all witnesses including the officer(s), subject(s), medical treatment personnel (if practicable), and third-parties. For chemical irritant use, taped statements are only required if the use occurs after handcuffing. |
| All serious uses of force (as defined in the definition section of this order) and all canine bites which cause serious injury or hospital admission | CIS and IIS will respond to the scene of, and investigate |

Rev. 7/29/03, Replaces 6/1/03

18

**Deleted:** *Policy:¶*
¶
Cincinnati Police Officers must recognize and respect the value and dignity of every person. In vesting officers with the lawful authority to use force to protect the public's welfare, a careful balancing of all human interests is required.¶
¶
----------Page Break----------
Courtesy in all public contacts encourages understanding and cooperation. The most desirable method for effectuating an arrest is where a suspect complies with simple directions given by an officer. ¶
When officers are confronted with a situation where control is required to effect arrest or protect the public's safety, officers should attempt to achieve control through advice, warnings, and persuasion. The suspect should always be allowed to submit to arrest before force is used, unless this causes unnecessary danger to the officer.¶
¶
When officers have a right to make an arrest, they may use whatever force is reasonably necessary to apprehend the offender or effect the arrest, and no more. Just as officers must be prepared to respond appropriately to rising levels of resistance, they must likewise be prepared to immediately deescalate the use of force as the subject deescalates or comes under police control. They must avoid using unnecessary violence. Their privilege to use force is not limited to that amount of force necessary to protect themselves, but extends to that amount reasonably necessary to enable them to effect the arrest of a resistant subject.¶
¶
Service of court orders or arrest warrants will be done with extreme caution and, when possible, only after adequate numbers of officers are on the scene.¶
¶
... [3]

12.545

F. Reporting a Use of Force: ........................................................................ | Deleted: Procedure:

1. The investigating supervisor will immediately notify the district/section/unit OIC (officer in charge), if on duty, or the Night Chief, if on duty. The use of force will not be investigated by any officer who used force or chemical irritant during the incident, whose conduct led to the injury to a prisoner, or who authorized the conduct that led to the reportable incident.

   a. If none of the above are on duty, ensure the next command officer is notified when he comes on duty.

   b. Contact the IIS (Internal Investigation Section) Commander and the officer's district/section/unit commander for all serious uses of force (as defined in the definition section of this order) and all canine bites which cause serious injury or hospital admission.

   c. Contact the IIS (Internal Investigation Section) Commander and the officer's district/section/unit commander if more than the necessary amount of force appears to have been used, or the injuries are inconsistent with the reported force.

2. The supervisor will conduct a preliminary fact finding interview of any witnesses and officers at the scene, and search for evidentiary materials. The supervisor will then conduct a thorough investigation and evaluate the propriety of the action taken.

   a. Other than a simple use of chemical irritant, a supervisor will ensure neutral officers transport the prisoner to a detention facility or hospital, if applicable.

      1) Officers may remove a prisoner to a safe location to prevent an escalation of the incident.

   b. Detail supervisors will be responsible for the investigation of a use of force involving officers under their supervision.

Rev. 7/29/03, Replaces 6/1/03                    19

12.545

    c.  A supervisor in the district where the force occurred will investigate and report incidents when the officer is off duty.

       1)  If a use of force occurs outside the city limits, a supervisor from the closest district will investigate the incident.

    d.  If an officer is involved in a use of force outside a 50-mile radius of the city, the officer will immediately contact a PCS (Police Communications Section) supervisor and notify him of the use of force. The officer will leave a phone number where he can be contacted.

       1)  PCS will contact the involved officer's assigned district/section/unit commander and notify him of the incident.

       2)  The district/section/unit commander will call the officer to determine the correct course of action.

3.  After the preliminary fact finding interview, tape record all further interviews with the arrested, civilian witnesses, and police officer witnesses in incidents involving canine bites or the physical use of force. Attach the interview tapes to the original report.

    a.  The tape recorded interview will contain the following information:

       1)  Date, time, and location of interview.

       2)  Interviewer's name and title.

       3)  Reason for the interview, e.g., "I am investigating the arrest of John Doe, which took place at 1012 Ludlow Avenue."

       4)  Identity of the person interviewed.

Rev. 7/29/03, Replaces 6/1/03          20

12.545

     5)  Explanation of what happened with specific reference to how the injury occurred. Do not ask leading or suggestive questions.

   b.  If more information is needed, ask the appropriate questions.

   c.  Upon completion, conclude the taped interview by identifying yourself, the person interviewed, and state the time; e.g., "This is Sgt. Saunders concluding this interview with Mr. John Doe. The time is 2000 hours."

4.  The investigating supervisor will interview and examine the subject of the use of force. Be sure the arrested is fully aware of the supervisor's rank and purpose of the interview. The supervisor is responsible for examining the subject for any injuries and is responsible to ensure that necessary medical attention is secured.

   a.  The investigating supervisor will take Polaroid photographs of the subject. Take specific photos of any injury, or claimed injury, to the subject.

     1)  The investigating supervisor will record his name, badge number, date, time, and name of the subject on the photographs. Attach the photographs to the original report.

   b.  Anytime the subject of a use of force goes to a hospital, a supervisor will respond and:

     1)  Ask permission of the medical staff to view the arrested to note the total extent of the injuries.

     2)  Interview the arrested. Tape record the interview.

     3)  Interview the treating physician. Tape record the interview if the physician permits it. Include the diagnosis in the report.

12.545

a) If the treating physician cannot release a diagnosis of the subject's injuries due to doctor-patient confidentiality, the supervisor will note it in the report.

