# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **BESSIE JONES**, | : | Case No. 1:04-CV-616 |
| *Administratrix of the Estate on behalf of* | : | |
| Nathaniel Jeffrey Jones, *et al.*, | : | Chief Judge Susan J. Dlott |
| | : | |
| Plaintiffs, | : | ORDER GRANTING IN PART |
| | : | MOTION FOR SUMMARY |
| v. | : | JUDGMENT OF POLICE OFFICERS, |
| | : | GRANTING MOTION FOR |
| **CITY OF CINCINNATI**, *et al.*, | : | SUMMARY JUDGMENT OF POLICE |
| | : | SUPERVISORS, AND GRANTING |
| Defendants. | : | MOTION FOR SUMMARY |
| | : | JUDGMENT OF THE CITY AND |
| | : | CITY OFFICIALS |
| | : | |

This is a civil rights action brought by Plaintiffs against the City of Cincinnati and

numerous Cincinnati police officers, supervisors, and city officials seeking damages to redress

alleged violations of Nathaniel Jones's rights under the Fourth and Fourteenth Amendments of

the United States Constitution and Ohio law.  Before the Court are the Motions for Summary

Judgment of Defendant Police Officers (doc. 93), Defendant Police Supervisors (doc. 97), and

the City and its former Manager and Police Chief (doc. 103).  For the following reasons,

Defendant Police Officers' motion will be GRANTED IN PART and DENIED IN PART;

Defendant Police Supervisors' motion will be GRANTED; and the City, former City Manager,

and former Police Chief's motion will be GRANTED.

## I.  PROCEDURAL BACKGROUND

Nathaniel Jones died on November 30, 2003 after a violent struggle with Cincinnati

police officers.  Jones' family members brought this suit against the six police officers who

struggled with Jones, three supervisory police officers who appeared on the scene after the struggle was over, three responding firefighters, the City of Cincinnati, the Fire Chief, the Chief of Police, and the City Manager.  Plaintiffs filed a Complaint asserting a cause of action against all Defendants under 42 U.S.C. § 1983 alleging that they had violated Jones' civil rights under the Fourth and Fourteenth Amendments of the United States Constitution — specifically, Jones' right to be free from excessive force and his right as a pretrial detainee to receive adequate medical care.  Plaintiffs also alleged that the police officers, firefighters, and city officials wrongfully caused Jones' death in violation of Ohio Revised Code § 2125.01 and asserted various state tort claims against Defendants.

Defendants moved to dismiss Plaintiffs' Complaint in its entirety.[1]  The individual Defendants asserted that they were entitled to qualified immunity from suit on the federal claims, and all Defendants asserted that they were entitled to statutory immunity under Ohio law on the tort and statutory claims.  (Doc. 28.)  This Court granted Defendants' motion to dismiss in part. (Doc. 40.)  Accepting as true the allegations made in Plaintiffs' Complaint, the Court concluded that Plaintiffs had adequately stated § 1983 claims against the police officers, the City, the Police Chief, and the City Manager for use of excessive force and failure to provide adequate medical care and a § 1983 claim against the police supervisors for failure to provide medical care and that these Defendants were not entitled to qualified immunity.  Additionally, the Court held that Plaintiffs adequately stated a claim against all Defendants (except the City) for wrongful death in violation of Ohio Revised Code § 2125.01 and that Defendants were not entitled to statutory immunity.

_____

[1] The operative Complaint is Plaintiffs' Second Amended Complaint, doc. 25.

2

Conversely, the Court granted Defendants' motion to dismiss the § 1983 claim against the Fire Chief, the firefighters, and the police supervisors for excessive force and the § 1983 claim against the Fire Chief and firefighters for failure to provide adequate medical care. Defendants appealed the decision insofar as it held that the police officers, police supervisors, the City, the Police Chief, and the City Manager were not entitled to qualified immunity.  (Doc. 41.)  The Sixth Circuit affirmed and remanded the case for further proceedings.  *Jones v. City of Cincinnati*, 521 F.3d 555 (6th Cir. 2008).  All Defendants now move for summary judgment in their favor on all remaining claims against them.  (Docs. 93, 97, and 103.)[2]

## II.  FACTUAL BACKGROUND[3]

### A.  November 30, 2003

#### 1.  White Castle employee requests medical assistance

At approximately 5:45 a.m. on November 30, 2003, a 911 dispatcher announced on the public address system of Cincinnati Fire Department Engine Company 38's firehouse that assistance was needed at the White Castle on West Mitchell Avenue for a man in his 40s who was "down and unconscious" in front of the restaurant.  (Adams Dep. 17.)  When Firefighters Adams and Harrison arrived at White Castle approximately five minutes later, they did not see

---

[2] Defendant firefighters and the Fire Chief also filed a motion for summary judgment, which Plaintiffs did not oppose and which the Court has granted.

[3] Except as otherwise indicated, background facts are taken from Defendant Firefighters' Proposed Undisputed Facts (doc. 82 Ex. A), to which Plaintiffs did not respond; Defendant Police Officers' Proposed Undisputed Facts (doc. 93 Ex. A) to the extent they are admitted in Plaintiffs' Response (doc. 137-1); and Defendant Police Supervisors' Proposed Undisputed Facts (doc. 97 Ex. A) to the extent they are admitted in Plaintiffs' Response (doc. 137-2).  The Court considers the response "irrelevant" an admission.

anyone down and unconscious.  They did, however, see a man dancing inside of the restaurant.
Outside the restaurant, a White Castle employee indicated that the dancing man, Nathaniel Jones,
was the subject of the call, but the employee told Firefighter Adams, "He's okay.  You need to
see about her," referring to a woman sitting at a table in the restaurant and hyperventilating.
(Adams Dep. 26.)

Firefighter Adams entered the restaurant and, as he did, he allowed Jones to pass by him.
As Jones passed by, Firefighter Adams saw no evidence that Jones had been unconscious or
needed any assistance.  When they met at the door, Jones said "excuse me" to Firefighter Adams
in a loud voice.  Firefighter Adams felt intimidated by Jones because Jones was a large man[4] and
because of the way he said "excuse me" and leaned over Adams.  (Adams Dep. 35.)  Jones
proceeded into the parking lot, walked over to the fire truck, and started squatting up and down
and marching back and forth like a drum major.  Jones then shouted profanities and threw his
coffee cup at the fire truck.  At that point, Firefighter Adams thought that Jones was drunk or
that "something was going on" since Jones' behavior was not rational.  (Adams Dep. 36.)
Firefighter Harrison was concerned about Jones' safety because of the way he was acting, and he
thought Jones might walk out into the street.

Jones then started cussing at people who pulled into the gas station across the street.
Firefighter Adams felt that Jones was "a nuisance" and decided to get the police on the scene.
(Adams Dep. 46.)  Jones had not threatened anyone and had not damaged any property.  (Adams
Dep. 50-52.)  People at the restaurant drive-thru near where Jones was standing said to

_____

[4]  According to the Postmortem Examination report, Jones weighed 348 pounds and was 5
feet 11 inches tall at the time of his death.  (Parrott Dep. Ex. 1.)

Firefighter Adams, "don't go over there"; when Adams asked why, the people laughed and said, "He is going to want to dance with you." (Adams Dep. 54.)

### 2. Police respond to firefighter's request for assistance

At approximately 5:56 a.m., Cincinnati Police Officers Osterman and Pike heard the dispatch that the Cincinnati Fire Department had requested police assistance for a disorderly person. Officer Osterman was the first officer on the scene. Officer Osterman spoke to Firefighter Adams, who pointed out Jones to the officer. Jones was continuing to shout and do deep knee bends in the White Castle parking lot. (Adams Dep. 57.)

While Officer Osterman was talking to Firefighter Adams, Officer Pike arrived on the scene. Officer Pike saw Jones walk towards the corner of the White Castle lot. He observed Jones making exaggerated movements, that is, flailing his arms and pointing them straight up, and Officer Pike suspected that this person was the subject of the call for assistance. As Officer Pike watched, Firefighter Adams pointed toward the corner of the lot where Jones had gone.

Officer Pike could not tell if Jones was leaving the parking lot or not, and he drove his car toward the corner of the lot. He stopped his car within twenty-five to thirty feet of Jones. Jones was still behaving bizarrely, and Officer Pike thought Jones might have been mentally ill. Officer Pike radioed dispatch that this was a possible "MHRT-V run," in other words, a run that required a mental health response team (MHRT) and indicating that the subject might be violent (V). Other officers heard Pike announce that the run was possibly an MHRT run. (Johnstone Aff. ¶ 6.) The dispatcher announced that no MHRT officers were available. (Johnstone Aff. ¶ 7.) However, Officer Shulte, who was MHRT trained, responded and indicated that he would respond to the White Castle. (Johnstone Aff. ¶ 8.) Officer Johnstone, who had been dispatched

5

to accompany Officer Shulte on a residential burglary alarm run, also decided to respond to the White Castle.  (*Id.* ¶ 10.)[5]

Meanwhile, Officer Pike got out of his car and approached Jones in the corner of the parking lot.  Officer Osterman got in his car and pulled up next to Officer Pike.  Officers Pike and Osterman did not speak to each other before they approached Jones.

### 3.  Officers engage with Jones

Officer Pike was the first officer to speak to Jones.  He testified that he got out of his car and said to Jones, "Hello there.  How are you?" and that Jones responded, "Who the fuck is you?" (Pike Dep. 60.)  Officer Pike identified himself as a Cincinnati police officer, and Jones took a couple of steps toward him.  Officer Pike told Jones to back up.  Jones did not back up, but he did stop momentarily.

By this time, Officer Osterman stood to the left of Officer Pike.  Officer Osterman testified that Jones also asked him, "Who the fuck are you?"  Officer Osterman responded by pulling out his baton, identifying himself as Cincinnati Police, and ordering Jones to stay back. (Osterman Dep. 101.)  Officer Osterman then moved to the trunk of his car to retrieve a pepper ball gun.[6]

_____

[5]  The record does not demonstrate exactly when Officer Shulte arrived at the White Castle that morning.  Officer Pike did recall seeing Officer Shulte "late in the incident."  (Pike Dep. 54.)

[6]  Firefighter Adams, who was still near the White Castle entrance, described the initial contact somewhat differently.  He testified that Officer Pike said to Jones, "Hey, I want to talk to you" and that Jones did not respond but continued to march up and down and shout obscenities as he had been doing before the police arrived.  (Adams Dep. 60).  Adams testified that when Officer Osterman approached Jones, both officers again told Jones, "Sir, we want to talk to you," and that Jones still did not respond.  (*Id.* at 62.)

Jones went into a verbal tirade. (Pike Dep. 63.) Officer Pike increased the distance between Jones and himself, placing the corner of a parked car between them. He then requested a supervisor to respond with a Taser. During that time frame, Officer Pike's opinion of Jones changed: he stopped thinking that Jones was mentally ill began thinking that he was under the influence of some type of substance. (Pike Dep. 67.) After Officer Pike requested a supervisor with a Taser, he turned on the video recording system (MVR) in his car, which captured the ensuing events. Officer Pike tried to keep his distance from Jones and backpedaled away from him.