4) If possible, obtain a hospital and Department release for medical records from the arrested. Attach the release to the original investigative report.

5) Note on the Form 18F if the subject refuses treatment at the hospital.

5. If the arrested is seriously injured (as defined in this policy) or admitted to a hospital, immediately notify the IIS Commander, the district/section/unit commander of the involved officer, the CIS (Criminal Investigation Section) Commander, and the Night Chief/Duty Officer if on duty.

a. Incidents involving the self-ingestion of contraband are exempt from the procedure.

b. The Homicide Unit and IIS will conduct an investigation with the assistance of the affected district/section/unit when the injury is a result of the use of force.

1) The district/section/unit commander will coordinate the investigation in the absence of an IIS investigator.

a) The CIS and IIS Commanders will forward all findings and reports to the Police Chief's Office through command channels.

b) When IIS or the Homicide Unit is conducting the use of force investigation, the unit responsible for the primary investigation will complete a Form 18F.

Rev. 7/29/03, Replaces 6/1/03                    22

12.545

6. The investigating supervisor will complete a Form 18F.

    a. Ensure all blocks are completed. Multiple blocks may be checked, as applicable, in the following defined categories:

Ceased All Movement: Subject fails to comply with verbal commands from an officer to submit to arrest and abruptly stops all movement. This is often a behavioral cue that the subject is forming a plan to resist the officer.

Conspicuously Ignoring: Subject fails to comply with verbal commands from an officer to submit to arrest and fails to respond to questions or orders, refuses to acknowledge the officer's presence, engages in other activities, or attempts to leave the area.

Resistive Tension: Subject fails to comply with verbal commands from an officer to submit to arrest and makes body rigid by tensing the muscles. Can be full body resistance or a particular body part. Goal of the action is to prevent control by means of superior strength.

Exaggerated Movement: Subject fails to comply with verbal commands from an officer to submit to arrest and exhibits rapid body movements, such as flailing of the arms, excited pacing, bouncing or similar actions. Actions are often behavioral cues indicating preparation for physical exertion to avoid having the officer take control.

Excessive Emotional Tension: Subject fails to comply with verbal commands from an officer to submit to arrest and is belligerent, yelling or argumentative towards the officer or another person. Actions are often behavioral cues indicating preparation for physical exertion to avoid having the officer take control.

Combative/Assaultive: Subject fails to comply with verbal commands from an officer to submit to arrest and attempts, threatens or succeeds in physically assaulting an officer or another person by means of body weapons (hands, feet kicks, punches, elbow strikes spitting, biting etc.)

12.545

Armed: Subject fails to comply with verbal commands from an officer to submit to arrest and displays or claims to possess a weapon, threatens to obtain or use a weapon, makes overt actions consistent with being armed, or is reported to be armed.

    b.   Include concise statements addressing corroboration or contradiction for each witness.

    c.   Type a brief summary of the Use of Force incident on the Form 18F that includes the following information.

        1)   Decision to arrest, including the basis for the stop and seizure

        2)   How the subject resisted arrest

        3)   Subject's resistive behavior

        4)   Officer's tactics and actions to counter resistance/assault

        5)   The supervisor's analysis of the propriety of the officer(s) use of force

7.   The investigating supervisor will complete a Citizens Complaint Form (Form 648), if while investigating a use of force, the individual alleges excessive force. He will investigate the complaint thoroughly while all participants and witnesses are present. See Procedure 15.100 for routing of the form.

8.   The investigating supervisor will ensure the completion of and sign the Form 527 (Arrest and Investigation Report) and Form 527A (Case and Bond Information Sheet) listing the prisoner's physical condition. The Form 527 will accompany the prisoner to Central Intake at the Hamilton County Justice Center.

9.   The investigating supervisor will immediately facsimile the Form 18F to the following locations:

    a.   Police Chief's Office

    b.   Internal Investigations Section

Rev. 7/29/03, Replaces 6/1/03           24

12.545

c. Patrol Bureau

d. Inspections Section

10. The original report and one copy will be forwarded to the involved officer's assigned district/section/unit commander. The district/section/unit commander will review the original report and complete a use of force supplement. Within seven days, the district/section/unit commander will forward, in a sealed envelope, the taped statements, photos, and original report to the Police Chief's Office through the affected bureau commander.

   a. Inspections Section will file the photographs and tapes with its copy of the Form 18F.

11. If an additional investigation is required, note it on the supplement.

12. The investigating supervisor will make a blotter entry describing the incident and action taken.

13. Following each use of force investigation conducted by a supervising officer, an officer at the rank of lieutenant or higher will review the investigation, identify any discrepancies, and require the supervising officer who conducted the investigation to correct any such deficiencies. Appropriate non-disciplinary corrective action and/or disciplinary action will be taken when a supervising officer fails to conduct a thorough investigation or fails to properly adjudicate an incident, or when a reviewing lieutenant neglects to recommend appropriate corrective action.

G. Reporting Process for Use of Taser/Beanbag Shotgun/40 mm Foam Round/Pepperball Launcher

1. Supervisors must complete a detailed Form 18TBFP after any officer uses one of the above devices. The Form 18TBFP must be completed whether or not an individual is struck with a beanbag, 40 mm, or Pepperball round.