### 4. The encounter becomes physical – 6:00 a.m.

At the start of the MVR recording, Officer Pike tells Jones, "You gotta tell me what's going on."[7] Jones can be heard saying, "Get this little nappy haired white boy, redneck!" Officer Pike warned Jones three times to back up. Jones lunged at Officer Pike.[8] Officer Pike sprayed chemical irritant at Jones, but it appeared to have no effect. Jones then threw a punch at Officer Pike's head. Officer Pike ducked, and the punch caught the top of the officer's head and knocked his hat off. (Pike Dep. 77.) Jones continued to advance aggressively on Officer Pike,

---

[7] The MVR video recorded from Officer Pike's police car on November 30, 2003 was submitted to the Court as evidence in support of Defendants' Motion to Dismiss, doc. 28. The exact time of the events in the recording is indicated on the MVR in one-second increments. The altercation between Jones and the officers begins at MVR 06:00:07, that is, at seven seconds after six o'clock in the morning.

[8] Officer Osterman was at the back of his car, with the trunk lid obstructing his view of Officer Pike and Jones, when he heard elevated voices. (Osterman Dep. 110.) He leaned to the side of the trunk lid to see what was going on, and he saw Jones rushing in toward Officer Pike. (*Id.* at 111.)

saying "My momma taught me this!"  Officer Pike put out an assistance call from the microphone attached to his uniform.

Meanwhile, Officer Osterman drew his baton and approached Jones from behind. (Osterman Dep. 114.)  Officer Osterman delivered three strikes to Jones' right leg and ordered Jones to get down.  (*Id*. at 115.)  The baton strikes seemed to have no effect on Jones' physical abilities, and Jones remained on his feet.  (*Id*. at 116.)  At this point, all three men moved from the right side of Officer Pike's police car to the left front of the car.  Officer Osterman tackled Jones in an attempt to get him off balance and away from Officer Pike.  (*Id*. at 117.)  Jones lost his balance and all three men fell to the ground in front of Officer Pike's car.  (*Id*. at 117; Pike Dep. 79.)  From the time Officer Osterman tackled Jones until the end of the struggle, Jones never got back to his feet.  (Osterman Dep. 130.)

Officer Pike quickly stood up after the tumble.  (MVR 06:00:30-06:00:35.)  He removed his baton from his belt and shouted several times, "Put your hands behind your back!"  Officer Osterman also shouted several times, "Put your hands behind your back!"  Jones did not comply. The MVR shows that Jones struggled to get up off the ground, at one point reaching up and grabbing Officer Osterman's neck.  (MVR 06:00:44-47.)  The officers repeatedly and continuously struck and jabbed Jones with their batons while shouting orders at him.  (MVR 06:00:35-55.)

Amid the blows, Jones struggled to his knees and reached toward Officer Osterman. (MVR 06:00:48.)  Officer Osterman thought that Jones was reaching for his gun.  (Osterman Dep. 127.)  Firefighter Adams observed this struggle and testified that Jones kept "trying to get up" and "grabbing — like somebody is drowning, they will grab at your clothes."  (Adams Dep.

8

84-85.) Officer Pike continued to strike the upper part of Jones' body with his baton. Jones reached back with his left arm and grabbed Officer Pike's baton. Officer Pike and Jones struggled with the baton for approximately six seconds until Officer Pike regained control of his baton. (MVR 06:00:54-59.)

While Jones was on his knees, Officers Pike and Osterman continued to jab and strike him, and the officers continued to order him to put his hands behind his back. Jones went back down to the ground. (MVR 06:01:00.) From that point forward, the MVR does not capture Jones because he is on the ground and obscured by the hood of Officer Pike's police car. The MVR does show that one officer continues to strike Jones with his baton.

Officers Guy Abrams and Tom Slade were riding in a two-person unit when they heard the dispatch requesting police assistance at the White Castle. (Abrams Dep. 25.) Officer Abrams heard Officer Pike say over dispatch that it might be an MHRT run, which signified to Abrams that the subject of the call might have a mental illness. (*Id*. at 26-27, 29.) When Officers Abrams and Slade arrived on the scene, Abrams saw Officer Pike give Jones a couple of strikes with his baton and Jones go down on his hands. (*Id*. at 31.) Officer Abrams got out of the police car and ran to where Jones was struggling with Officers Pike and Osterman. (MVR 6:01:08.)

Around the time Officer Abrams showed up, Officer Osterman and Officer Pike got Jones prone on the ground. Officer Osterman testified that from that point forward, Jones was not actively fighting but was resisting. (Osterman Dep. 130.) Officer Osterman then used his baton to pull Jones' right arm out from under Jones' body in order to handcuff him. (*Id*. at 131-32.)

9

Officer Abrams tried to get control of Jones' left arm.  (Abrams Dep. 33.)  Officer Abrams gave Jones one strike with his baton and was able to pull Jones' left arm back.  (*Id*. at 33-34.)  Officer Abrams then slid his baton across the parking lot because he didn't need it any more.  (Abrams Dep. 34.)  Jones was making a grunting noise.  (Abrams Dep. 35.)  Jones can be heard on the MVR saying, "Mama!"  (MVR 06:01:19.)

After Officer Slade parked his car, he ran to the melee and asked the officers if they had maced Jones.  (MVR 06:01:20.)  Officer Pike said, "Yes."  Officer Slade then said, "Let me give him pepper."  An unidentified officer said, "Go ahead."  Officer Slade leaned down and yelled, "Pepper!" and then sprayed the pepper spray in Jones' face.  Officer Slade then applied a shin restraint, which is a pain compliance technique, to Jones' left leg.  (Slade Aff ¶ 18.)  Officer Slade applied the shin restraint to get Jones to submit to handcuffing and to maintain control of Jones' left leg.  Jones can be heard moaning on the MVR (MVR 06:01:48.)  Officer Pike put a handcuff on Jones' right arm.  (Pike Dep. 86.)

Officers Johnstone and Reese then arrived on the scene.  (MVR 06:01:51.)  By the time Officer Reese arrived, there were no more baton strikes.  Reese did, however, apply a shin restraint to Jones with his baton.[9]  Officer Johnstone began helping Officer Abrams handcuff Jones' left arm.  (Abrams Dep. 38; Johnstone Aff. ¶ 16.)  Officer Johnstone discovered that Jones was resisting the handcuffing process — specifically, that Jones was tensing and flexing his arm to prevent the officers from bringing it into position for handcuffing.  (Johnstone Aff. ¶ 17.)

_____

[9] A shin restraint is not a jab or strike.  Rather, the baton is slid in front of the shin bone and pressure is applied to cause pain or discomfort to a resisting subject.

### 5.  Jones stops struggling, police finish handcuffing – 6:03 a.m.

Jones stopped moaning and became silent.  (MVR 06:02:23.)  At 6:02:32 a.m., someone said, "How 'bout we roll him?"  Five seconds later, someone said, "We need another set," referring to another set of handcuffs.  (MVR 06:02:37.)  Eventually, the officers finished handcuffing Jones, a task that required linking three sets of cuffs together because of Jones' size.  (MVR 06:02:54 (an unidentified speaker says, "There we go."))  The officers stood, leaving Jones face down on the ground.  (MVR 06:03:00; Johnstone Aff. ¶ 21.)  Firefighters Adams and Otten, who had witnessed the struggle, left the parking lot in their fire truck.  As they left, they saw Jones, who was on his stomach and handcuffed with his hands behind his back, looking up at the officers standing near him.  (Otten Dep. 70-72; Adams Dep. 79.)

Within thirty seconds of Jones' handcuffing, Officer Slade said, "We have to get him rolled, don't we?"  (MVR 06:03:24.)  Within forty-five seconds of Jones' handcuffing, the officers had rolled him on his back.  (MVR 06:03:40.)  Officer Pike did not see any indication that Jones was breathing.  (Pike Dep. 100.)  Officer Pike checked Jones' pulse and found that Jones had a good, strong pulse.  Pike announced that he had found a pulse but was unsure whether Jones was breathing.  (Slade Aff. ¶ 30.)  Officer Pike said, "Sir, sir!" several times, but Jones did not respond.  (Pike Dep. 101.)  Officer Johnstone realized that Jones needed emergency medical assistance.  (Johnstone Aff. ¶ 29.)  Officer Pike, thinking that the firefighters were still in the White Castle parking lot, said, "Have fire come and take a look at him."  (Pike Dep. 102.)[10]  However, the firefighters had left the lot.

### 6.  Police supervisors arrive

---

[10]  An unidentified speaker is heard yelling "Fire!" at MVR 06:03:47.

Three police supervisors – Sergeants Waites, Battison, and Brazile – arrived on the scene within seconds of each other, all after the struggle was over.[11] When Sergeant Waites arrived, Jones was on his stomach and was handcuffed, and officers rolled Jones onto his back almost immediately after Waites' arrival. Sergeant Waites believed Jones was dead because he was not breathing and froth was coming out of his mouth. Then Sergeant Battison arrived on the scene. An officer told him Jones did not appear to be breathing, and Sergeant Battison asked the dispatcher to expedite the fire department back to the scene. (Johnstone Aff. ¶ 30; MVR 06:03:59.) Officer Reese began to rub the sternum area of Jones' chest, but Jones did not respond. (Reese Aff. ¶ 20.) Officer Reese also tried to clear Jones' airway but could not because Jones' jaws were clenched. (*Id.* ¶¶ 21-22.) Officer Osterman went to the trunk of his car to retrieve a first aid kit.

Sergeant Battison had been taught at in-service training at the Police Academy that a person could be rolled onto his side to avoid positional asphyxia. (Battison Dep. 17.) Sergeant Battison ordered the officers to turn Jones on his side, and the officers complied. (MVR 06:04:40-47.) Officer Pike understood that putting Jones on his side would help give him a clear airway. (Pike Dep. 94.) A third supervisor, Sergeant Brazile arrived. According to Sergeant Brazile, Jones was on his side and handcuffed and appeared to be unconscious.

Firefighters appeared on the scene within two minutes of being called back. (MVR 06:05:50.) Firefighter Adams asked the officers to remove Jones' handcuffs, but none of the

---

[11] Sergeant Battison had been notified by communications that officers on the scene of a run had requested a supervisor with a Taser; Sergeants Waites and Brazile responded to the "officer needs assistance" call.

officers responded to the request.  (Adams Dep. 91.)[12]  Firefighter Harrison recalls that the officers refused outright to remove Jones' handcuffs.  (Harrison Dep. 42-43.)  Despite the fact that Jones was still handcuffed behind his back, Firefighter Adams rolled Jones onto his back and began to perform CPR.  Paramedics from the rescue unit then arrived, and they also asked that Jones' handcuffs be removed.  At that point, an officer removed Jones' handcuffs.  (Adams Dep. 102-3.)  Jones was placed in an ambulance to be transported to a hospital, but rescue workers were unable to resuscitate him.