**Deleted:** E. Use of the Taser:¶
¶
1. Use the taser to control violent or potentially violent suspects under the following conditions:¶
¶
a. Attempts to subdue the subject by conventional tactics are inappropriate or ineffective.¶
¶
b. There is reasonable expectation it will be unsafe for officers to approach within contact range of the suspect.¶
¶
2. Officers should, if possible, obtain sufficient backup before using the taser to control the suspect.¶
¶
a. Deploy personnel in such a manner that will enable them to use other appropriate means to subdue the subject if the taser is ineffective.¶
¶
b. Officers will use extreme caution and avoid standing near the subject.¶
¶
3. Depressing the taser ... [4]

**Deleted:** D. Use of 40mm Foam Round¶
¶
1. A 40mm foam round launcher will be assigned to each district.¶
¶
2. The 40mm foam round consists of a soft rubber sponged nose attached to a hard plastic carrier.¶
¶
3. The 40mm foam round launcher is a single shot shoulder mounted weapon.¶
¶
a. A holographic sight is attached to the launcher to assist with aiming and shot placement.¶
¶
4. Only supervisors and officers trained in the use of the 40mm foam round launcher are permitted to use the weapon..¶
¶
<#>The presence of a second officer is highly recommended in the event the officer using the 40mm foam round launcher encounters lethal resistance.¶
¶ ... [5]

a. Complete a Form 18T (Taser Silhouette Report) for taser use and attach to the Form 18TBFP.

   1) Report any accidental discharges on a Form 17 and route via chain of command.

b. Facsimile the Form 18TBFP to the following locations:

   1) Police Chief's Office

   2) Patrol Bureau

   3) Inspections Section

c. Send the original report and one copy to the district/section commander. After review, the district/section commander will forward the original report to Inspections Unit through the affected bureau commander.

d. No supplementary report is necessary unless requested by the Police Chief or bureau commander.

e. The relief officer in charge is responsible for providing a media voice mail, as soon as possible after the incident, describing the incident and the use of the taser/beanbag shotgun/40mm foam round/Pepperball launcher.

H. Reporting Process for an Injury to Prisoner:

1. Supervisors will complete a Form 18I for any injury to the arrested, not the result of the use of force, while under or just prior to police control, and as a result of police activity.

2. The narrative section of the Form 18I will be brief and concise. If the incident also involved the use of chemical irritant, the narrative must address the circumstances warranting chemical irritant usage as well as the circumstances of the injury.

Rev. 7/29/03, Replaces 6/1/03                    26

12.545

3. Facsimile the Form 18I to the following locations:

    a. Police Chief's Office.

    a. Patrol Bureau.

    c. Inspections Section.

4. Forward the original Form 18I along with the photographs to the district/section/unit commander for review.

I. Reporting Process for Use of Chemical Irritant

1. Supervisors will complete a Form 18CI when reporting the use of chemical irritant.

    a. Facsimile copies to:

        1) Patrol Bureau

        2) Inspections Section

    b. Forward the original report to the involved officer's assigned district/section/unit commander. After review, the district/section/unit commander will forward the original report to Inspections Section through the affected bureau commander.

    c. Keep a copy for the unit files.

2. The investigating supervisor will make a blotter entry describing the incident and action taken.

3. Inspections Section will maintain and file all Forms 18CI.

J. Priority of Forms:

1. If more than one act by an individual occurs (e.g., use of force and a use of beanbag shotgun), only one report is needed.

2. Listed below is the order in which a report is made, with "1." being the highest priority:

    a. Use of Force

12.545

           1) Include taser/beanbag shotgun/40mm foam round/Pepperball information, if applicable.
           2) Include canine information, if applicable.

      b. Taser/Beanbag Shotgun/40mm Foam Round/Pepperball

           1) Include canine information, if applicable.

      c. Canine

      d. Injury to Prisoner

      e. Chemical Irritant

      f. Officers' report non-compliant suspect/arrestee

K. Documentation Needed for Each Form:

    1. Form 18F (Supervisor's Use of Force Investigation Report):

      a. Taped statement

      b. Photos

      c. Medical release (if treated)

      d. Summary of doctor's diagnosis (if treated)

    2. Form 18TBFP (Use of Taser /Beanbag Shotgun / 40 mm Foam Round / Pepperball):

      a. Taped statement with use of beanbag shotgun, 40 mm foam round, Pepperball.

      b. No taped statement with use of taser

      c. Photos

      d. Medical release (if treated)

      e. Summary of doctor's diagnosis (if treated)

    3. Form 18C (Use of Canine - Canine Bite):

      a. Taped statement

b.  Photos

c.  Medical release (if treated)
d.  Summary of doctor's diagnosis (if
    treated)

4.  Form 18CI (Use of Chemical Irritant):

    a.  Short narrative

    b.  No photos
    f.  No taped statement unless subject was
        handcuffed at the time.

5.  Form 18I (Injury to Prisoner):

    a.  Photos only

    b.  No taped statement

6.  Form 18NC (Officers' report of non-
    compliant suspect/arrestee):

    a.  Report only

L.  Responsibilities of Inspections Section to
    insure policy and procedure compliance and
    implementation:

    1.  Inspections Section will review, and
        evaluate in writing, and submit for Chief's
        approval all supervisor reported use of
        force, use of beanbag shotgun, 40mm foam
        round, and PR-24, and all canine bites
        (except those causing serious injury or
        hospital admission).

    2.  Inspections Section will review, evaluate,
        and submit for Chief's approval all
        investigations of chemical irritant use on
        handcuffed individuals.

    3.  Inspections Section will review all
        Officer's Report of Non-Compliant
        Suspect/Arrestee for trends and training
        issues.

Rev. 7/29/03, Replaces 6/1/03                    29

| Page 3: [1] Deleted | Lou Reiter | 2/6/2003 7:30:00 AM |
|---|---|---|

Resistive Tension: Subject fails to comply with verbal commands from an officer to submit to arrest and makes body rigid by tensing the muscles. Can be full body resistance or a particular body part. Goal of the action is to prevent control by means of superior strength. Conspicuously Ignoring: Subject fails to comply with verbal commands from an officer to submit to arrest and fails to respond to questions or orders, refuses to acknowledge the officer's presence, engages in other activities, or attempts to leave the area.