### 7.  Coroner determines Jones' cause of death

Hamilton County Chief Deputy Coroner Robert Pfalzgraf, M.D., in consultation with County Coroner Carl Parrott, Jr., M.D., determined that the cause of Jones' death was "[c]ardiac dysrhythmia due to physiologic stress reaction with hypoxia due to violent struggle with restraint."  (Pfalzgraf Dep. Ex. 1, bates 07451.)  Cardiac dysrhythmia is a "catchall term for all types of abnormal cardiac rhythms."  (Pfalzgraf Dep. 25.)  The term "physiologic stress reaction" indicates that Jones had been in a violent struggle.  (*Id*. at 46.)[13]  Dr. Pfalzgraf concluded that Jones' hypoxia, or deficiency in the amount of oxygen reaching his body tissues, was caused by his restraint.  (*Id*. at 95.)  "Hypoxia due to violent struggle with restraint" is synonymous with

---

[12]  Officer Abrams heard the request to remove the handcuffs but did not remove them because he thought that Jones might try to run or fight some more.  (Abrams Dep. 48-50.)  Officer Pike testified that he did not hear the firefighters ask that Jones' handcuffs be removed, but he also testified that he would not have removed the handcuffs unless a supervisor had told him to.  (Pike Dep. 97-98.)  Sergeant Brazile testified that he did not hear a request to remove the handcuffs.  (Brazile Aff. ¶ 13.)

[13]  Physical activity, such as a struggle, causes the blood level of a hormone called catecholamine to rise.  Catecholamine, commonly called adrenaline, is referred to as "fight or flight" hormone, and it can cause dysrhythmia (abnormal heartbeat).  (Pfalzgraf Dep. at 48.)

13

positional asphyxia. (Pfalzgraf Dep. at 47.) Positional asphyxia is a death that occurs when a person's body position interferes with breathing.

Dr. Pfalzgraf also determined that there were several "contributory" causes to Jones' death: obesity, hypertensive heart disease, and intoxication by cocaine and phencyclidine ("PCP"). (Pfalzgraf Dep. Ex. 1, bates 07451.) Jones' intoxication, caused by cocaine and PCP, did not cause his death but were factors that would have increased his risk of death due to positional asphyxia. (Pfalzgraf Dep. at 94.)

The initial paramedic records supplied to the coroner's office indicated that Jones was in asystole, meaning Jones' heart had no electrical rhythm, when his heartbeat was measured on the scene. (*Id*. at 15.) However, Dr. Pfalzgraf later learned from the Fire Department that Jones actually had sinus bradycardia, or a slow heartbeat, when first measured on the scene. (*Id*. at 15, 21.) When someone is lacking oxygen, the heartbeat slows down and he presents with sinus bradycardia. (*Id*. at 15, 18-19) Dr. Pfalzgraf testified that if he had known that Jones had sinus bradycardia at the time his heartbeat was first measured on the scene, he would have "fought more strongly for positional asphyxia as the major cause of death and then put everything else in the contributing line." (*Id*. at 16.)

**B. Police Training**

### 1. Sudden custody deaths and positional asphyxia

Prior to the November 30, 2003 incident resulting in Jones's death, Cincinnati Police Officers had received a training bulletin regarding sudden death from positional asphyxia. (Osterman Dep. 154; Slade Dep. 40.) Specifically, in a February 2003 roll call, officers received

"Staff Notes" that included a training bulletin published by the Police Academy that listed risk

factors for positional asphyxia.  (Streicher Dep. 99 and Dep. Ex. 1.)  The Staff Notes state:

> <u>Attached</u> to these Staff Notes is the latest training bulletin
> published by the Police Academy.  This bulletin discusses the
> issues surrounding sudden custody deaths and positional asphyxia,
> including:
> •     Factors related to positional asphyxia;
> •     What to be alert for during a violent struggle;
> •     Steps to take after a struggle;
> •     Some symptoms to be alert to in both the person in custody
>       and the officers involved in the struggle, and
> •     A court case judgment in a positional asphyxiation death in
>       Florida.

(Streicher Dep. Ex. 1.)

The referenced bulletin, Training Bulletin # 2003-1, is titled, "Sudden Custody Deaths

and Positional Asphyxia" and is dated February 2003.  The bulletin begins by describing a

specific scenario:

> A number of officers arrive on the scene of a disorderly person
> threatening passers-by.  They observe a somewhat overweight and
> intoxicated individual, extremely agitated, sweating profusely, and
> yelling.  As the officers attempt to control the individual, a violent
> struggle ensues. The individual ends up face down on the ground
> and is handcuffed.  A few minutes later, the individual stops
> breathing.

(*Id.*)  The bulletin notes that a violent struggle is the precipitating event for positional asphyxia

and that "if a struggle lasts longer than three minutes, the participants . . . increas[e] their risk for

sudden death."  The bulletin also states that "a suspect on his stomach, particularly on a hard

surface, is at increased risk."  (*Id.*)  Finally, the bulletin specifies the steps an officer is to take

after a struggle:

> 1) Once the individual is controlled, move him to a seated position.
> Do not leave the person prone on the ground.

15

> 2) Look for signs of troubled breathing – Gasping, shallow breathing, inability to speak.
>
> 3) Head dropping – A person physically exhausted may allow their chin to drop to their chest, which further constricts airflow. Individuals who speak clearly or remain verbally combative are not at risk. If there are any concerns, get immediate medical assistance.

(*Id.*)

Staff Notes, such as the one just described, are weekly publications from the Police Department that notify personnel of current events in the agency. (Streicher Dep. 97.) The Notes are designed to be "gone over" with police officers at roll call, and officers are expected to read them. (*Id.* at 101.) Officers sign a document indicating that they have received the training.

Officer Osterman described the extent of his training on positional asphyxia as follows: "It was, 'Here's a training bulletin on positional asphyxia. This is what happens. When this happens, you need to do that.' 'Sign here.' . . . It's not like it was a week-long course on how to deal with positional asphyxia." (Osterman Dep. 148.) Officer Slade similarly testified that the information regarding positional asphyxia was done at roll call: "There's no real special training except for, 'Here, read this and sign here.'" (Slade Dep. 43-44.)

### 2. Mental Health Response Team

The City's Mental Health Response Team ("MHRT") consists of specially trained officers who act as first responders, when available, in cases involving suspected mentally ill individuals. (Streicher Dep. 65; *see also* Cincinnati Police Department ("CPD") Policies and Procedures 12.110 "Handling Suspected Mentally Ill Individuals and Potential Suicides" (Slade Dep. Ex. 2).) MHRT officers are trained how to approach mentally ill subjects and de-escalate situations involving mentally ill individuals. (Slade Dep. at 23-24, 29, 30, 37-38.)

The MHRT policy distinguishes between emergency and non-emergency situations. (*Id.*) If the run is an emergency and no MHRT officer is available, beat cars will be dispatched immediately. In a non-emergency, the nearest available MHRT officer from an adjoining district will be dispatched as the primary car. (*Id.*) The policy does not define what constitutes an emergency. A supervisor must respond on all radio runs involving violent or potentially violent mentally ill individuals and, when possible, consult the MHRT officer on the scene to decide on a course of action. (*Id.*) The purpose of the MHRT policy is to provide the most appropriate means of ensuring the arrest of the individual in a way that is the least injurious to the officers and the suspect. (Lemmie Dep. 36.)

## III.  LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. "Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Cresher v. Neyer*, 477 F.3d 784, 796 (6th Cir. 2007) (citing Fed. R. Civ. P. 56(a)). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). The nonmoving party must provide more than a scintilla of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). That is, the nonmoving party must present sufficient evidence to permit a reasonable jury to find in that party's favor. *Id.*

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the

burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  In responding to

a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go

beyond the pleadings and "present affirmative evidence in order to defeat a properly supported

motion for summary judgment." *Anderson*, 477 U.S. at 257.  The Court's task is not "to weigh

the evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Liberty Lobby*, 477 U.S. at 249.

## IV. DISCUSSION

The following claims remain: excessive force in violation of the Fourth Amendment

against Officers Pike, Osterman, Abrams, Slade, Reese, and Johnstone; deliberate indifference to

Jones' need for adequate medical care in violation of the Fourteenth Amendment against those

same officers and Sergeants Battison, Waites, and Brazile; and wrongful death in violation of

Ohio Rev. Code § 2125.01 against the officers and the supervisors.  Plaintiffs also assert their

Fourth and Fourteenth Amendment claims against the City, former City Manager Valerie

Lemmie, and former Police Chief Tom Streicher and their wrongful death claim against Lemmie

and Streicher in their individual capacities.[14]

### A. Qualified Immunity — Police Officers and Supervisors

Defendant police officers and supervisors assert that they are entitled to qualified

immunity from claims brought against them under 42 U.S.C. § 1983 and that, accordingly, they

---

[14]  Plaintiffs named all Defendants in their individual and official capacities.  However, in its Order on Defendants' Motion to Dismiss, the Court held that Streicher and Lemmie were immune in their official capacities from the state law claims pursuant to Ohio Revised Code § 2744.02(A) because "[u]nder Ohio law, when a party sues an employee of a political subdivision in his official capacity he is protected by the immunity which protects the political subdivision itself."  Doc. 40 at 27 (quoting *Oswald v. Lucas Cnty. Juvenile Det. Ctr.*, No. 99-3771, 2000 WL 1679507 (6th Cir. Oct. 30, 2000)).

are entitled to summary judgment in their favor.  "Government officials, including police officers, are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights."  *Aldini v. Johnson*, 609 F.3d 858 (6th Cir. 2010) (*citing Hills v. Kentucky*, 457 F.3d 583, 587 (6th Cir. 2006)).  "Stated differently, a 'defendant enjoys qualified immunity on summary judgment unless the facts alleged and the evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that (1) the defendant violated a constitutional right; and (2) the right was clearly established.'"  *Id.* (*quoting Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009)).  With regard to the second step,

> [t]he contours of the right must be sufficiently clear that a
> reasonable official would understand that what he is doing violates
> that right.  This is not to say that an official action is protected by
> qualified immunity unless the very action in question has
> previously been held unlawful, . . . but it is to say that in the light
> of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citation omitted).  The Court is not required to address these two steps sequentially.  *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 818 (2009) (discussing *Saucier v. Katz*, 533 U.S. 194 (2001), and reconsidering the sequential procedure required therein).

The plaintiff bears the ultimate burden of demonstrating that the defendant is not entitled to qualified immunity.  *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 605 (6th Cir. 2006).  Although the plaintiff carries the burden, the Court also must interpret the facts in the light most favorable to the plaintiff.  *Huckaby v. Priest*, 636 F.3d 211, 216-17 (6th Cir. 2011)  If the legal question of immunity is completely dependent on which view of the facts the jury accepts, the

district court should not grant summary judgment on the issue.  *Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989).

### 1.  Excessive force — officers

A claim of excessive force under the Fourth Amendment requires that a plaintiff demonstrate that a seizure occurred and that the force used in effecting the seizure was objectively unreasonable.  *Graham v. Connor*, 490 U.S. 386, 394-95 (1989).[15]  There is no dispute in this case that, once the physical altercation began, the officers seized Jones.  The matter turns, then, on whether the officers' use of force was objectively unreasonable.

> Because the test of reasonableness is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.
>
> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.
>
> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively

---

[15]  "A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, by means of physical force or show of authority, in some way restrained the liberty of a citizen."  *Graham*, 490 U.S. at 395 n.10.

> reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Graham*, 490 U.S. at 396-97. In keeping with this precedent, the Sixth Circuit has highlighted three factors of particular relevance in assessing the reasonableness of an officer's use of force: "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the police officers or others, and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Floyd v. City of Detroit*, 518 F.3d 398, 407 (6th Cir. 2008) (*quoting Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006)).