Exaggerated Movement: Subject fails to comply with verbal commands from an officer to submit to arrest and exhibits rapid body movements, such as flailing of the arms, excited pacing, bouncing or similar actions. Actions are often behavioral cues indicating preparation for physical exertion to avoid having the officer take control.Combative/Assaultive: Subject fails to comply with verbal commands from an officer to submit to arrest and attempts, threatens or succeeds in physically assaulting an officer or another person by means of body weapons (hands, feet kicks, punches, elbow strikes spitting, biting etc.)Armed: Subject fails to comply with verbal commands from an officer to submit to arrest and displays or claims to possess a weapon, threatens to obtain or use a weapon, makes overt actions consistent with being armed, or is reported to be armed.

Excessive Emotional Tension: Subject fails to comply with verbal commands from an officer to submit to arrest and is belligerent, yelling or argumentative towards the officer or another person. Actions are often behavioral cues indicating preparation for physical exertion to avoid having the officer take control.Ceased All Movement: Subject fails to comply with verbal commands from an officer to submit to arrest and abruptly stops all movement. This is often a behavioral cue that the subject is forming a plan to resist the officer.

| Page 17: [2] Deleted | Lou Reiter | 2/6/2003 7:38:00 AM |
|---|---|---|

Police officers have a number of options available when confronted with a situation that requires use of force. Force decision making will reflect not only the amount of resistance encountered but also factors related to the officer and subject involved as well as circumstances in the particular environment where the incident occurs. There may be

circumstances where the best option is to disengage and wait for other officers, contain the individual without engaging him, or simply wait him out.

Force situations often do not allow for a neat progression up a continuum of force and officers must be ready to escalate or de-escalate as the situation evolves. Force options may be used simultaneously, for instance, combining verbal skills with use of chemical irritant. The officer must choose the necessary response based on law, department policy, training, and experience.

| Force Options | Officer/Subject Factors |
|---|---|
| Officer Presence | Physical Size |
| Verbal Skills | Alcohol/Drug Use |
| Chemical Irritant | Mental Illness |
| Assistance from other Officers | Multiple Subjects |
| Soft Hands (Escort, Restrain) | |
| Hard Hands (Pressure Points, Strikes | Special Circumstances |
| PR-24 (Baton) | Environmental Factors |
| Less than lethal (taser, beanbag shotgun, 40 mm sponge round, pepperball) | Distance from Subject |
| | Injury or Exhaustion |
| | Proximity of Weapon |
| Deadly Force (Firearm, other) | Officer on the Ground |
| Disengage | Special Knowledge |

| Page 18: [3] Deleted | Lou Reiter | 2/6/2003 7:34:00 AM |
|---|---|---|

*Policy:*

Cincinnati Police Officers must recognize and respect the value and dignity of every person. In vesting officers with the lawful authority to use force to protect the public's welfare, a careful balancing of all human interests is required.

--------------------------------------Page Break----------------------------------------------
Courtesy in all public contacts encourages understanding and cooperation. The most desirable method for effectuating an arrest is where a suspect complies with simple directions given by an officer.

When officers are confronted with a situation where control is required to effect arrest or protect the public's safety, officers should attempt to achieve control through advice, warnings, and persuasion. The suspect should always be allowed to submit to arrest before force is used, unless this causes

unnecessary danger to the officer.

When officers have a right to make an arrest, they may use whatever force is reasonably necessary to apprehend the offender or effect the arrest, and no more. Just as officers must be prepared to respond appropriately to rising levels of resistance, they must likewise be prepared to immediately deescalate the use of force as the subject deescalates or comes under police control. They must avoid using unnecessary violence. Their privilege to use force is not limited to that amount of force necessary to protect themselves, but extends to that amount reasonably necessary to enable them to effect the arrest of a resistant subject.

Service of court orders or arrest warrants will be done with extreme caution and, when possible, only after adequate numbers of officers are on the scene.

The taser electronic control device may be used in situations where time and conditions permit the consideration of an alternate force. The taser can be an extremely effective control device for close range immobilization. Only officers successfully completing the Department taser training program will use the taser.

Beanbag shotguns, 40mm foam rounds and pepperball rounds may be used anytime officers encounter individuals actively resisting arrest or threatening harm to themselves or others. They may not be used to prevent theft or minor vandalism.

If the offender resists, the officer may use such force as required under the circumstances to overcome the resistance, even to the extent of taking life, if that is necessary. They may not use deadly force merely to prevent escape in misdemeanor cases.

--------------------------------------------Page Break--------------------------------------------

The use of deadly force to prevent escape of felony suspects is constitutionally unreasonable except where the escape presents an immediate risk of death or serious physical harm to the officer or another.

Where the suspect poses no immediate threat of death or serious physical harm to others, the harm resulting from failing to apprehend the suspect does not justify the use of deadly force to do so. If officers use unnecessary and excessive force, or

act wantonly and maliciously, they will be
subjected to disciplinary action, possible criminal
prosecution, and/or civil liability.
When possible, personnel will use chemical irritant as the
primary response to aggressive citizen behavior when verbal
commands and other techniques that do not require the use
of force would be ineffective, or where issuing verbal
commands would present a danger to the officer or others.
Aggressive citizen behavior is defined as any citizen who
displays or engages in any of the following behaviors
resistive tension, conspicuously ignoring, exaggerated
movement, combative/assaultive behavior, armed, excessive
emotional tension, subject ceased all movement, and/or
subject has a violent history, as those terms are further
defined above.
Officers will sign the appropriate criminal charges
following a use of chemical irritant or force incident
associated with the signing of a state mental hold.