Plaintiffs articulate four categories of force used by the officers against Jones and argue that a jury could find the use of force in each category to be unreasonable: (1) Officers Pike's and Osterman's failure to wait for the arrival of an MHRT officer before approaching Jones, (2) the officers' repeated striking or jabbing of Jones without giving him time to comply with their orders to put his hands behind his back, (3) Officer Slade's use of pepper spray on Jones when he knew Jones had already been sprayed with chemical irritant, and (4) the officers' failure to remove Jones' handcuffs in order to allow effective administration of CPR.

### a. Failure to wait for an MHRT-trained officer

There is no dispute that Officer Pike suspected that Jones might be mentally ill but that he got out of his car and spoke to Jones rather than wait for an MHRT officer to arrive and that Officer Osterman backed up Officer Pike. Plaintiffs contend that there was no emergency and that Officer Pike's decision to exit his car unnecessarily escalated the situation which ultimately concluded in Jones' death. Thus, Plaintiffs argue, Officers Pike and Osterman's decision to

21

speak to Jones rather than wait for an MHRT-trained officer constituted an excessive use of force.

Plaintiffs cite no authority that holds that initiating verbal contact with an individual — even when that individual is behaving in a way that leads an officer to conclude that he may be suffering from mental illness — constitutes a use of force.  Plaintiffs also do not provide the Court with any legal authority supporting a conclusion that Jones had a constitutional right not to be verbally addressed by an officer under the circumstances.  Most important, a seizure triggering the Fourth Amendment's protections occurs only when police officers have in some way restrained the liberty of a citizen.  *Graham*, 490 U.S. at 395 n.10.  Officer Pike had not restrained Jones' liberty in any way at the moment that Pike stepped out of his police car and initiated a conversation with Jones, so the protections of the Fourth Amendment were not triggered at that moment.  Because Plaintiffs cannot demonstrate the existence of a constitutional right not to be spoken to by a police officer under the undisputed circumstances present in this case, Officers Pike and Osterman are entitled to immunity as to the Fourth Amendment claim arising out of their initial contact with Jones.

### b.  Repeated jabs and strikes

It is undisputed that Nathaniel Jones was struck or jabbed with a police baton thirty-three times in less than one minute on the morning of November 30, 2003.  (Glenn Dep. Ex.1 at 32.)[16]

---

[16]  The City of Cincinnati's Citizen Complaint Authority ("CCA") investigated Nathaniel Jones' death and issued its findings in a report dated July 19, 2004.  The report is attached as Exhibit 1 to the affidavit of Kenneth Glenn.  As part of its investigation, the CCA contracted with a company to view Officer Pike's MVR recording of the Jones incident and determine the time between baton strikes.  The first strike to Jones occurs at MVR 06:00:36 a.m. and the last occurs at 06:01:35 a.m.

Officer Pike struck or jabbed Jones twenty-four times — in several instances pausing less than two tenths of a second between blows.  (*Id.*; *see also* doc. 93 at 17.)  Officer Osterman struck Jones seven times and jabbed him once; and Officer Abrams jabbed Jones once.  (*Id.*)[17]  The coroner's postmortem examination of Jones revealed abrasions consistent with baton strikes to the following areas of Jones' body: One on the lower abdomen, two on the back, one on the right forearm, one on the left arm, two on the left hand, two on the right hand, five on the right thigh, one on the right calf, three on the right knee, and one on the left knee.  (Glenn Dep. Ex. at 29.)

While they were striking and jabbing Jones with their batons, Officers Pike and Osterman were shouting at Jones to put his hands behind his back.  Jones did not comply.  Despite being sprayed in the face with mace and taken to the ground by the officers, Jones pushed himself to his hands and knees and started to rise up into a kneeling position.  Officers Pike and Osterman continued to strike or jab Jones until he was prone on the ground again.  At no time did Jones comply with the officers' demands to put his arms behind his back.

Plaintiffs argue that, unlike the officers' characterization of Jones' behavior as resisting arrest, Jones was actually struggling to get air.  Their characterization is bolstered by the testimony of Firefighter Adams who said that, in trying to get up, Jones was like a man who is "drowning [who] will grab you at your clothes."  (Adams Dep. 84.)  The MVR clearly shows Jones reaching out with his arm, struggling to get to his feet.  The MVR also shows Jones reaching up to fend off Officer Pike's blows — at one point briefly grabbing officer Pike's baton.

---

[17]  Officers Slade, Reese, and Johnstone never struck or jabbed Jones.  Officers Slade and Reese applied shin restraints to Jones during the handcuffing process.  Plaintiffs do not argue that the application of shin restraint was an unconstitutional use of force.

The MVR shows a violent struggle, but it also leaves unanswered as many questions as it answers.  It is undisputed that Jones had just committed the crime of assaulting an officer.  It was therefore reasonable for the officers to conclude that Jones continued to pose an immediate threat to their safety.  Jones was non-compliant and behaving in a way that led the officers to believe he was under the influence of some substance, and the mace seemed to have no effect on Jones.  Also, Jones reached up toward the officers, grabbed Officer Pike's baton, and extended his arm toward Officer Osterman in a way that led him to believe that Jones was reaching for his gun.  Viewing the testimony and MVR in this light, a reasonable juror could conclude that the officers' use of force was reasonable.

However, the Court must view the evidence in a light most favorable to the Plaintiff.  *Huckaby*, 636 F.3d at 216-17.  Jones was unarmed and Officer Pike had already put out a call for additional police assistance, factors which would weigh against the need to repeatedly strike Jones.  Further, Jones was an obese man who had been maced and had been exerting himself in the struggle, so he may well have been struggling to get upright in order to catch his breath rather than simply disobeying the officers' orders.  Finally, Officers Pike and Osterman repeatedly hit Jones with barely a pause in between strikes, so it is arguable that Jones did not have an opportunity to submit to their demands to put his hands behind his back.  Viewing the facts from this perspective, a reasonable juror could conclude that Officers Pike's and Osterman's use of force was unreasonable.

Whether Officer Osterman's and Pike's decisions to repeatedly strike and jab Jones was reasonable under the circumstances depends on whether the jury accepts the view that Jones was resisting arrest or was struggling to get upright to breathe — both reasonable conclusions based

24

on the evidence.  For this reason, summary judgment on the grounds of qualified immunity is not appropriate with respect to Officer Pike's and Osterman's repeated striking and jabbing of Jones.

Summary judgment on the excessive force claim is appropriate, however, as to Officer Abrams.  At the moment he arrived on the scene, Abrams observed his fellow officers struggling to handcuff Jones, and he could have reasonably concluded that the struggle was occurring because Jones was actively resisting.  The CPD Use of Force Policy in effect at the time provided that a PR-24 baton such as the ones used by the officers in this incident "offers a less lethal method for subduing and apprehending violent and/or actively resisting subjects."  (CPD Policy 12.545.)[18]  Abrams jabbed Jones once on his left side while trying to grab Jones' left arm, which was underneath his chest.  After using the baton to jab Jones, Officer Abrams was able to pull Jones' arm back for handcuffing.  Officer Abrams then slid his baton across the parking lot. Even when viewed in a light most favorable to Plaintiffs, Officer Abrams' decision to deliver one jab to Jones so that he could gain control of Jones' arm for handcuffing was reasonable.

### c.  Chemical irritant

The following facts are undisputed: When Officer Slade arrived on the scene, Jones was on the ground but unrestrained.  Officer Slade asked if Jones had been maced, and Officer Pike said "yes."  Officer Slade said, "Let me give him pepper," and an unidentified officer said, "Go ahead."  Officer Slade then sprayed Jones in the face with pepper spray.

Defendants rely on the testimony of Officers Abrams and Pike to prove that Jones was struggling and resisting arrest at the time Officer Slade sprayed him with pepper spray.  Officer

---

[18]  The CPD Policies and Procedures in effect in 2003 are discussed in the July 19, 2004 Citizen Complaint Authority (CCA) Report regarding the death of Nathaniel Jones.  The CCA Report is attached as Exhibit 1 to the 12/08/09 deposition of Kenneth Glenn, doc. 116.

Abrams testified that Jones was jerking his arm back and forth and resisting him (Abrams Dep. 36), and Officer Pike testified that Jones was resisting by not allowing the officer to bring his arm behind his back (Pike Dep. 87).  Officer Slade also testified in his affidavit that he could see Jones straining against the officers and actively resisting their attempts to put him in handcuffs. (Slade Aff. ¶¶ 9-10.)

Plaintiffs deny that Jones was resisting arrest, citing Officer Osterman's testimony and the MVR.  The testimony of Officer Osterman on which Plaintiffs rely is as follows:

> **Q [by Plaintiffs' counsel].**  And I believe at that point [when Officer Slade arrived] — . . ., you indicated from that point on, there was — the fight was more or less over.  Just the struggle to get him handcuffed.  "He wasn't actively fighting us.  He was actively resisting us."
>
> **A [by Officer Osterman].**  Correct.

(Osterman Dep. 130.)  Contrary to Plaintiffs' characterization, Officer Osterman's testimony does not contradict the other officers' testimony that Jones was struggling at the time Officer Slade sprayed Jones with pepper spray.  In fact, Officer Osterman expressly stated that Jones was struggling and actively resisting being handcuffed.  Additionally, it is not possible to determine from the MVR that Jones is not resisting because his body is on the ground and obscured from view by the hood of Officer Pike's car.

There were four officers on the scene at the time Officer Slade sprayed Jones with pepper spray, and all four state that Jones was actively resisting arrest.  There is no admissible evidence to the contrary.  The question, then, is whether the application of pepper spray to an individual who is not fleeing, is not fighting, is unarmed, and has already been sprayed with a chemical

irritant but continues to actively resist being handcuffed violates a clearly established constitutional right.

Plaintiffs rely on *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004), as support for their position that Officer Slade violated Jones' constitutional right when he sprayed Jones with the pepper spray.  In *Champion*, after Champion was handcuffed and his feet were bound, officers continued to pepper spray Champion and to apply pressure to Champion's back as he lay on his stomach.  *Id*. at 895.  Champion died on route to the hospital.  *Id*. at 895-96.  The Sixth Circuit found that the officers were not entitled to qualified immunity.  Regarding the first prong of the qualified-immunity analysis — that the defendant violated a constitutional right — the Sixth Circuit held that the officers' acts of laying on top of a mentally retarded individual who had stopped resisting arrest and posed no flight risk, and sprayed him with pepper spray even after he was immobilized by handcuffs and a hobbling device, constituted an objectively unreasonable use of force.  *Id*. at 901.  As to the second prong of the test — whether the right was clearly established — the court found that caselaw and the evidence presented at trial about the training the officers had received demonstrated that the force exerted against Champion violated his clearly established Fourth Amendment rights.  Specifically, the Sixth Circuit had previously held that "[a] reasonable person would know that spraying mace on a blinded and incapacitated person . . . would violate the right to be free from excessive force."  *Id*. at 903 (quoting *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994)).  In addition, the officers had been trained that pepper spraying a suspect after the individual was incapacitated constituted excessive force.

*Champion* does not address the question in this case, that is, whether spraying a person who has once been sprayed with chemical irritant and is not fighting the officers but also is not complying with an officer's orders to put his hands behind his back violates clearly established rights.  Unlike Champion, Jones was not handcuffed and hobbled when he was sprayed with pepper spray.  The undisputed evidence shows that Jones was prone on the ground but was not secured; and all the officers testified that he was straining against their efforts to handcuff him.