A charge of Resisting Arrest is not appropriate when the
only other action is the signing of an Emergency
Hospitalization Examination/state mental hold.

| Page 25: [4] Deleted | Lou Reiter | 2/6/2003 12:54:00 PM |
|---|---|---|

   B.   Use of the Taser:

        1.   Use the taser to control violent or
             potentially violent suspects under the
             following conditions:

             a.   Attempts to subdue the subject by
                  conventional tactics are inappropriate
                  or ineffective.

             b.   There is reasonable expectation it will
                  be unsafe for officers to approach
                  within contact range of the suspect.

        2.   Officers should, if possible, obtain
             sufficient backup before using the taser to
             control the suspect.

             a.   Deploy personnel in such a manner that
                  will enable them to use other
                  appropriate means to subdue the subject
                  if the taser is ineffective.

             b.   Officers will use extreme caution and
                  avoid standing near the subject.

        3.   Depressing the taser release bar will
             propel two darts. The darts pull two fine
             conducting wires from a cassette.

    a.  It is necessary for both darts in a cassette to hit some part of the suspect's clothing or body for the taser to be effective.

        1)  If the suspect is wearing heavy clothing, the taser may not be effective.

        2)  If a first shot does not make contact or is ineffective, attempt a second shot.

        3)  If a second shot does not make contact or is ineffective, end taser deployment.

    b.  Due to the high voltage electronic spark of the taser, never test or fire it near flammable materials.

        1)  Do not use the department issued chemical irritant and the taser simultaneously.

4.  Medical Treatment Guidelines:

    a.  Officers will obtain appropriate medical treatment for suspects when necessary.

    b.  Only medical personnel may remove darts embedded in a subject's skin.

        1)  Transport the individual to University Hospital for removal.

5.  Charging and Care of the Taser:

    a.  Designated vehicles in Park Unit, Traffic Unit, and the districts are equipped with unloaded tasers.

---------------------------Page Break---------------------------

        1)  Do not store taser cartridges at temperatures above 150 degrees Fahrenheit. Extreme temperatures can cause defects in the cartridges. Supervisors will remove the taser and cartridges from police vehicles not in use when temperatures could exceed the recommended storing temperatures.

    b.  All districts, the Park Unit, and Traffic Unit have taser battery chargers.

    c.  When the taser is used, replace with a fully charged battery. When used for a brief test activation, replace the battery with a fully charged battery at shift completion.

    d.  Do not leave the same battery in a taser for more than two weeks without recharging, even if the taser was not used.

    e.  Nickel cadium batteries are spent after 500 to 1000 charges. This equates to approximately six months field use.

C.  Use of Beanbag Shotgun

  1.  Two supervisors' cars and ten beat cars in each district are equipped with beanbag shotguns.

    a.  Supervisors are responsible for loading beanbag shotguns.

    b.  Never load regular shotgun ammunition into beanbag shotguns or vice versa.

  2.  A beanbag shotgun shell is a standard 2 3/4 inch, 12 gauge shotgun shell with a transparent hull for easy identification.

    a.  Stocks on beanbag shotguns are orange and clearly labeled as "less lethal."

  3.  Beanbag shotguns will be carried with four rounds loaded in the magazine tube and no round in the chamber.  They will be decocked with safety on, in secured boxes, in the trunks of vehicles.

    a.  A breakaway seal will be on each box.

    b.  Do not remove and inspect the beanbag shotgun at the beginning of each shift.

        1)  Open the trunk and check the seal. If the seal is intact, the weapon is ready to be used.

        2)   If the seal is broken, call for a supervisor to inspect the weapon and reseal the box.

4.   If the shotgun is removed during the shift, a supervisor must inspect the shotgun and reseal it in the box.

5.   Supervisors will ensure beanbag shotguns are evenly disbursed geographically throughout each district.

6.   Neither permission from nor the presence of a supervisor is required for officers to use beanbag shotguns, except in crowd control situations.

    a.   The presence of a second officer is highly recommended in the event the officer using the beanbag shotgun encounters lethal resistance.

7.   Unless it would present a danger to the officer or another, verbal warnings must be issued prior to use. Where feasible, officers will allow a reasonable time between the warning and use of the beanbag shotgun.

8.   When using a beanbag shotgun, an officer should be no less than 20 feet and no more than 75 feet from a suspect. Beanbag rounds have an optimal effective range of 20 to 50 feet with a maximum effective range of 75 feet according to the manufacturer's specifications.

    a.   Using a beanbag shotgun within 30 feet of an individual increases the chance of serious injury.

--------------------------------Page Break--------------------------------

    b.   If serious injury requiring hospitalization occurs from using a beanbag shotgun, follow the notification process for shots fired as outlined in Procedure 12.550.

9.   When using a beanbag shotgun, aim at center mass. Avoid the head, neck, and groin areas, if possible.

    Take any individual struck with a beanbag round to University Hospital for medical

evaluation.

10. While multiple beanbag rounds may be
    expended as necessary, no more than two
    beanbag shotguns should be simultaneously
    deployed on an individual.

11. If four rounds prove to be ineffective,
    officers need to consider another option.

12. After using a beanbag shotgun, and after an
    individual is under control, immediately
    notify onlookers that a beanbag shotgun,
    not a regular shotgun, was used. Inform the
    onlookers that the beanbag shotgun is a
    less lethal alternative designed to
    apprehend individuals without causing
    serious injury.

    a.  Officers are exempt from the
        notification requirements during
        incidents involving civil unrest.