"Courts have consistently concluded that using pepper spray is excessive force in cases where . . . the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else." *Champion*, 380 F.3d at 903 (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002)).  However, this Court is unaware of precedent that holds that the use of pepper spray on a suspect who is on the ground but is unsecured and not yielding to commands to put his hands behind his back is excessive force.  To the contrary, the Sixth Circuit has held that "in sufficiently pressing circumstances, officers may use pepper spray to take custody of unarmed suspects."  *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 774 (6th Cir. 2004) (citing *Monday v. Oullette*, 118 F.3d 1099 (6th Cir. 1997)).  Furthermore, there is no evidence that Officer Slade had ever been instructed that the use of pepper spray on an unrestrained subject who is not submitting to handcuffing would be excessive.  The Cincinnati Police Department's use of force policy in November 2003 provided that the use of chemical irritant was permissible to effect the arrest of an actively resisting subject.  (Slade Dep. Ex. 3 at 5.)  For these reasons, the Court finds that Plaintiffs have failed to demonstrate that Officer Slade unreasonably violated a clearly established right when he sprayed Jones with pepper spray.

### d.  Failure to remove handcuffs

28

It is undisputed that Officer Abrams heard Firefighter Adams ask that Jones' handcuffs be removed before Firefighter Adams began performing CPR on Jones, and that Officer Abrams did not remove Jones' handcuffs.[19]  Plaintiffs argue that it should have been apparent to Officer Abrams that his refusal to comply with the request to remove Jones' handcuffs violated the Fourth Amendment because Jones was unconscious and thus did not pose any threat and could not attempt to evade arrest by flight.

Defendants do not dispute that restraint by handcuffing is a use of force.[20]  However, they argue that leaving Jones' handcuffs on was an objectively reasonable use of force because Jones had just fought with the police officers, arguably tried to take away their weapons, and exhibited greater than normal strength.

The Court is unaware of any caselaw specifically establishing the right of an unconscious and non-breathing detainee to have his or her handcuffs removed at the request of an emergency medical care provider, and Plaintiffs cite to none.  However, the specific action in question need not have been previously held unlawful for an officer to know that what he is doing violates an individual's right to be free from excessive force.  *Anderson*, 483 U.S. at 640.  For a right to be

---

[19]  Plaintiffs allege that all the officers on the scene are responsible for a failure to remove Jones' handcuffs, but the evidence demonstrates that only Officer Abrams heard the request to remove the handcuffs.  (Abrams Aff. ¶¶ 32-34.)  Thus, only Officer Abrams is potentially liable for this particular alleged use of excessive force against Jones.

[20]  The typical excessive force claim regarding handcuffing involves allegations that an officer applied handcuffs too tightly.  Indeed, an individual's right to be free from unduly tight or excessively forceful handcuffing during the course of a seizure has been clearly established.  *Morrison*, 583 F.3d at 401.  To establish the violation of the right to be free from unduly tight or excessively forceful handcuffing, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that (1) he or she complained that the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced some physical injury resulting from the handcuffing.  *Id.*

"clearly established" for qualified immunity purposes, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right. . . . [I]n the light of pre-existing law, the unlawfulness must be apparent." *Id*.

At the time of the altercation with Jones, the contours of the right to be free from excessive force were sufficiently clear that Officer Abrams should have known that refusing to remove Jones' handcuffs at the firefighter's request was unlawful. At that moment, there were no factors weighing in favor of using any amount of force against Jones: he was not in the midst of committing a crime, he did not pose an immediate threat to the safety of officers or others, and he was not resisting. *See Floyd*, 518 F.3d at 407. While it appears that courts have stopped short of holding that any amount of force on an unconscious and non-breathing subject is excessive, such a conclusion seems inescapable in light of the broad array of caselaw establishing and applying constitutional use-of-force standards. *See*, *e.g.*, *Wysong v. City of Heath*, 260 F. App'x 848, 856 (6th Cir. 2008) ("The same cases holding that police may not use force on a subdued, non-resisting subject hold that the right to be free from physical force when one is not resisting the police is a clearly established right."); *Bultema v. Benzie Cnty.*, 146 F. App'x 28, 35 (6th Cir. 2005) ("It is well established in this circuit that the gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional."); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004) ("We have . . . consistently held that various types of force applied after the subduing of a suspect are unreasonable and a violation of a clearly established right.").

By the time the firefighters responded back to the scene, Jones was obviously subdued. In fact, a little more than two minutes elapsed between the time the officers realized Jones was

not breathing and the time Firefighter Adams asked that Jones' handcuffs be removed.  (MVR 6:03:40-6:05:50.)  The continued use of handcuffs on Jones when he had not been breathing for more than two minutes and a medical provider was attempting to provide CPR is sufficient evidence from which a reasonable juror could conclude that Officer Abrams violated Jones' constitutional right to be free from excessive force and the right was clearly established.

To summarize, Plaintiffs have met their burden of producing evidence which, viewed in a light most favorable to them, would permit a reasonable juror to find that Officers Pike and Osterman violated Jones' Fourth Amendment right to be free from excessive force when they repeatedly struck and jabbed Jones without giving him time to comply with their orders to put his hands behind his back, and that this right was clearly established at the time.  Plaintiffs similarly have met their burden regarding Officer Abrams' decision not to remove Jones' handcuffs at the firefighter's request.  Plaintiffs have failed to meet their burden as to all other aspects of their excessive force claim against the police officers.

### 2.  Adequate medical care

Pretrial detainees in the custody of police have a clearly established right to adequate medical care under the Fourteenth Amendment.  *Spears v. Ruth*, 589 F.3d 249, 254 (6th Cir. 2009); *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 604 (6th Cir. 2005); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) ("The Due Process Clause . . . require[s] the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police.").  Plaintiffs argue that the officers and supervisors on the scene violated Jones' right to adequate medical care when they failed to take steps to avoid positional asphyxia and when they failed to perform CPR on Jones.

31

"A cause of action under § 1983 for failure to provide adequate medical treatment requires a showing that the defendants acted with deliberate indifference to the serious medical needs of the pretrial detainee.  Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to [the plaintiff's] health and safety."  *Spears*, 589 F.3d at 254 (citations and internal quotation marks omitted).  The claim has both an objective and subjective component.  *Id*.  The objective component is satisfied if the plaintiff demonstrates the existence of a sufficiently serious medical need.  *Id*.  The subjective component is satisfied if the plaintiff shows that the defendants possessed "a sufficiently culpable state of mind in denying medical care."  *Id*. (quoting *Estate of Carter v. Detroit*, 408 F.3d 305, 311 (6th Cir. 2005)).

### a.  Sufficiently serious medical need

Defendants do not dispute that Jones had a serious medical need when they rolled him onto his back and discovered that he did not appear to be breathing.  However, they submit that this serious medical need did not become apparent until the moment that Jones was rolled on his back, which occurred on the MVR at 06:03:40,[21] and they claim that Jones was struggling until the moment he was handcuffed at 06:03:00.  Defendants assert that before the handcuffing process was complete, Jones did not gasp for air nor give any sign of distress.  Defendants also suggest that Jones did not have obvious symptoms of medical distress when the firefighters left the scene (visible at MVR 06:02:44) because the firefighters observed Jones looking up at the officers as they departed the parking lot in their fire truck.

---

[21]  Defendants submit that Jones was rolled on his back at MVR 06:03:32, but the Court's review of the MVR places that action eight seconds later at MVR 06:03:40.

The time at which Jones' medical need was objectively apparent is important because it has bearing on the second prong of the analysis — whether the officers had a sufficiently culpable state of mind in denying needed medical care. Contrary to Defendants' assertions, there is evidence that shows Jones' need for medical care may have been obvious before he was rolled onto his back. Jones can be heard moaning on the MVR during much of time the officers were struggling to handcuff him, but Jones lets out an abrupt shout at MVR 06:02:23 and then falls silent. Further, at 06:02:32, an unidentified speaker says, "How 'bout we roll him?" But Jones was not rolled onto his back until more than a minute later,[22] at which point the officers discovered that Jones did not appear to be breathing. The officers' decision to leave Jones on his stomach and continue to handcuff him during that minute may have had crucial consequences. The fact that at least one officer believed Jones should be rolled from his stomach more than a minute before the officers actually rolled him over could permit the factfinder to conclude that Jones' medical need to be moved off of his stomach to prevent positional asphyxia was apparent even earlier than admitted by Defendants.

### b. Sufficiently culpable state of mind

The level of culpability required to support § 1983 liability depends on the circumstances of each case. *Owensby*, 414 F.3d at 602. "The determining factor is 'whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct.'" *Id*. (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002)). In most cases concerning the medical needs of pretrial detainees, the required level of culpability is that of

---

[22] At the time the unidentified officer says, "How 'bout we roll him?" Jones was not yet handcuffed. It is only after Jones is handcuffed that Officer Slade says, "We have to get him rolled, don't we?" at MVR 06:03:24. Jones is finally rolled to his back at MRV 06:03:40.

"deliberate indifference" to the detainee's serious medical needs.  *Jones*, 521 F.3d at 560.  A

heightened level of culpability, that of malice and intent to harm, applies "when unforeseen

circumstances demand an officer's instant judgment."  *Owensby*, 414 F.3d at 603.

The Sixth Circuit, when considering Defendants' appeal from a denial of qualified

immunity at the motion to dismiss stage, held that the heightened malice standard did not apply

in this case because the Complaint alleged that the officers left Jones on the ground for a

prolonged time and "stood there and discussed the absence of fire personnel" after they noticed

Jones was not breathing.  *Jones*, 521 F.3d at 560.  Based on these allegations, the Sixth Circuit

liked this case to *Owensby*, in which the deliberate indifference standard applied because the six

minutes between taking the suspect into custody and the time medical care was provided gave

the officers "time to fully consider the potential consequences of their conduct."  *Owensby*, 414

F.3d at 603.

The Court now makes its determination of the required level of culpability based on

evidence, not allegations.  The evidence shows that the officers were trained on the risk factors

of positional asphyxia and that Jones satisfied most, if not all, of those risk factors.  Additionally,

at least one officer recognized the need to roll Jones off of his stomach more than a minute

before he was actually moved.  Accordingly, the Court again concludes that the officers had time

to fully consider the potential consequences of their conduct and that the deliberate indifference

standard applies.

To demonstrate deliberate indifference, Plaintiffs must show that each individual officer

(1) was aware of the facts from which the inference could be drawn that a substantial risk of

serious harm to Jones existed, (2) drew the inference, and (3) disregarded the risk.  *Spears*, 589

F.3d at 255. With respect to the officers' failure to take steps to prevent Jones from positional asphyxia, the Court finds that Plaintiffs have met their burden. First, the officers were aware of the facts from which the inference could be drawn that there was a substantial risk of serious harm to Jones. In February 2003, nine months before the incident involving Nathaniel Jones, each officer received a training bulletin that educated them about sudden custody deaths and positional asphyxia. That bulletin described a scenario that was nearly identical to the incident with Jones:

> A number of officers arrive on the scene of a disorderly person threatening passers-by. They observe a somewhat overweight and intoxicated individual, extremely agitated, sweating profusely, and yelling. As the officers attempt to control the individual, a violent struggle ensues. The individual ends up face down on the ground and is handcuffed. A few minutes later, the individual stops breathing.