---

**Page 25: [5] Deleted**　　　　　**Lou Reiter**　　　　　**2/6/2003 12:55:00 PM**

D.  Use of 40mm Foam Round

    1.  A 40mm foam round launcher will be assigned
        to each district.

    2.  The 40mm foam round consists of a soft
        rubber sponged nose attached to a hard
        plastic carrier.

    3.  The 40mm foam round launcher is a single
        shot shoulder mounted weapon.

        a.  A holographic sight is attached to the
            launcher to assist with aiming and shot
            placement.

    4.  Only supervisors and officers trained in
        the use of the 40mm foam round launcher are
        permitted to use the weapon.

        The presence of a second officer is highly
        recommended in the event the officer
        using the 40mm foam round launcher
        encounters lethal resistance.

        Unless it would present a danger to the
        officer or another, verbal warnings must
        be issued prior to use. Where feasible,
        officers will allow a reasonable time

between the warning and use of the foam round.

    c.  If serious injury requiring hospitalization occurs from using a 40mm foam round, follow the notification process for shots fired as outlined in Procedure 12.550.

5.  When using the 40mm foam round, aim at center mass. Avoid the head, neck, and groin areas, if possible. The 40mm exact impact sponge round will prove most successful for incapacitation when used within its optimal energy range of approximately 10 to 75 feet, although it may be used in situations from 5 to 120 feet.

    a.  Take an individual struck with a 40mm foam round to University Hospital for medical evaluation.

6.  If four rounds prove to be ineffective, officers need to consider another option.

7.  After using the 40mm foam round launcher, and after an individual in under control, inform onlookers that the 40mm foam round is a less lethal alternative designed to apprehend individuals without causing serious injury.

    a.  Officers are exempt from the notification requirements during incidents involving civil unrest.

E.  Use of Pepperball

1.  Pepperball launchers will be assigned to the districts at the discretion of the Police Chief.

2.  The Pepperball round consists of a small hard plastic sphere containing OC pepper powder.

3.  The Pepperball launcher is a semi-automatic shoulder mounted, high capacity weapon powered by compressed air.

    a.  Each district will be assigned one SCUBA compressed air tank and a Pepperball fill adapter.

      b.   Any member of Cincinnati Fire Squad 52 can refill SCUBA tanks at the firehouse at 5th and Central Avenues.

4.   Only supervisors and officers trained in the use of Pepperball launchers are permitted to use the weapons.

      a.   The presence of a second officer is highly recommended in the event the officer using Pepperball encounters lethal resistance.

      b.   If serious injury requiring hospitalization occurs from the use of Pepperball, follow the notification process for shots fired as outlined in Procedure 12.550.

5.   When using Pepperball, aim at center mass. Avoid the head, neck and groin areas if possible. The effective range of the Pepperball is 0 to 30 feet for targeting individuals and up to 100 feet for area saturation according to manufacturer's specifications.

      a.   Generally, four to ten rounds should be deployed at a subject. More rounds may be utilized, if in the opinion of the officer, the additional rounds will assist in gaining compliance of the individual.

      b.   Heavy clothing can hinder the effectiveness of the Pepperball rounds. If a subject is wearing heavy clothing, consider targeting the legs.

      c.   Subjects struck with Pepperball rounds often lower their head and turn away from the source of impact. It is important to anticipate this reaction when employing Pepperball rounds.

      d.   Decontamination for individuals exposed to Pepperball OC powder is fresh air and clear cool water.

6.   Pepperball rounds can be used to saturate an area with OC powder by aiming the rounds at solid objects such as buildings, walls or the ground.

7. After using Pepperball, and after the individual is under control, inform onlookers that Pepperball is a non-lethal alternative designed to apprehend individuals without causing serious injury.

    a. Officers are exempt from the notification requirements during incidents involving civil unrest.

F. Use of Chemical Irritant:

1. Unless it would present a danger to the officer or another, a verbal warning to the individual that chemical irritant will be used must be issued prior to use.

2. Where feasible, officers will defer using the chemical irritant a reasonable time to allow the individual to comply with the verbal warning.

3. Officers may use chemical irritant on handcuffed or otherwise restrained individuals to prevent injury to the individual or another person or to prevent escape.

4. If it is necessary to use chemical irritant on a violent prisoner after handcuffing and placing him in the rear seat of the police vehicle, officers will not open the rear doors of the police vehicle to spray the prisoner. Instead officers will spray the prisoner through the protective screen.

    a. If the vehicle is equipped with a plexiglass partition, officers can either slide the partition to an open position and spray the prisoner through the opening, or through the rear door window nearest the prisoner's face.

-----------------------------------Page Break-----------------------------------

5. When spraying chemical irritant, if possible spray five to ten feet from an individual using a 3 second burst(s). The target should be an individual's face and upper torso.

6. Officers may not keep a sprayed individual in a face-down position any longer than necessary to handcuff or end the threat of harm or escape.

7.   Absent exigent circumstances, officers will offer to decontaminate every sprayed individual within 20 minutes of the use of chemical irritant.

   a.   Expose individuals sprayed with chemical irritant to fresh air. Give them an opportunity to rinse their face with plenty of clear, cool water.

   b.   Individuals should not rub or hold their faces, or use any oils, creams, or ointments.

8.   Officers are required to request medical assistance for sprayed individuals in the following circumstances:

   a.   When the individual complains of continued effects after having been decontaminated.

   b.   The individual indicates that they have a pre-existing medical condition (e.g. asthma, emphysema, bronchitis, heart ailment, etc.) that may be aggravated by the chemical irritant.