(Streicher Dep. Ex. 1.) Each of the six officers present at the time Jones was handcuffed knew that Jones was obese and agitated, and they each participated at least in some degree in a physical struggle with Jones. Accordingly, they all knew that Jones was at risk for positional asphyxia. They all were trained to watch for labored breathing under the circumstances and to move the person into a seated position.

Further, at least one officer (who is unidentified) drew the inference from the facts that a risk of substantial harm existed even before Jones was handcuffed, saying "How 'bout we roll him?" Presumably the officer said this because, under these particular circumstances, (1) he knew that leaving Jones on his stomach increased the risk of positional asphyxia, and (2) he had been trained to watch for signs of troubled breathing. Because one officer made this inference, and all the officers on the scene were similarly situated in terms of their training and what they

35

observed on the scene, the factfinder may conclude that all the officers made that same inference. Finally, because the officers did not roll Jones off of his stomach until more than a minute after the serious medical need arguably arose, the factfinder could conclude that they disregarded the risk of harm.  Therefore, viewing the facts in a light most favorable to Plaintiffs, there is a genuine issue of material fact as to whether all six officers acted with deliberate indifference to Jones' need to be moved off of his stomach in order to prevent positional asphyxia.  The officers are not entitled to qualified immunity on Plaintiffs' claim that they violated Jones' Fourteenth Amendment right to adequate medical care by failing to take steps to prevent positional asphyxia.

Whether the officers and supervisors are entitled to qualified immunity for their alleged inaction *after* Jones stopped breathing, however, requires a different analysis.  All three supervisors arrived on the scene after the struggle was over, and Jones was rolled onto his back almost immediately after the first supervisor, Sergeant Waites, arrived.  Sergeant Waites believed Jones was dead because he was not breathing.  Plaintiffs make a specific argument that the officers and the supervisors violated Jones'  right to adequate medical care because they did not move him into a seated position *after they realized he was not breathing*.  However, the evidence is insufficient to lead a factfinder to conclude that putting Jones into a seated position *after he had stopped breathing* was deliberately indifferent to Jones' medical needs.

The training bulletin the officers received regarding positional asphyxia directs officers to move an individual into a seated position at the conclusion of a struggle and then look for signs of troubled breathing.  In other words, the bulletin instructs officers to put an individual in an upright position to *prevent* positional asphyxia.  The bulletin does not state that an officer

36

should put an individual in an upright position *after he has stopped breathing* due to positional asphyxia. To the contrary, the training bulletin cautions officers to watch for "head dropping" in an individual, stating that "[a] person physically exhausted may allow their chin to drop to their chest, which further constricts airflow." (Streicher Dep. Ex. 1.) Given that Jones could not have held his head up once he was unconscious, putting Jones in an upright position at that point would have further constricted airflow.[23]

Plaintiffs' argument that Jones should have been placed in a seated position after he stopped breathing is similar to an argument made in *Wilson v. Meeks*, 52 F.3d 1547 (10th Cir. 1995). In *Meeks*, the plaintiff insisted that "any patient with an airway blockage should be 'rolled over.'" *Id.* at 1556. However, two other witnesses contradicted that statement: the doctor stated that a person should be on his back to facilitate breathing, and the EMT stated that a patient should be turned on his side. *Id.* The Tenth Circuit concluded that "[t]o pinion the police in the center of such a medical dispute is unfair and unwise." *Id.*

The court's conclusion in *Meeks* likewise applies here, and the Court will only charge the officers with the knowledge they were given in their training. The police training bulletin on positional asphyxia states, "[i]f there are any concerns, get immediate medical assistance." When the officers realized Jones was not breathing, they called for fire to return to the scene. Because there is no evidence that the officers or the supervisors were instructed to put an unconscious person in an upright position, their failure to do so under the circumstances cannot amount to a failure to provide adequate medical care. The officers and supervisors are therefore

---

[23] Once Jones was unconscious, the only way for Jones to be put upright would have been for the officers to hold him up, and it would have been very difficult to get someone Jones' size and girth into a position where he could breathe well. (Pfalzgraf Dep. 60-61.)

entitled to qualified immunity on the specific claim that they were deliberately indifferent to Jones' medical needs when they did not put Jones in an upright position *after* he appeared to be unconscious and not breathing.

Finally, Plaintiffs claim that the officers and supervisors were deliberately indifferent to Jones' medical needs when they did not give him CPR.  Defendants respond that they did not have a duty to provide Jones with medical care themselves rather than call for medical assistance.  In *Rich v. City of Mayfield Heights*, 955 F.2d 1092 (6th Cir. 1992), the Sixth Circuit considered this question in the context of a prisoner's right to receive medical care.[24]  In *Rich*, the arresting officer found the prisoner hanging by his neck when he went to the cell to inform the prisoner of the amount of his bond.  Rather than cut the prisoner down himself, the officer immediately ran out and got help.  *Id*. at 1094.  A minute elapsed between the time he discovered the prisoner hanging and the time he got back into the cell with the paramedics.  *Id*.  The Sixth Circuit granted the officer qualified immunity after determining that there was no particularized constitutional duty on the part of jail officials to immediately cut down a prisoner found hanging in his cell rather than call for medical assistance.  *Id*. at 1097.  The court specified that the prisoner's particularized right was the right to have medical assistance summoned immediately upon the police officers becoming aware that he was in need of immediate medical care.  *Id*.  Because medical care was summoned promptly, the Sixth Circuit concluded that the prisoner's constitutional rights were not violated.  *Id*.

---

[24] The right of a prisoner to receive medical care also applies to pretrial detainees.  *Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985).

This case is factually distinguishable from *Rich* to the extent that the officers in this case arguably created Jones' medical distress, whereas in *Rich* the officer discovered the prisoner in a state of self-created medical need.  However, Plaintiffs cite no authority that holds that the Due Process Clause requires officers to render CPR themselves rather than call for medical assistance in any circumstances.  Furthermore, the Supreme Court has held that officers fulfill their constitutional obligation to provide medical care by seeing that the detainee is taken promptly to the hospital that provided treatment necessary for the injury.  *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 245 (1983).

In resolving a case which, like this one, involved a pretrial detainee's death attributed to positional asphyxiation caused by police restraint, the District Court for the Southern District of Ohio relied on *Rich* when concluding that due process requires that police officers promptly summon medical care when a detainee has been injured during apprehension.  *Owensby v. City of Cincinnati*, 385 F. Supp. 2d 626, 651 (citing *Revere*, 463 U.S. at 244-45 and *Rich*, 955 F.2d at 1097), *aff'd*, 414 F.3d 596 (6th Cir. 2005).  The parameters of the right appear to be that articulated by the Ninth Circuit in 1986 when it stated,

> The due process clause requires responsible governments and their agents to secure medical care for persons who have been injured while in police custody. . . .  We have found no authority suggesting that the due process clause establishes an affirmative duty on the part of police officers to render CPR in any and all circumstances. . . .  Due process requires that police officers seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital.

*Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986).  In short, the Court cannot extrapolate from existing law that the due process clause requires officers to provide CPR themselves, even if they have created the medical need.

Plaintiffs in this case do not present any evidence to refute Officer Pike's testimony that he requested that fire come look at Jones as soon as Jones was rolled over onto his back (Pike Dep. 92) and that Officer Johnstone called for the fire department to come back to the scene (Johnstone Aff. ¶ 29).  Someone can be heard shouting, "Fire" at MVR 06:03:47, seven seconds after Jones is rolled onto his back.  When Sergeant Battison arrived, he called for the Cincinnati Fire Department to make an expedited return to the scene.  (Battison Aff. ¶¶ 7, 9.)  Sergeant Battison then ordered the officers to move Jones from his back to his side, hoping that it would help Jones breathe.  (*Id.* ¶ 10.)  Firefighters arrived and began performing CPR on Jones at MVR 06:05:50, two minutes and ten seconds after the officers rolled Jones onto his back.  The record thus supports a conclusion that, upon rolling Jones onto his back and discovering that he did not appear to be breathing, the officers and supervisors reacted immediately by calling the fire department back to the scene and that the firefighters did arrive on the scene within minutes.  The officers and supervisors therefore did not intentionally deny Jones access to medical care after he had fallen unconscious, and they are entitled to qualified immunity to the extent Plaintiffs claim that they violated Jones' constitutional rights when they did not give him CPR.

To summarize, Plaintiffs have met their burden of producing evidence that would permit a reasonable juror to conclude that all six Defendant officers were deliberately indifferent to Jones' right to adequate medical care when they left him face down on the ground after his

serious medical need arguably arose.  Plaintiffs have failed to meet their burden as to all other aspects of their deliberate indifference claim against the police officers and supervisors.

### B.  Qualified Immunity — City Executives

Plaintiffs seek to hold former Chief Streicher and former City Manager Lemmie individually liable under § 1983 due to their supervisory roles.  Specifically, Plaintiffs argue that Streicher and Lemmie acted with deliberate indifference to the rights and safety of Jones by failing to adequately train the City's police officers.

Respondeat superior is not a proper basis for supervisory liability on a failure-to-train claim.  *See Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009); *McQueen v. Beecher Cmty. Schools*, 433 F.3d 460, 470 (6th Cir. 2006).  Rather, to hold an individual supervisor liable "under a failure-to-train theory, the [plaintiff] must point to a specific action of [the] supervisor to defeat a qualified immunity claim."  *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 544 (6th Cir. 2008).  "[A] supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it.'"  *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson Cnty.*, 668 F.2d 869, 874 (6th Cir. 1982)).  "At a minimum a plaintiff must show that the [supervisor] at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."  *Id.* (quoting *Hays*, 668 F.2d at 874).

There is no allegation in this case that Chief Streicher or Lemmie either encouraged the specific incidents of misconduct or in some other way directly participated in them.  Instead, Plaintiffs seek to hold these Defendants individually liable for establishing a policy and custom

of training and supervision that was so inadequate as to inevitably result in the violation of

Jones' rights.  As recognized by the Sixth Circuit in *Phillips*, general allegations that officers

were not properly trained "are more appropriately submitted as evidence to support a failure-to-

train theory against the municipality itself, and not the supervisors in their individual capacities."

534 F.3d at 543-44.  Plaintiffs' argument here, as it did in *Phillips*, "improperly conflates a §

1983 claim of individual supervisory liability with one of municipal liability."  *Id*. at 543; *see*

*also Everson*, 556 F.3d at 495 (finding that plaintiff attempted to conflate a § 1983 claim of

individual supervisory liability with a claim of municipal liability and noting that § 1983 liability

must be premised on more than the right to control one's employees).

To hold an individual supervisor liable in his or her individual capacity under a failure-

to-train theory, a plaintiff "must point to a specific action of each individual supervisor to defeat

a qualified immunity claim."  *Id*. at 544.  Plaintiffs in this case do not point to any specific action

by Chief Streicher that demonstrated authorization, approval, or knowing acquiescence in the

allegedly unconstitutional conduct of the officers.  As for Lemmie, Plaintiffs point to three

"facts" that they believe demonstrate her acquiescence in the officer's allegedly unconstitutional

conduct: that she (1) rejected the CCA Report's conclusions that the officers used excessive

force against Jones, (2) incorrectly articulated the CPD's use of force standard in a letter to the

CCA, and (3) refused to discipline the officers or Chief Streicher for his failure to train.  (Doc.

137 at 37.)