# CINCINNATI POLICE DEPARTMENT

# STAFF NOTES

*Colonel Thomas H. Streicher, Jr., Police Chief*
*February 25, 2003*

| | ITEM | SUBMITTED BY |
|---|---|---|
| 1. | LEGAL SUPPORT | PLANNING SECTION |
| 2. | TRAINING BULLETIN #2003-1 - SUDDEN CUSTODY DEATHS AND POSITIONAL ASPHYXIA | TRAINING SECTION |
| 3. | SPAM EMAIL | INFORMATION TECHNOLOGY MANAGEMENT SECTION |
| 4. | ANNUAL LIQUOR PERMIT RENEWALS | GENERAL VICE ENFORCEMENT UNIT |
| 5. | COLLEGE CREDIT FOR ACADEMY TRAINING | TRAINING SECTION |
| 6. | THANK YOU LETTERS | CHIEF'S OFFICE |
| 7. | REVISION OF PROCEDURES 12.205, TRAFFIC ENFORCEMENT AND 12.554, INVESTIGATORY STOPS | PLANNING SECTION |
| 8. | COMMENDATIONS | CHIEF'S OFFICE |

Slade
EXHIBIT NO. 4
AMS DEPO

*Colonel Thomas H. Streicher, Jr., Police Chief      February 25, 2003*

1.   **LEGAL SUPPORT**

     Ernest McAdams, Jr., City Prosecutor, will be out of the
     office from February 22 to March 10, 2003.  All questions
     may be directed to Charlie Rubenstein, Chief Assistant City
     Prosecutor.

2.   **TRAINING BULLETIN #2003-1 - SUDDEN CUSTODY DEATHS AND
     POSITIONAL ASPHYXIA**

     Attached to these Staff Notes is the latest training
     bulletin published by the Police Academy.  This bulletin
     discusses the issues surrounding sudden custody deaths and
     positional asphyxia, including:

     •    Factors related to positional asphyxia;
     •    What to be alert for during a violent struggle;
     •    Steps to take after a struggle;
     •    Some symptoms to be alert to in both the person in
          custody and the officers involved in the struggle, and
     •    A court case judgement in a positional asphyxiation
          death in Florida.

     Questions may be directed to the Police Academy staff at
     line 352-3562.

3.   **SPAM EMAIL**

     SPAM email is generally unwanted, unsolicited email, which
     is forwarded through various electronic mailing lists.  SPAM
     email can be dangerous because it can transport viruses and
     bog down the email system.  Users are reminded not to
     forward SPAM email through the Department's mailing list.
     The "Police All" list, as all Department email, should be
     used only for business purposes.  Examples of these are
     press releases, crime information, or information that
     effects Department employees with their duties.

Case: 1:04-cv-00616-SJD Doc #: 119-1 Filed: 06/04/10 Page: 65 of 69 PAGEID #: 2182

If you receive email with the instructions to forward it on to everyone you know, this should be a flag that the email contents could be a hoax or contain a virus. Users should verify the authenticity of the email with Information Technology Management Section (ITMS) before forwarding it. If the email is determined to be a hoax, ITMS will distribute an administrative message notifying users. Questions may be directed to ITMS at 564-2100.

4.   **ANNUAL LIQUOR PERMIT RENEWALS**

All districts are required to turn in liquor permit objection binders to the General Vice Enforcement Unit by March 25, 2003.  The dates for the Neighborhood and Public Works Committee to review all objections are April 8th at 1100 hours and April 22nd at 1800 hours.

Any questions may be directed to the General Vice Enforcement Unit.

5.   **COLLEGE CREDIT FOR ACADEMY TRAINING**

Xavier University has made the decision to provide 24 semester credit hours for completion of recruit training. This may equal one full year of college study.  Xavier University offers daytime and evening courses as well as an accelerated Weekend Degree Program.  For additional information on college credit from Xavier University contact Dr. Mary Kay Meyer at 745-3030 or by email at MeyerMK@xu.edu.

6.   **THANK YOU LETTERS**

Attached to these Staff Notes are two thank you letters. The first is from Joseph G. Farrell, a business owner in Northside, expressing his support for District Five officers.  The second letter is from Chief Richard A. Pope, Mariemont Police Department, for the assistance of our Explosive Ordinance Detection Canine Unit.

*Colonel Thomas H. Streicher, Jr., Police Chief          February 25, 2003*

7.  **REVISION OF PROCEDURES 12.205, TRAFFIC ENFORCEMENT AND
    12.554, INVESTIGATORY STOPS**

    Procedures 12.205, Traffic Enforcement, and 12.554,
    Investigatory Stops, have been revised.  Their Policy
    statements now include the following; "except in exigent
    circumstances, when a citizen is stopped or detained and
    then released as part of an investigation, the officer will
    explain to the citizen in a professional, courteous manner
    why he or she was stopped or detained."

    These revisions are effective immediately.  Personnel should
    review these procedures in their entirety.  The revised
    procedures are available on the Intranet and on the
    Department web page at www.cincinnatipolice.org.

*Colonel Thomas H. Streicher, Jr., Police Chief*      *February 25, 2003*

## COMMENDATION FOR THE WEEK OF 2/23/03-3/01/03

**DISTRICT ONE**
**POLICE OFFICER SCOTT KRAUSER**


On January 14, 2003, after serving for nine years as a member of the Cincinnati Police Department SWAT Unit, Police Officer Scott Krauser requested that he be relieved of his duties as an active member of the unit. Officer Krauser was selected for the team from a group of highly qualified candidates. He has served with distinction as a member of the SWAT Unit and made a significant contribution to the program. Officer Krauser is deserving of this commendation for his commitment and dedicated service to the SWAT Unit.