These "facts" are insufficient to support a finding of individual liability pursuant to §

1983 for failing to train.  First, Lemmie disagreed with the CCA Report based on her own review

of the report, videotape of the incident, and other documents.  Plaintiffs provide no authority to

support a finding that a city official's decision to accept the conclusions of an internal investigation into alleged police misconduct over the contrary conclusions of an outside investigation constitutes a ratification of an unconstitutional act. Second, Lemmie did not incorrectly articulate the CPD's use of force standard in her letter to the CCA.[25] The CPD policy Lemmie relied on in her letter expressly states that officers "must avoid using unnecessary violence." (Lemmie Dep. Ex. 2 at 2.) The fact that Lemmie concluded, based on her review of the facts available to her at the time, that the officers' conduct did not constitute unnecessary violence does not support a finding that she "knowingly acquiesced in the unconstitutional conduct of the offending officers." *Phillips*, 534 F.3d at 543. Finally, Plaintiffs do not cite any precedent holding that a failure to discipline officers or a police chief following a fatal police encounter in which there are conflicting reports and conclusions concerning police misconduct is sufficient to support individual liability on a failure-to-train claim. In sum, Plaintiffs have failed to meet their burden of pointing to specific action by either Chief Streicher or City Manager Lemmie sufficient to defeat these Defendants' entitlement to qualified immunity.

### C. Municipal Liability

---

[25] In a letter dated November 1, 2004 and addressed to Mr. Wendell M. France, Executive Director of the CCA, Lemmie explained her reasons for disagreeing with the CCA Report's conclusions and noted:

> The CCA report states that the officers used excessive force because the use of the PR-24's was not "consistent with Mr. Jones' level of resistance." However, . . . police officers are permitted to use reasonable force that is not necessarily "consistent" with the degree of resistance, as long as such actions are in accordance with CPD policy.

(Lemmie Dep. Ex. 2.) In fact, the CPD use of force policy, which Lemmie quoted in the same letter, does not specify that an officer's use of force must be "consistent" with the degree of resistance. Rather, the policy states that the officers "may use whatever force is reasonably necessary to apprehend the offender or effect the arrest, and no more."

Plaintiffs claim that the City of Cincinnati deprived Jones of the Fourth Amendment right to be free from excessive force and the Fourteenth Amendment right of a pretrial detainee to adequate medical care. A municipality can be held liable under § 1983 for an underlying constitutional violation by its officers only when execution of the municipality's policy or custom inflicts the alleged injury. *Monell v. Dep't of Soc. Servs*, 436 U.S. 658, 694 (1978). The Court having concluded that there are genuine issues of material fact as to whether the officers violated Jones' constitutional rights, it is necessary to examine whether, in fact, the City is responsible for these alleged constitutional violations. Defendants contend that the City, as well as Chief Streicher and City Manager Lemmie in their official capacities, are entitled to summary judgment on Plaintiffs' § 1983 claims because Plaintiffs have failed to bring forward any evidence to demonstrate that Jones' death was caused by an unconstitutional policy or custom of the City of Cincinnati.[26]

The Sixth Circuit has described the circumstances under which a government entity may be held liable under § 1983 as follows:

> Section 1983 does not permit a plaintiff to sue a local government entity on the theory of respondeat superior. *Monell v. New York City Dep't of Soc. Servs*., 436 U.S. 658, 692-94 (1978). A plaintiff may only hold a local government entity liable under § 1983 for the entity's own wrongdoing. *Id.* A local government entity violates § 1983 where its official policy or custom actually serves to deprive an individual of his or her constitutional rights. *Id.* A city's custom or policy can be unconstitutional in two ways: 1) facially unconstitutional as written or articulated, or 2) facially

---

[26] Plaintiffs' claims against Chief Streicher and Lemmie in their official capacities are essentially claims against the City and will be analyzed as such. *See Everson v. Leis*, 556 F.3d 484, 493 n.3 (6th Cir. 2009) ("[I]ndividuals sued in their official capacities stand in the shoes of the entity they represent." "[O]fficial-capacity suits . . . represent only another way of pleading an action against an entity of which the officer is an agent.") (internal quotations and citations omitted).

> constitutional but consistently implemented to result in
> constitutional violations with explicit or implicit ratification by
> city policymakers.  *Id.*

*Gregory v. City of Louisville*, 444 F.3d 725, 752-53 (6th Cir. 2006).  The Court will separately

examine the two components of Plaintiffs' § 1983 claim against the municipality: (1) liability for

the allegedly excessive force used against Jones and (2) liability for the alleged violation of

Jones' right to medical care.

### 1. Excessive Force

Plaintiffs argue that the City can be held liable for the officers' use of excessive force

against Jones because the City "created a culture which allowed for disregard of policies

protecting Mr. Jones' constitutional rights."  (Doc. 137 at 34.)  To support this argument,

Plaintiffs point to the facts that the officers involved in Jones' arrest were not disciplined, that

Chief Streicher testified at his deposition that it is virtually impossible to employ a metric to

evaluate whether an officer is adequately trained because of how police training occurs, and that

City Manager Lemmie understood that officers were expected to exercise "good judgment" in

their dealings with the public consistent with the rules, practices, and policies of the department.

(Doc. 137 at 35.)

The evidence shows that the City had in place a use-of-force policy and that all officers

were trained on this policy.  The use-of-force policy in place at the time of the incident, CPD

Policies and Procedures 12.545, provided as follows:

> When officers have a right to make an arrest, they may use
> whatever force is *reasonably* necessary to apprehend the offender
> or effect the arrest, *and no more*.  Just as the officers must be
> prepared to respond appropriately to rising levels of resistance,
> they must likewise be prepared to immediately de-escalate the use

45

> of force as the subject de-escalates or comes under police control.
> They must avoid using unnecessary violence.

(*See* Glenn Dep. Ex. 1 at 41.)  The CPD Policies and Procedures also described the appropriate

use of the PR-24, the side-handle baton the officers used when apprehending Jones:

> The PR-24 is an impact tool that offers a less lethal method for
> subduing and apprehending violent and/or actively resisting
> subjects.  Compared to empty hand counter strikes, the PR-24 is
> less likely to cause injury to the officer and provides added
> distance from the subject.  Officers should target a subject's torso,
> arms and legs, and avoid the subject's head, throat, neck, heart and
> groin.

(*Id*. at 42.)  Officers Osterman and Pike received training in the use of PR-24s during their initial

academy training and received additional training during in-service training.  (*See id*.; *see also*

Streicher Dep. 12.)  That Chief Streicher and City Manager Lemmie could not, during their

depositions, articulate specific metrics by which the adequacy of police training could be

measured is insufficient to create a fact question as to whether the City had an official policy or

custom that caused the alleged constitutional violation in this case.

It is true that a municipality may ratify the acts of its employees and subject itself to §

1983 liability if it fails to meaningfully investigate alleged constitutional violations.  *Otero v.

Wood*, 316 F. Supp. 2d 612, 627 (S.D. Ohio 2004).  However, Plaintiffs do not allege that the

City did not investigate Jones' death – nor could they.  There were three official investigations

into the Jones incident.  First, the CPD deployed its internal Criminal Investigation Section to

determine what happened and prepare a report for Chief Streicher.  (Streicher Dep. 23.)  That

report concluded that the officers had not violated any CPD policies and should not be

disciplined.  (Lemmie Dep. 65.)  Simultaneously, the Citizens Complaint Authority conducted its

own investigation and prepared a report.  (*Id*. at 24.)  That report concluded, among other things,

that Officers Pike, Osterman, and Abrams used an excessive number of baton strikes during Jones' arrest and recommended "severe disciplinary sanctions" against them.  (Glenn Dep. Ex. 1 at 45.)  Both the CPD internal investigation and the CCA reports were submitted to the City Manager, who reviewed both reports and decided not to discipline the involved officers. (Lemmie Dep. 63-64; Lemmie Dep. Ex. 2.)  Finally, the CPD gave its report on the incident to the Hamilton County Prosecutor's Office for a determination as to whether the officers had committed a crime.  (*Id*. at 25-26.)  On March 22, 2004, the Hamilton County Prosecuting Attorney ruled that the officers did not violate any Ohio criminal statutes.  (Glenn Dep. Ex. 1 at 33.)  While Plaintiffs are correct that the City did not discipline any of the involved officers, that in itself does not constitute evidence that the City had a custom of allowing officers to disregard police policies and procedures: a failure to discipline is not a failure to investigate.

To summarize, Plaintiffs do not present any evidence to support their assertion that the City "created a culture which allowed for disregard of policies protecting Mr. Jones' constitutional rights," nor do they otherwise demonstrate that the City's facially constitutional use-of-force policy was consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers.

### 2. Failure to Provide Adequate Medical Care

Plaintiffs claim that the City is liable for Jones' death because it was aware of the risks of positional asphyxia but failed to adequately train officers how to prevent it.  The Supreme Court recently articulated the high threshold a plaintiff must cross in order to hold a municipality liable under a failure-to-train theory:

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating

47

> citizens' rights may rise to the level of an official government
> policy for purposes of § 1983.  A municipality's culpability for a
> deprivation of rights is at its most tenuous where a claim turns on a
> failure to train. . . .  To satisfy the statute, a municipality's failure
> to train its employees in a relevant respect must amount to
> "deliberate indifference to the rights of persons with whom the
> [untrained employees] come into contact." *Canton [v. Harris]*, 489
> U.S. [378,] 388 [(1989)].  Only then "can such a shortcoming be
> properly thought of as a city 'policy or custom' that is actionable
> under § 1983."  *Id*. at 389.

*Connick v. Thompson*, 131 S. Ct. 1350, 1359-60 (2011) (internal citations omitted).  "Deliberate

indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a

known or obvious consequence of his action." *Bd. of Cnty Comm'rs of Bryan Cnty, Okl. v.*

*Brown*, 520 U.S. 397, 410 (1997).  "Thus, when city policymakers are on actual or constructive

notice that a particular omission in their training program causes city employees to violate

citizens' constitutional rights, the city may be deemed deliberately indifferent if the

policymakers choose to retain that program."  *Connick*, 131 S. Ct. at 1360 (citing *Bryan Cnty*.,

520 U.S. at 407).  "A pattern of similar constitutional violations by untrained employees is

'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Id*.

(citing *Bryan Cnty*., 520 U.S. at 409).  "Without notice that a course of training is deficient in a

particular respect, decisionmakers can hardly be said to have deliberately chosen a training

program that will cause violations of constitutional rights."  *Id*.

     Plaintiffs assert that a jury could conclude that the CPD's failure to properly train its

officers to immediately put Jones in a seated position after he was subdued and handcuffed

demonstrated a deliberate indifference to the likely violation of his constitutional right to proper

medical care.  (Doc. 137 at 23.)  Plaintiffs do not allege that there had been a "pattern of similar

constitutional violations" by Cincinnati police officers that would have put the City on notice

that its training in regard to positional asphyxia was inadequate.  However, they note that

positional asphyxia had been a part of law enforcement dialogue for many years and that, despite

this, Chief Streicher could not define what it meant for an officer to be "adequately trained" in

the prevention of positional asphyxia.  Additionally, Plaintiffs note that three years earlier, a

pretrial detainee had died from positional asphyxia after an encounter with Cincinnati police.[27]

Defendants do not dispute that positional asphyxia had been part of the national law

enforcement dialogue for many years or deny the situation that occurred in *Owensby*.  However,

Defendants maintain that the police training on positional asphyxia at the time of Jones' death

was adequate and that, even if it weren't, any deficiency in the training was unknown to the City.