# Cincinnati Police Academy
# Training Bulletin
## Sudden Custody Deaths and Positional Asphyxia



# # 2003-1

**February, 2003**

## Introduction

An in-custody death, tragic in and of itself, is an event with serious consequences for both the Department and the officers involved. Beyond the multitude of investigations and lawsuits, involved officers are at high risk for a variety of social and psychological problems including Post -Traumatic Stress Disorder.

There is a growing body of knowledge about positional asphyxia and an increasing recognition of its role in in-custody deaths. More importantly, a number of risk factors have been identified that can assist officers in reducing the chances of a sudden in-custody death.

## References:

P.M. 12.600 <u>PRISONERS: SECURING, HANDLING, AND TRANSPORTING</u>

Chicago Police Training Bulletin on Positional Asphyxia

"Positional Asphyxia and Sudden Death" National Law Enforcement Technology Center

"Police Custody Death Syndrome" Wayne County Sheriff's Department

"Legal Lights," <u>The Trainer</u>, December, 2002.

Fernandez v. City of Cooper City, 11th Circuit, May, 2002.

## Information

Consider this scenario. A number of officers arrive on the scene of a disorderly person threatening passers-by. They observe a somewhat overweight and intoxicated individual, extremely agitated, sweating profusely, and yelling. As the officers attempt to control the individual, a violent struggle ensues. The individual ends up face down on the ground and is handcuffed. A few minutes later, the individual stops breathing.

Put simply, positional asphyxia can occur when a person's breathing is restricted from pressure exerted against the chest or the position of a person's head causes obstruction of their airway. Either of these conditions can result from a body position that interferes with breathing. Some restraint and transport positions increase the risk of positional asphyxia.

## Factors Related to Positional Asphyxia

There is general agreement that certain factors increase the risk of positional asphyxia. These factors include –

<u>Cocaine Induced Delirium</u> - This is a side effect suffered by some cocaine users. It is characterized by disorientation, hallucinations, and an increase in heart rate.

<u>Other drug/alcohol use</u> - Intoxication may reduce respiratory function.

<u>Physical Build</u> - Obesity has been identified as a factor increasing risk for positional asphyxia.

<u>Environment -</u> Extreme temperatures increase risk.

<u>Underlying Health Problems</u> - Asthma, emphysema, and heart disease have all been implicated as factors.

CPD Training Bulletin # 2003-1

## The Precipitating Event – A Violent Struggle

Apprehension and control of violent individuals is one of the core functions of police. The use of reasonable physical force to control people is an all too common necessity for officers. Yet the death of an individual following such a struggle is extremely rare. Certain factors involved in the struggle are associated with positional asphyxia. They include:

A protracted struggle - Some experts cite the three-minute rule. If a struggle lasts longer than three minutes, the participants may experience high levels of lactic acid and low oxygen levels, increasing their risk for sudden death.

Suspect Position - A suspect on his stomach, particularly on a hard surface, is at increased risk.

Pressure Applied on the back - In struggles where officers use body weight for control directly on the suspect's back, there will be increased risk of positional asphyxia.

## Steps After the Struggle

1) Once the individual is controlled, move him to a seated position. Do not leave the person prone on the ground.

2) Look for signs of troubled breathing - Gasping, shallow breathing, inability to speak.

3) Head dropping – A person physically exhausted may allow their chin to drop to their chest, which further constricts airflow.

Individuals who speak clearly or remain verbally combative are not at risk. If there are any concerns, get immediate medical assistance.

## Watch Other Officers

Officers involved in intense physical struggles may also experience medical problems. Any officer whose breathing is labored, has trouble speaking, and/or experiences chest pain should immediately request medical help. In the sometimes chaotic situations in which officers work, it is crucial that everyone on the scene be alert to these problems.

## One Court Case*

In circumstances similar to the scenario described above, Fidel Fernandez died after a struggle with officers in Cooper City, Florida. The plaintiffs argued that the death of Fernandez from positional asphyxiation stemming from prone restraint, pressure on the upper torso, and a struggle in handcuffing Fernandez was evidence of unconstitutionally excessive force. The court ruled for the officers, stating "..it is unclear as to what reasonable alternatives the officers had in dealing with Fidel. The prone restraint pressure on the upper torso,…and struggle were all the result of Fidel's illegal, physical, and prolonged resistance. …Sympathy for a plaintiff does not transform law enforcement officials' objectively reasonable responses to a volatile situation into a constitutional violation."

*Be aware this is a Florida case and Ohio courts may view the case differently.

QUICK CHECK REVIEW

1. Positional asphyxiation can occur from:
   a. pressure exerted against the chest or back
   b. the position of a person's head
   c. any body position interfering with breathing
   d. all of the above

2. Factors that increase the risk of positional asphyxiation include:
   a. disorientation, hallucinations, and an increase in heart rate.
   b. being intoxicated
   c. being overweight.
   d. very hot or very cold days.
   e. chronic illness/disease.
   f. All of the above.

3. True or False: A struggle lasting longer than three minutes increases the participants' risk of sudden death.

4. True or False: Following a struggle, the individual being controlled should be moved to a seated position and checked for signs of breathing difficulties.

5. It is crucial that all participants in intense struggles be watched for:
   a. labored breathing
   b. trouble speaking
   c. complaints of chest pain.
   d. All of the above.

Answers: 1-d; 2-f; 3-True; 4-True; 5-d