As to the adequacy of the training, Defendants note that the bulletin on which all the officers

were trained says *both* to move the individual into a seated position *and, separately*, "Do not

leave the individual prone on the ground."  All the officers testified that they were familiar with

the concept of positional asphyxia and knew not to leave an arrestee lying prone on his stomach.

(Slade Dep. 50, Osterman Dep. 161-62; Abrams Dep. 45; Johnstone Dep. 35; Pike Dep. 94;

Reese Dep. 54.)  The officers did, in fact, roll Jones off of his stomach.  The issue here is

whether the amount of time it took them to do so exhibited a deliberate indifference to Jones'

right to adequate medical care.  Furthermore, Defendants note, Plaintiffs' characterization of the

---

[27]  On November 7, 2000, Cincinnati police officers apprehended a cooperative, unarmed
man whom they had mistaken for someone else.  *Owensby*, 385 F. Supp. 2d at 633-636.  There was
testimony in that case that the officers struck Owensby with their batons, pinned him in a prone
position, put pressure across his shoulders and legs, handcuffed him, and then twice maced him in
the face.  *Id*. at 634-35.  Officers then placed Owensby, who was handcuffed and unconscious, in
the back seat of a police car and did not check on him for another six minutes.  *Id*. at 636.  When
officers did check on Owensby, he was not breathing and was never successfully resuscitated.  *Id*.
at 637.

constitutional injury as a failure to put Jones *in a seated position* ignores the fact that Jones was already unconscious when he was rolled onto his back and that CPR cannot be performed on a person in a seated position. (Pfalzgraf Dep. 61.)[28] The training bulletin instructed officers to summon emergency personnel immediately if they had concerns, and the officers did that in this case.

Neither does the fact that Chief Streicher was unable to define "adequately trained" in the context of positional asphyxia demonstrate deliberate indifference to the need for additional training. Chief Streicher testified that police training was geared to enable officers to make appropriate decisions in rapidly evolving situations, and that being aware of the risks of positional asphyxia was one of many scenarios that an officer had to consider. (Streicher Dep. 144-146, 151.)[29] Nothing in Chief Streicher's testimony reflects the type of "continued adherence to an approach that they know or should have known has failed to prevent tortious

---

[28]    Plaintiffs offered no expert medical testimony to support their assertion that putting an obese, unconscious person in a seated position is preferable to rolling the person onto his side or back.

[29]    When asked to define when an officer is adequately trained in the area of positional asphyxia, Chief Streicher said:

> [T]o say that I can take positional asphyxia and say, "you're adequately trained with it," and say that there is a metrics to evaluate that is virtually impossible because of how training a police officer occurs. . . . [P]olice training is a matter of weaving together a number — a multitude of different levels of instruction to help officers make decisions in a dynamic situation that can change in a blink of an eye, and there are so many considerations that they have to maintain in their head, and those perceptions that those officers are experiencing is what helps them make the decision, and oftentimes, very rapidly, they have to make those decisions.

(Streicher Dep. 144-45.)

conduct by employees . . . — the 'deliberate indifference' — necessary to trigger municipal liability." *Bryan Cnty.*, 520 U.S. at 409.

Defendants also take issue with Plaintiffs' attempt to analogize this case to *Owensby*, stating that *Owensby* involved very different facts. The Court agrees that the facts of *Owensby* differ materially from those in this case — most notably, there was evidence in *Owensby* to support a finding that Owensby was beaten, handcuffed, and maced and placed in the back of a police car when he was already unconscious; that an officer saw Owensby in the cruiser and stated, "Can he breathe? It don't look like he can from the way he's laying;" and that regardless of all this, no officer investigated or provided medical care to Owensby for six minutes. 358 F. Supp. 2d at 635-36.

More important than the factual distinctions between these cases, though, is the point of law holding that a pattern of similar violations is ordinarily necessary to show deliberate indifference for failure-to-train purposes. *Connick*, 131 S. Ct at 1360. In *Canton v. Harris*, 489 U.S. 378 (1989), the Court left open the possibility that, "in a narrow range of circumstances," a pattern of similar violations might not be necessary to show deliberate indifference. *Id.* at 1361 (quoting *Bryan Cnty.*, 520 U.S. at 1361). Specifically, "it may happen that in light of the duties assigned to specific officers . . . the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. Plaintiffs have failed to meet their burden of producing evidence to support a finding that the need for different training on positional asphyxia was "so obvious" that it can be said that the City was deliberately indifferent to the need. Plaintiffs presented no evidence as to

the likelihood that officers will encounter a suspect who is at risk for positional asphyxia.  In fact, Chief Striecher testified that in his thirty-eight years of experience, he had never been confronted with a situation involving positional asphyxia.  (Striecher Dep. 144.)  In short, there is not enough evidence to create a genuine issue of material fact as to whether there was an obvious need for specific additional training regarding positional asphyxia in this case.

The outcome of the struggle between Jones and the officers on November 30, 2003 was tragic.  It is undisputed that the officers did not move Jones into a seated position when they realized he was unconscious and not breathing.  However, these facts and the balance of the evidence do not create a genuine issue of material fact as to whether the training provided to the police officers was inadequate or whether the City was deliberately indifferent to a need for additional or different training on how to prevent in-custody death from positional asphyxia.

### D.  Statutory Immunity as to State Law Claim

Plaintiffs claim that Defendants (except the City) are liable for violating Ohio's civil wrongful death statute, Rev. Code § 2125.01.  Defendants respond that they are entitled to immunity to the wrongful death claim under Ohio Rev. Code § 2744.03(A)(6)(b), which provides that employees of a political subdivision are immune from civil liability unless the employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner.  An Ohio appellate court recently described these three exceptions to immunity as follows:

> One acts with a malicious purpose if one willfully and intentionally acts with a purpose to cause harm.  Malice includes the willful and intentional design to do injury, or the intention or desire to harm another through conduct which is unlawful or unjustified.  Bad faith is defined as a dishonest purpose, moral obliquity, conscious wrongdoing, or breach of a known duty

52

> through some ulterior motive or ill will.  A person acts wantonly if
> that person acts with a complete failure to exercise any care
> whatsoever.  One acts recklessly if one is aware that one's conduct
> creates an unreasonable risk of physical harm to another.
> Recklessness is more than mere negligence in that the person must
> be conscious that his [or her] conduct will in all probability result
> in injury.

*Spears v. Akron Police Dept.*, No. 24847, 2010 WL 625822, at *4 (Ohio Ct. App. Feb 25, 2010)

(internal citations and quotations omitted).  Ohio courts apply a presumption of immunity.  *Cook*

*v. City of Cincinnati*, 658 N.E.2d 814, 821 (Ohio Ct. App. 1995).

Plaintiffs argue that there is a genuine issue of material fact regarding whether the

officers and supervisors acted recklessly in their conduct with Jones, thus precluding immunity.

"Recklessness is a perverse disregard of a known risk.  Recklessness, therefore, necessarily

requires something more than mere negligence.  The actor must be conscious that his conduct

will in all probability result in injury."  *O'Toole*, 118 Ohio St. 3d 374, at syllabus ¶ 3.  The

determination of recklessness is typically within the province of the jury.  *Id*. at 387.  However,

"the standard for showing recklessness is high, so summary judgment can be appropriate in those

instances where the individual's conduct does not demonstrate a disposition to perversity."  *Id*.

There is evidence in the record that could support a finding that Officers Pike and

Osterman beat Jones with their batons without giving him a chance to submit, that all the officers

were aware of the risk of death due to positional asphyxia and that Jones was at risk for such

death and that — despite this knowledge — they left him on his stomach on the ground for

approximately two minutes while placing three sets of handcuffs on him and then left him prone

on the ground for another forty seconds after he was secured in handcuffs.  Finally, there is

evidence in the record that the cause of Jones' death was positional asphyxia caused by the

violent struggle and the manner of his restraint.  Viewed in a light most favorable to Jones, the evidence is sufficient to permit a reasonable juror to conclude that the officers' actions were reckless and that their actions caused Jones' death.

To the contrary, the evidence is insufficient to create a fact dispute as to whether the three supervisors knew their conduct would, in all probability, result in injury to Jones.  All three arrived after Jones had stopped breathing.  Sergeant Waites believed Jones already was dead, Sergeant Battison summoned the fire department back to the scene and ordered the officers to roll Jones to his side to be in a position of recovery, and Sergeant Brazile was aware that the fire department had been summoned.  These facts are insufficient to satisfy the high standard for a showing of recklessness.

Finally, there is insufficient evidence to support Plaintiffs' claim that the City Manager and Police Chief caused Jones' death by recklessly failing to properly train the officers and supervisors.  As discussed above, the City trained its officers on the risks of positional asphyxia, and the officers understood from that training that they should not leave Jones on his stomach after he was subdued.  There is a genuine issue of material fact as to whether all six officers acted with deliberate indifference to Jones' need to be moved off of his stomach in order to prevent positional asphyxia.  However, this remaining fact question goes toward the officers' actions, not the adequacy of their training.  Therefore, while it is true that the training consisted only of a training bulletin that was discussed at a routine roll call,[30] Plaintiffs have failed to illuminate any evidence in the record that could create a dispute of fact as to whether the

---

[30] Sgt. Battison received training on positional asphyxia at the police academy, where he was instructed that a subject should be positioned on his side to avoid positional asphyxia.  (Battison Dep. At 17.)

54

officers' training regarding positional asphyxia was so deficient as to constitute a perverse disregard of a known risk.  To summarize, the officers are not entitled to statutory immunity on the wrongful death claim and the supervisors, City Manager, and Police Chief are entitled to statutory immunity on the wrongful death claim.

## V.  CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment of Defendant Police Officers (doc. 93) is GRANTED IN PART and DENIED IN PART.  The Motion is GRANTED on qualified immunity grounds as to Plaintiffs' Fourth Amendment claims arising out of the officers' initial contact with Jones, Officer Abrams' use of a PR-24 against Jones, and Officer Slade's use of pepper spray; and GRANTED on qualified immunity grounds as to Plaintiffs' Fourteenth Amendment claims arising out of the officers' failure to put Jones in a seated position after he was unconscious and failure to provide CPR.  The officers' Motion is DENIED as to Plaintiffs' Fourth Amendment claim arising out of Officers Pike and Osterman's repeated striking of Jones prior to handcuffing him and Officer Abrams' failure to remove Jones' handcuffs; Plaintiffs' Fourteenth Amendment claim arising out of all the officers' failure to take steps to prevent positional asphyxia; and Plaintiffs' wrongful death claim.

The Motion for Summary Judgment of Defendant Police Supervisors (doc. 97) is GRANTED on qualified immunity grounds as to Plaintiffs' Fourth and Fourteenth Amendment claims and on statutory immunity grounds as to Plaintiffs' wrongful death claim.

The Motion for Summary Judgment of the City of Cincinnati, Former City Manager Valerie Lemmie and Police Chief Streicher (doc. 103) is GRANTED on the merits as to the claims against the municipality, on qualified immunity grounds as to Plaintiffs' Fourth and

Fourteenth Amendment claims against the executives in their individual capacities, and on statutory immunity grounds as to Plaintiffs' wrongful death claim.

IT IS SO ORDERED.

___s/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court